**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>STICKY'S HOLDINGS LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>(Subchapter V)<br><br>Case No. 24-10856 (JKS)<br><br>**Re: D.I. 247**<br><br>Obj. Deadline: Aug. 28, 2024 @ 4 pm ET<br>Hearing Date: Sept. 19, 2024 @ 11 am ET |

**UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF THE**
**SUBCHAPTER V DEBTORS' PLAN OF REORGANIZATION**

Andrew R. Vara, the United States Trustee for Region 3 ("U.S. Trustee"), by and through his undersigned counsel, hereby files this objection ("Objection") to confirmation of the *Subchapter V Debtors' Plan of Reorganization* (the "Plan"), and states:

**PRELIMINARY STATEMENT**

1. The Debtors' Plan should not be confirmed in its present form because it (1) extracts non-consensual third-party releases from holders of claims or interests that (a) vote to accept the Plan, unless they also check an opt-out box on the ballot, (b) vote to reject the Plan, unless they also check an opt-out box on the ballot, (c) are entitled to vote and do not cast a ballot, including those who may not have received the solicitation materials, and (d) are presumed to accept the plan, unless they opt out of the third-party releases by completing and returning an opt-

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Sticky's Holdings LLC (3586); Sticky Fingers LLC (3212); Sticky Fingers II LLC (7125); StickyFingers IIILLC (3914); Sticky Fingers IV LLC (9412); Sticky Fingers V LLC (1465); Sticky Fingers VI LLC (0578); Sticky'sBK I LLC (0423); Sticky's NJ 1 LLC (5162); Sticky Fingers VII LLC (1491); Sticky's NJ II LLC (6642); StickyFingers IX LLC (5036); Sticky's NJ III LLC (7036); Sticky Fingers VIII LLC (0080); Sticky NJ IV LLC (6341);Sticky's WC 1 LLC (0427); Sticky's Franchise LLC (5232); Sticky's PA GK I LLC (7496); Stickys Corporate LLC(5719); and Sticky's IP LLC (4569). The Debtors' mailing address is 21 Maiden Lane, New York, NY 10038.

out election form, despite these parties not being entitled to vote, and (2) proposes to treat the whole Plan as a settlement, which it is not.

2.     First, the failure to opt out of a third-party release does not constitute affirmative consent to same under governing contract law.  The Supreme Court in *Purdue* did not "express a view on what qualifies as a consensual release." *Harrington v. Purdue Pharma L.P.*, 603 U.S. ___, 144 S. Ct. 2071, 2088 (2024).  But from the Supreme Court's pronouncement that non-consensual releases of non-debtors by non-debtors are not authorized under the Bankruptcy Code, it follows that proposed "consensual" releases must be heavily scrutinized as to whether they are indeed consensual.  Here, the Plan's third-party release provisions must be stricken because silence is not affirmative consent.

3.     This Court has previously found that "the opt out mechanism is not sufficient to support the third party releases. . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *In re Washington Mut., Inc.,* 442 B.R. 314, 355 (Bankr. D. Del. 2011) (Walrath, J.).  This Court has also rejected the Debtors' argument that deeming consent from silence "should be approved as typical, customary, and routine." *Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (Owens, J.).  In *Emerge*, this Court held that "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" to treat "a party's silence or inaction" as the necessary "affirmative consent." *Id.*

4.     Second, the Plan contains an impermissible provision whereby the whole Plan is proposed to be treated as a settlement.  The Plan is not a settlement; the Plan is governed by the applicable confirmation standards under the Code.  Plan § 6.9.

5. Accordingly, as explained below, confirmation of the Debtors' Plan should be denied.

## JURISDICTION AND STANDING

6. Under (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine confirmation of the Plan and this Objection.

7. Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with the administrative oversight of cases commenced pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). This duty is part of the U. S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.),* 898 F.2d 498, 500 (6th Cir. 1990) (describing the U. S. Trustee as a "watchdog").

8. Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in Chapter 11 cases and to comment on such plans and disclosure statements.

9. The U.S. Trustee has standing to be heard on Plan confirmation pursuant to 11 U.S.C. § 307.

## BACKGROUND

10. These cases were filed on April 25, 2024. The Debtors elected to proceed under subchapter V of chapter 11 of the Bankruptcy Code.

11. On April 26, 2024, the U.S. Trustee appointed Natasha Songonuga to serve as the subchapter V trustee.

12. On July 24, 2024, the Debtors filed the Plan. [D.I. 247]. On July 26, 2024, the Court entered an order scheduling the hearing to consider confirmation of the Plan for September 19, 2024, at 11 a.m. ET and approved certain solicitation procedures. [D.I. 249]. The Court set the voting deadline and the confirmation objection deadline for August 28, 2024. [D.I. 249].

*Relevant Plan Provisions*

13. Section 6.9 of the Plan contains the following provision casting the provisions of the Plan as a settlement:

> **Compromise and Settlement of Claims and Controversies**
>
> Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and in consideration for the Distributions and other benefits provided pursuant to this Plan**, the provisions of this Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest**, or any Distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

Plan § 6.9 (emphasis added).

14. Section 6.11 of the Plan provides for Releases by Holders of Claims and Equity Interests (the "Third Party Release[s]"):

> **Releases by Holders of Claims and Equity Interests**
>
> On the Effective Date, except as otherwise provided herein and except for the right to enforce this Plan, **all persons (i) who voted to accept this Plan or who are presumed to have voted to accept this Plan but did not affirmatively mark the box on the ballot to opt out of granting the releases provided under this Plan and (ii) who voted to reject this Plan but did not affirmatively mark the box on the ballot to opt out of granting the releases provided under this Plan,** under section 1126(f) of the Bankruptcy Code shall, to the fullest extent permitted by applicable law, **be deemed to forever release, and waive the Released Parties of**

4

**and from all liens, claims, causes of action, liabilities, encumbrances, security interests, interests or charges of any nature or description whatsoever based or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases or affecting property of the Estate, whether known or unknown, suspected or unsuspected, scheduled or unscheduled, contingent or not contingent, unliquidated or fixed, admitted or disputed, matured or unmatured, senior or subordinated, whether assertable directly or derivatively by, through, or related to any of the Released Parties and their successors and assigns whether at law, in equity or otherwise, based upon any condition, event, act, omission occurrence, transaction or other activity, inactivity, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date in any way relating to or arising out of, in whole or in part, the Debtor, the Debtors' prepetition operations, governance, financing, or fundraising, the purchase or sale of the Debtors' securities, the Chapter 11 Cases, the pursuit of Confirmation of this Plan, the consummation of this Plan or the administration of this Plan, including without limitation, the negotiation and solicitation of this Plan, all regardless of whether (a) a Proof of Claim or Equity Interest has been filed or is deemed to have been filed, (b) such Claim or Equity Interest is allowed, or (c) the Holder of such Claim or Equity Interest has voted to accept or reject this Plan**, except for willful misconduct, gross negligence, fraud or criminal misconduct; *provided*, *however*, that the Debtors shall not be a Released Party until the Last Distribution Date if the Plan is confirmed under section 1191(b) of the Bankruptcy Code. Nothing contained herein shall impact the right of any Holder of an Allowed Claim or Interest to receive a Distribution on account of its Allowed Claim or Allowed Interest in accordance with this Plan.

Plan § 6.11 (emphasis added).

15. Section 9.83 of the Plan lists the definition of "Released Party":

**"Released Party"** means each of the following: (a) the Debtors (but only if the Plan is confirmed under section 1191(a) of the Bankruptcy Code); (b) Greer; (c) the Debtors' officers and directors; (d) Pashman; (e) Aprio Wealth Management; (f) Dine Technology, LLC; (g) Capital Road Advisors Management LLC; and (h) Kurtzman Carson Consultants LLC (dba Verita), *provided that,* if the Plan is confirmed under section 1191(b), such parties shall be a Released Party only on the Last Distribution Date.

Plan § 9.83.

16. Section 6.13 of the Plan, titled "Injunction Related to Third Parties," provides:

From and after the Effective Date, all persons who have held, hold or may hold Claims against or Equity Interests in the Debtors are permanently enjoined from commencing or continuing in any manner, any Cause of Action released, to be released or discharged pursuant to this Plan, or the Confirmation Order, from and after the Effective Date, to the extent of the releases, exculpation, and discharge

5

> granted in this Plan, all Holders of Claims or Equity Interests shall be permanently enjoined from commencing or continuing in any manner against the Released Parties and the Exculpated Parties and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to this Plan. except as otherwise expressly provided in this Plan, the Plan Supplement or related documents, or for obligations issued pursuant to this Plan, all persons who have held, hold or may hold Claims or Equity Interests that have been released, discharged, or are subject to exculpation, are permanently enjoined, from and after the Effective Date, from taking any of the following actions: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such persons on account of or in connection with or with respect to any such Claims or Equity Interests; (c) creating, perfecting or enforcing any encumbrance of any kind against such persons or the property or estates of such persons on account of or in connection with or with respect to any such Claims or Equity Interests; and (d) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released, settled or discharged pursuant to this Plan.

Plan § 6.13.

## ARGUMENT

**I.     The Combined Plan Is Not Confirmable Because It Proposes Non-Consensual Third-Party Releases That Are Not Authorized Under the Bankruptcy Code.**

17.     In *Purdue Pharma*, 144 S. Ct. at 2082-88, the Supreme Court held that non-consensual third-party releases are not authorized under the United States Bankruptcy Code.

18.     Contract principles govern whether a release is consensual. *In re SunEdison, Inc.*, 576 B.R. 453, 458 (S.D.N.Y. Bankr. 2017). Contract principles govern because a third-party release is essentially a settlement between a non-debtor claimant and another non-debtor. Here, the Debtors do not meet the state-law burden of establishing that the releasing parties have expressly consented to release their property rights nor to having that release memorialized in the Plan.

19.     The "general rule of contracts is that silence cannot manifest consent." *Patterson v. Mahwah Bergen Ret. Grp., Inc.*, 636 B.R. 641, 686 (E.D. Va. 2022).

20. Using Delaware common law as a point of reference, silence does not equal consent except under limited circumstances not applicable here. *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)).

21. As a general rule of contract construction:

> Acceptance by silence is exceptional. Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance. See Comment b to § 53. The usual requirement of notification is stated in § 54 on acceptance by performance and § 56 on acceptance by promise. The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak. The exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds. See Chapter 5.

RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

22. Silence and inaction, however, will generally not be deemed assent to an offer because Delaware follows the "mirror image" rule, requiring the acceptance to be identical to the offer. *See Urban Green Techs., LLC v. Sustainable Strategies* 2050 LLC, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017); *see also Patterson*, 636 B.R. at 686 (contract law does not support consent by failure to opt out). "[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance." *See Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) (citations omitted; quoting RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981): "The mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting.").

23. Just like it is legal error to define consent in a manner inconsistent with state law, it is error to presume it exists. As discussed above, consent arises when two sets of parties affirmatively assent to something. *See* 1 VOSS ON DELAWARE CONTRACT LAW § 2.05 (citing *Loveman v. The NuSmile, Inc.*, C.A. No. 08C-08-223 MJB, memo. op. at *7 (Del. Super. Ct. Mar. 31, 2009) (Brady, J.). A party seeking to include non-debtor releases in a bankruptcy plan must show that they are consensual. To do so, state law requires that mutually agreeing third parties must come forward, state their consent affirmatively, and ask the court to memorialize their consent in a plan. Nothing in the Code authorizes bankruptcy courts to extinguish claims by inferring consent outside the bounds of state law.

24. The Debtors propose that the Third-Party Releases in the Plan, which benefit numerous non-debtors that are Released Parties, bind: (i) all parties who vote to accept the Plan, unless they check an opt-out box on the returned ballot, (iii) those who vote to reject the Plan, unless they check an opt-out box on the returned ballot, (iii) all creditors in voting classes who do not return a ballot with an opt-out election; (iv) claimants or holders of interests in non-voting classes who are deemed to accept the plan, unless they complete and return an opt-out election form; and (v) unclassified claimants.[2] Because the Plan forces third-party releases on these parties without their affirmative consent, the releases are non-consensual and cannot be approved under *Purdue*.

25. First, merely voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

---

[2] The Plan at Section 6.11 states that the release applies and is effective "regardless of whether (a) a Proof of Claim or Equity Interest has been filed or is deemed to have been filed, (b) such Claim or Equity Interest is allowed, or *(c) the Holder of such Claim or Equity Interest has voted to accept or reject this Plan.*" *See* Plan at § 6.11 (emphasis added). The emphasized qualifier appears to suggest that the Third-Party Release is given by those Holders who do not vote on the Plan, classified or unclassified.

Voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*. Those voting on the chapter 11 plan have not "manifest[ed] [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. *Id*. Nor are they "silently tak[ing] offered benefits" from the released non-debtors, *id.*, such that consent may be inferred. The only benefits received are through distributions from the debtor's chapter 11 plan—there are no benefits provided from the released non-debtor to the releasing claimant. Further, because the plan's distributions are not contingent on agreeing to the non-debtor release, one cannot infer consent from the acceptance of those distributions.

26. Thus, in *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015), the United States Bankruptcy Court for the Southern District of New York rejected the idea that the independent consent to a third-party release required under contract law should be inferred from a vote cast on a chapter 11 plan:

> If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and 'consented' to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***

*Id.* at 79 (emphasis added). Similarly, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that the failure to opt out of a third-party release does not constitute the requisite affirmative consent to bind the releasing party under contract law. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id*. at 688.

27. As this Court noted in *Emerge*, "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent through a party's silence or inaction. *Emerge*, 2019 WL 7634308, at *18.

28. The Debtors may try to distinguish these cases from *Emerge* based on the argument that *Emerge* dealt with creditors and shareholders who were receiving no distribution under the plan. However, the Court's decision in *Emerge* was not expressly limited to such a factual situation. To the contrary, the Court's recognition that failure to return a ballot or opt-out election form can be due to "carelessness, inattentiveness, or mistake," rather than constituting the manifestation of an intent to agree to a third-party release, would be applicable regardless of whether a creditor or interest holder was to receive a distribution under a plan.

29. Second, the plan imposes nondebtor releases on those who vote to reject the Plan, unless they check an opt-out box on the returned ballot. But it is even more obvious that those who vote to reject a plan are not consenting merely through silence by failing to opt out of the nondebtor release. *See Chassix*, 533 B.R. at 79.

30. Whether or not a creditor votes to accept or reject the plan, such creditors may not have understood the solicitation package, and may not have possessed the time or financial resources to engage counsel, never imagining that their rights against non-debtors could be extinguished through the bankruptcy of these Debtors.

31. Third, creditors in voting classes who do not vote and do not opt out of the third-party releases shall also be stripped of their direct claims against non-debtors. For the reasons discussed above, no consent can be inferred from this silence. Further, such creditors (a) may never have received the solicitation package, or received it late, due to mail errors or delays, or (b) received the solicitation package timely, completed same and returned it to the balloting agent but,

through no fault of their own, the ballot never reached the balloting agent, or the ballot was received late.

32. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix*, 533 B.R. at 88. Moreover, the court in *SunEdison* observed that solicited parties may have failed to vote for reasons other than an intention to assent to the releases. *See SunEdison*, 576 B.R. at 461.[3]

33. Fourth, the non-consensual Third-Party Releases will also be imposed on unimpaired claimants or holders of interests who are not permitted to vote on the plan, but who receive a notice informing them that, unless they check an opt out box on the Non-Voting Status and Opt-Out Form to opt out of giving third-party releases, they will be deemed to have consented to same. For the same reasons discussed in *Chassix* and *Emerge*, such "deemed consent" from silence does not constitute the affirmative consent required to support a consensual release.

34. Fifth, the non-consensual Third-Party Releases will apparently be imposed on holders of administrative claims and priority tax claims. *See* Plan at § 6.11 (third-party release binding regardless of whether "*the Holder of such Claim or Equity Interest has voted to accept or reject this Plan.*") (emphasis added). The claims to be released include direct claims that unimpaired parties hold against numerous non-debtors. The scope of the release of their direct claims against non-debtors is far broader than the claims upon which they will be paid. The release covers any claims against non-debtors Released Parties that are:

---

[3] Not all decisions from this District have required affirmative consent for third party releases. In *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013), this Court reached a different conclusion than that of *Emerge* and the other cases cited above concerning the need for affirmative consent to third party releases.

11

> of any nature or description whatsoever based or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Case or affecting property of the Estate, whether known or unknown, suspected or unsuspected, scheduled or unscheduled, contingent or not contingent, unliquidated or fixed, admitted or disputed, matured or unmatured, senior or subordinated, whether assertable directly or derivatively by, through, or related to any of the Released Parties and their successors and assigns whether at law, in equity or otherwise, based upon any condition, event, act, omission occurrence, transaction or other activity, inactivity, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date in any way relating to or arising out of, in whole or in part, the Debtors, the Debtors' prepetition operations, governance, financing, or fundraising, the purchase or sale of the Debtors' securities, the Chapter 11 Case, the pursuit of Confirmation of this Plan, the consummation of this Plan or the administration of this Plan, including without limitation, the negotiation and solicitation of this Plan, . . .

Plan § 6.11 (in pertinent part).

35.    So, for example, a taxing authority whose priority claim against the Debtors is proposed to be paid in full under the Plan (as required by the Code) could later be subject to an argument by a Released Party that it has no obligation to pay taxes in connection with revenue received from transactions with the Debtors because, under the Plan, the taxing authority has been deemed to release the Released Party for all claims related in any manner to the Debtors.

36.    For all of these classes of creditors, conspicuous warnings in the disclosure statement, on the plan ballots, or on an opt-out form that silence or inaction will constitute consent to a release are not sufficient to convert their silence into consent to the non-debtor release. *See SunEdison*, 576 B.R. at 458-61. In *SunEdison*, the debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *Id.* at 460. The court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be

attributable to other causes). *Id.* The debtors did not contend that an ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak. *Id.*

37. In sum, there will be no affirmative consent to Third-Party Releases given by numerous persons and entities on whom such releases will be imposed. Such releases are therefore non-consensual.

38. This Court also may not approve the injunction enforcing the "opt out" release by parties in interest against non-debtors because *Purdue* clearly stands for the proposition that non-consensual third-party releases are not permitted by the Bankruptcy Code. *See Purdue Pharma*, 144 S.Ct. at 2088. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related. *See Purdue Pharma*, 144 S. Ct. at 2085 (citing 11 U.S.C. § 524(e)). Even if non-debtor releases are consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief because, if the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent "immediate and irreparable harm" to either the estates or the released parties. A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those releases.[4] Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

---

[4] Section 6.13 of the Plan appears to be an injunction to enforce the Third-Party Release, but it also contains reference to claims and interests "discharged." To the extent this injunction is also meant to enforce the Debtors' discharge, the injunction should comport with section 1192 of the Code.

## II. The Plan Is Impermissibly Deemed to Be a Settlement

39. Section 6.9 of the Plan provides:

**Compromise and Settlement of Claims and Controversies**

Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

Plan § 6.9

40. Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).

41. Section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims that creditors and interest holders may have against it, which is what Plan § 6.9 seeks to do. *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest belonging to the debtor or to the estate.' . . . It is significant that there is no parallel authorization regarding claims against the estate.") (quoting section 1123(b)(3)(A)) (internal citation omitted).

42. The resolution of claims against the Debtors is governed by sections 1129 and 1141.

43. A plan may incorporate one or more negotiated settlements, but a plan is not itself a settlement. Sending a plan to impaired creditors for a vote is not equivalent to parties negotiating

14

a settlement among themselves. A "settlement" is "an agreement ending a dispute or lawsuit." BLACK'S LAW DICTIONARY (10th ed. 2014). An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *Id.*

44. Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee [or chapter 11 debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

45. The decision whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Washington Mut.*, 442 B.R. at 338 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)). In contrast, chapter 11 plans are subject to the requirements of Bankruptcy Code sections 1123 and 1129. What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the plan context is different from what may be permissible under a plan.

46. Here, Plan § 6.9 purports to treat the Plan itself as if it were a Rule 9019 "settlement." Further, it appears § 6.9 is not limited to settling claims belonging to the Debtor or the estates. Thus, § 6.9 exceeds the scope of what can be settled under section 1123(b)(3)(A). Rule 9019 cannot authorize the court to approve something the Supreme Court held no Bankruptcy Code provision permits. Section 2075 of title 28 commands that bankruptcy rules shall not abridge

substantive rights. To the extent Rule 9019 might be read as permitting a *Purdue* violation, this reading would be wrong, and prohibited both by section 2075 and Supreme Court precedent.

47. Unless § 6.9 is narrowed so that (i) it pertains only to claims the Debtors are settling against others and (ii) the Plan itself is not a settlement, the Plan does not comply with section 1123(b)(3)(A) and does not satisfy section 1129(a)(1).

## CONCLUSION

In conclusion, for the reasons specified above, the U.S. Trustee requests that confirmation of the Plan be denied, or in the alternative, the Court direct that the Plan be modified to address his concerns listed above.

**Dated:** August 28, 2024

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: /s/ *Jonathan W. Lipshie*
Joseph F. Cudia
Jonathan W. Lipshie
Trial Attorneys
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: 202-567-1124
E-Mail joseph.cudia@usdoj.gov
          jon.lipshie@usdoj.gov

## **CERTIFICATE OF SERVICE**

I, Jonathn Lipshie, counsel to Andrew R. Vara, the United States Trustee for Regions 3 and 9, do hereby certify that on this 28th day of August 2024, I caused a true and correct copy of the *United States Trustee's Objection to Confirmation of the Subchapter V Debtors' Plan of Reorganization* to be served as follows:

**Via ECF Notification and Electronic Mail:**

COUNSEL FOR DEBTORS:

John W. Weiss, Esquire
Joseph C. Barsalona II, Esquire
Pashman Stein Walder Hayden, P.C.
824 North Market Street, Suite 800
Wilmington, Delaware, 19801-1242
jweiss@pashmanstein.com
jbarsalona@pashmanstein.com

Richard Solow, Esquire
Katherine R. Beilin, Esquire
Pashman Stein Walder Hayden, P.C.
21 Main Street, Suite 200
Hackensack, NJ 07601
rsolow@pashmanstein.com
kbeilin@pashmanstein.com

SUBCHAPTER V TRUSTEE:

Natasha Songonuga, Esquire
Archer & Greiner, P.C.
300 Delaware Avenue, Suite 1100
Wilmington, Delaware, 19801
Nsongonuga@archerlaw.com

/*s/ Jonathan Lipshie*
Jonathan Lipshie