**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Sticky's Holdings LLC, *et al.*, | Case No. 24-10856 (JKS) |
| Debtors.[1] | Jointly Administered |

**BRIEF IN SUPPORT OF CONFIRMATION OF SUBCHAPTER V
DEBTORS' MODIFIED FIRST AMENDED PLAN OF REORGANIZATION**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Sticky's Holdings LLC (3586); Sticky Fingers LLC (3212); Sticky Fingers II LLC (7125); Sticky Fingers III LLC (3914); Sticky Fingers IV LLC (9412); Sticky Fingers V LLC (1465); Sticky Fingers VI LLC (0578); Sticky's BK I LLC (0423); Sticky's NJ 1 LLC (5162); Sticky Fingers VII LLC (1491); Sticky's NJ II LLC (6642); Sticky Fingers IX LLC (5036); Sticky's NJ III LLC (7036); Sticky Fingers VIII LLC (0080); Sticky NJ IV LLC (6341); Sticky's WC 1 LLC (0427); Sticky's Franchise LLC (5232); Sticky's PA GK I LLC (7496); Stickys Corporate LLC (5719); and Sticky's IP LLC (4569). The Debtors' mailing address is 21 Maiden Lane, New York, NY 10038.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...........................................................................................................4
   I.   Procedural History ................................................................................4
   II.  The US Foods Settlement ......................................................................8
   III. The Plan Solicitation and Notification Process ....................................9

ARGUMENT ...............................................................................................................10
   I.   The Plan Satisfies the Disclosure Requirements of 11 U.S.C. § 1190. ......................10
   II.  The Plan Satisfies the Confirmation Requirements of a Plan Under 11 U.S.C.
      § 1191(b). ....................................................................................11
   III. The Plan Satisfies the Applicable Provisions of 11 U.S.C. § 1129(a). ......................12

    A.     The Plan Complies with Section 1129(a)(1). ....................................12

        a.   The Plan Complies with the Requirements of Section 1122. ................12
        b.   The Plan Satisfies the Mandatory Requirements of Section 1123(a). ......13
            i.      Section 1123(a)(1) ............................................13
            ii.     Section 1123(a)(2) ............................................14
            iii.    Section 1123(a)(3) ............................................14
            iv.    Section 1123(a)(4) ............................................14
            v.      Section 1123(a)(5) ............................................14
            vi.    Section 1123(a)(6) ............................................15
            vii.   Section 1123(a)(7) ............................................15
            viii. Section 1123(a)(8) ............................................15
        c.   The Consensual Release Provisions and the Exculpation Provision Under the
           Plan Are Consistent with Section 1123(b) ....................................16
            i.      The Debtors' Releases Are Appropriate and Should be Approved ...........16
            ii.     The Third-Party Releases Are Consensual and Should Be Approved .......18
            iii.    The Exculpation Provision Should Be Approved ...........................24

    B.     The Plan Complies with Section 1129(a)(2). ....................................28

    C.     The Plan Complies with Section 1129(a)(3). ....................................29

    D.     The Plan Complies with Section 1129(a)(4). ....................................30

    E.     The Plan Complies with Section 1129(a)(5). ....................................31

    F.     Section 1129(a)(6) Is Inapplicable. ..............................................31

    G.    The Plan Complies with Section 1129(a)(7). ....................................31

    H.    The Requirements of Section 1129(a)(8) is Inapplicable Because the Debtors are
        Seeking Confirmation Pursuant to Section 1191(b) of the Bankruptcy Code ....32

**I.**      **The Plan Complies with Section 1129(a)(9).**...........................................................33

**J.**      **The Requirements of Section 1129(a)(10) is Inapplicable Because the Debtors are Seeking Confirmation Pursuant to Section 1191(b) of the Bankruptcy Code**....35

**K.**      **The Plan Complies with Section 1129(a)(11).**.........................................................35

**L.**      **Section 1129(a)(12) is Inapplicable.** ....................................................................37

**M.**      **Section 1129(a)(13) is Inapplicable.** ...................................................................38

**N.**      **Section 1129(a)(14) is Inapplicable.** ...................................................................38

**O.**      **Section 1129(a)(15) is Inapplicable.** ...................................................................38

**P.**      **Section 1129(a)(16) is Inapplicable.** ...................................................................38

**IV.**   **The Plan Meets All of the Confirmation Requirements Under Section 1191(b) and (c) of the Bankruptcy Code.**...........................................................................39

**A.**      **The Plan is Fair and Equitable Pursuant to Section 1191(c) of the Bankruptcy Code** ...........................................................................................................39

      **a.**    **The Plan Satisfies the First Requirement of Section 1191(c)** ............................40
      **b.**    **The Plan Satisfies the Second Requirement of Section 1191(c)**.........................40
      **c.**    **The Plan Satisfies the Third Requirement of Section 1191(c)**...........................43

**B.**      **The Plan Does Not Unfairly Discriminate as to Class 3** .....................................43

**V.**    **The Settlement with US Foods Should be Approved Pursuant to Bankruptcy Rule 9019**...........................................................................................................44

**CONCLUSION** .........................................................................................................**48**

# TABLE OF AUTHORITIES

Page(s)

Cases

*In re Premier Int'l Holdings, Inc.,*
2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ................................................26

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
526 U.S. 434 (1999) ...........................................................................................32

*Frito-Lays Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.),*
10 F.3d 944 (2d Cir. 1993) ..................................................................................12

*Harrington v. Purdue Pharma, L.P.,*
144 S. Ct. 2071 (2024) ............................................................ 2, 16, 19, 20

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II),*
994 F.2d 1160 (5th Cir. 1993) ..............................................................................35

*Iberiabank v. Geisen (In re FFS Data, Inc.),*
776 F.3d 1299 (11th Cir. 2015) ...........................................................................23

*In re 203 N. LaSalle St. P'ship,*
190 B.R. 567 (Bankr. N.D. Ill. 1995) ...................................................................43

*In re Aegean Marine Petroleum Network, Inc.,*
599 B.R. 717 (Bankr. S.D.N.Y. 2019) .................................................................26

*In re Alecto Healthcare Services, LLC,*
2024 WL 1208355 ...............................................................................................42

*In re Arsenal Intermediate Holdings, LLC,*
2023 WL 2655592 (CTG) ......................................................... 19, 20, 21, 24

*In re Aztec Co.,*
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ..............................................................43

*In re Bally Total Fitness,*
2007 WL 2779438 (Bankr. S.D.N.Y Sept. 7, 2007) .............................................28

*In re Channel Clarity Holdings LLC,*
2022 WL 3710602 (Bankr. N.D. Il. July 19, 2022) ..............................................41

*In re Combustion Eng'g, Inc.,*
391 F.3d 190 (3d Cir. 2004) .................................................................................29

*In re Coram Healthcare Corp.,*
315 B.R. 321 (Bankr. D. Del. 2004) .............................................................. 16, 17

*In re Drexel Burnham Lambert Grp., Inc.,*
138 B.R. 723 (Bankr. S.D.N.Y. 1992) .................................................................13

*In re Drexel Burnham Lambert Grp., Inc.,*
960 F.2d 285 (2d Cir. 1992) ................................................................................26

*In re Elsinore Shore Assocs.,*
91 B.R. 238 (Bankr. D.N.J. 1988) .......................................................................30

*In re Enron Corp.,*
326 B.R. 497 (S.D.N.Y. 2005) ......................................................................25, 26

*In re Essar Steel Minn.,*
652 B.R. 709 (Bankr. D. Del. 2023) ............................................................. 19, 21

*In re Exaeris, Inc.*,
    380 B.R. 741 (Bankr. D. Del. 2008) ...................................................................17
*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) .....................................................................44
*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996)..............................................................43
*In re Future Energy Corp.*,
    83 B.R. 470 (Bankr. S.D. Ohio 1988) ..................................................................30
*In re Ionosphere Clubs, Inc.*,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989) ...................................................................13
*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987) ..............................................................................13
*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...................................................................12
*In re K.D. Co., Inc.*,
    254 B.R. 480 (B.A.P. 10th Cir. 2000)..................................................................23
*In re Key3Media Group, Inc.*,
    336 B.R. 87 (Bankr. D. Del. 2005) ......................................................................45
*In re Landing Assoc., Ltd.*,
    157 B.R. 791 (Bankr. W.D. Tex. 1993) ...............................................................36
*In re Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) ...............................................................................29
*In re Martin*,
    91 F.3d 389 (3d Cir. 1996) ..................................................................................45
*In re Neshaminy Office Bldg. Assoc's*,
    62 B.R. 798 (Bankr. E.D. Pa. 1986).....................................................................45
*In re Nite Lite Inns*,
    17 B.R. 367 (Bankr. S.D. Cal. 1982) ...................................................................29
*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ....................................................................12
*In re Penn. Truck Lines, Inc.*,
    150 B.R. 595 (E.D. Pa. 1992)...............................................................................45
*In re Platinum Oil Props., LLC*,
    465 B.R. 621 (Bankr. D.N.M. 2011).....................................................................23
*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) ............................................................... 25, 26, 27, 29
*In re Resort Int'l, Inc.*,
    145 B.R. 412 (Bankr. D.N.J. 1990).......................................................................30
*In re Sea Garden Motel and Apartments*,
    195 B.R. 294 (Bankr. D. N.J. 1996).....................................................................35
*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) ....................................................................17
*In re Spansion*,
    No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. April 16, 2010) ............26
*In re Sun Country Dev., Inc.*,
    764 F.2d 406 (5th Cir. 1985) ...............................................................................30

*In re Texaco Inc.*,
   84 B.R. 893 (Bankr. S.D.N.Y. 1988) ...................................................................29
*In re Toy & Sports Warehouse, Inc.*,
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) ...................................................................12
*In re Trinity Family Practice & Urgent Care PLLC*,
   2024 WL 2704056............................................................................................41, 42
*In re Urgent Care Physicians, Ltd.*,
   2021 WL 6090985 (Bankr. E.D. Wis. Dec. 20 2021) ......................................41, 42
*In re Wash. Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ................................................................26, 28
*In re World Health Alts., Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) ....................................................................17
*In re Young*,
   2021 WL 1191621 (Bankr. D.N.M. Mar. 26, 2021) .............................................41
*IRS v. Kaplan (In re Kaplan)*,
   104 F.3d 589 (3d Cir. 1997) .................................................................................36
*Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988) ...........................................................................12, 29
*Penn Cent. Transp. Co.*,
   596 F.2d 1127 (3d Cir. 1979) ...............................................................................45
*Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968)........................................................................................45, 46
*Silverman v. Tracar, S.A. (In re Am. Preferred Prescription, Inc.)*,
   255 F.3d 87 (2d Cir. 2001) ...................................................................................23
*Traders State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.)*,
   917 F.2d 1210 (9th Cir. 1989) ..............................................................................29
*U.S. v. Energy Res. Co.*,
   495 U.S. 545 (1990).............................................................................................36
*United States v. Reorganized CF&I Fabricators, Inc.*,
   518 U.S. 213 (1996).............................................................................................32

Statutes

11 U.S.C. § 1122(a) ....................................................................................12, 13
11 U.S.C. § 1129(a) ................................................................ ii, 12, 32, 35
11 U.S.C. § 1183(c) .........................................................................................11
11 U.S.C. § 1190............................................................................... ii, 10, 11
11 U.S.C. § 1190(1)–(2)..................................................................................10
11 U.S.C. § 1191(b) ..................................................................................passim
11 U.S.C. § 1191(e) ........................................................................... 11, 33, 34
11 U.S.C. §§ 1122 and 1123 ......................................................................12, 13
11 U.S.C. §§ 1126(c)–(d)................................................................................32
11 U.S.C. §§ 1129(a)(5)(A), (B)......................................................................31
11 U.S.C. §§ 1181(c), 1192..............................................................................11
28 U.S.C. § 1930..............................................................................................37
Bankruptcy Code section 1182(1) .....................................................................4
Section 1114 of the Bankruptcy Code ..............................................................38

Section 1123 of the Bankruptcy Code ............................................................................16
Section 1123(a) ...............................................................................................................13
Section 1123(a)(1) ..........................................................................................................13
Section 1123(a)(2) ..........................................................................................................14
Section 1123(a)(3) ..........................................................................................................14
Section 1123(a)(4) .....................................................................................................14, 44
Section 1123(a)(5) .....................................................................................................14, 15
Section 1123(a)(6) ..........................................................................................................15
Section 1123(a)(7) ..........................................................................................................15
Section 1123(a)(8) .....................................................................................................15, 16
Section 1123(b) ...............................................................................................................16
Section 1123(b)(3)(A) of the Bankruptcy Code ........................................................16, 17
Section 1126 of the Bankruptcy Code ..............................................................................9
section 1129 of title 11 of the United States Code............................................................1
Section 1129(a)(1) .......................................................................................................ii, 12
Section 1129(a)(2) ...............................................................................................ii, 28, 29
Section 1129(a)(3) ...............................................................................................ii, 29, 30
Section 1129(a)(4) .................................................................................................ii, 30
Section 1129(a)(5) .................................................................................................ii, 31
Section 1129(a)(6) .................................................................................................ii, 31
Section 1129(a)(7) .................................................................................................ii, 31
Section 1129(a)(8) ...........................................................................................ii, 32, 33
Section 1129(a)(9) ...........................................................................................ii, 33, 36
section 1129(a)(9)(A) .......................................................................................................33
section 1129(a)(9)(C) .......................................................................................................34
Section 1129(a)(10) ...............................................................................................ii, 35
Section 1129(a)(11) ...........................................................................................ii, 35, 37
Section 1129(a)(12) ...............................................................................................ii, 37
Section 1129(a)(13) ...............................................................................................ii, 38
Section 1129(a)(14) ...............................................................................................ii, 38
Section 1129(a)(15) ...............................................................................................ii, 38
Section 1129(a)(16) ..............................................................................................iii, 38
section 1129(b) ...............................................................................................................43
section 1129(b)(2)(A) .................................................................................................39, 40
Section 1141(a) of the Bankruptcy Code ........................................................................23
Section 1181(a), Section 1129(a)(15) of the Bankruptcy Code ......................................38
section 1190(1)(A) of the Bankruptcy Code ..................................................................10
section 1190(1)(B) of the Bankruptcy Code...................................................................10
section 1190(1)(C) of the Bankruptcy Code...................................................................11
Section 1191(a) of the Bankruptcy Code ..........................................................11, 17, 38
Section 1191(b) and (c) of the Bankruptcy Code .....................................................iii, 39
Section 1191(c) of the Bankruptcy   Code ...............................................................passim
Section 1191(c)(2)(A) of the Bankruptcy Code ...................................................40, 41, 42
Sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code .........................................5
Sections 1107 and 1108 of the Bankruptcy Code...............................................................4
U.S.C. § 1129(a)(9)..........................................................................................................33

U.S.C. § 1191(c) .................................................................................................40
§ 365 of the Bankruptcy Code ...........................................................................34
§ 1191 .................................................................................................................41

Rules

Fed. R. Bankr. P. 9019(a) ..............................................................................44, 45
Rule 9019......................................................................................................45, 47

Other Authorities

H.R. Rep. No. 95-595
    (1977) ...........................................................................................................12
S. Rep. No. 95-989
    (1978) ...........................................................................................................12
The Pros and Cons of the Small Business Reorganization Act of 2019,
    36 Emory Bankr. Dev. J. 383 (2020) ..........................................................41

The above-captioned debtors and debtors in possession (the "Debtors"), hereby submit this memorandum of law (the "Confirmation Brief") filed (i) in response to the (a) *United States Trustee's Objection to Confirmation of the Subchapter V Debtors' Plan of Reorganization* [D.I. 292] (the "UST Objection") and (b) *Sticky Fingers Restaurants LLC's Objection to Subchapter V Debtors' Plan of Reorganization and Reservation of Rights* [D.I. 293] (the "SFR Objection"), and (ii) in support of confirmation of the *Subchapter V Debtors' Modified First Amended Plan of Reorganization* [D.I. 368] (as may be modified, amended, or supplemented from time to time, the "Plan")[1] and, pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code") and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      On April 25, 2024 (the "Petition Date"), the Debtors commenced their cases (the "Bankruptcy Cases") with the intention of confirming a plan of reorganization.  On July 24, 2024, the Debtors filed their *Subchapter V Debtors' Plan of Reorganization* [D.I. 121] (the "Initial Plan").  On October 11, 2024, the Debtors filed the *Subchapter V Debtors' First Amended Plan of Reorganization* [D.I. 335] (the "Amended Plan").   On October 21, 2024, the Debtors filed the currently proposed Plan.

2.      The Debtors have worked productively throughout this proceeding with the United States Trustee, the Subchapter V Trustee, and their significant creditors and major equity holders. As detailed in the Finley Declaration (defined below), the Debtors' financial projections attached as Exhibit B to the Plan (the "Financial Projections") were carefully drafted to maximize recoveries for all Creditors.  In fact, the Debtors' efforts have procured a Plan where the only impaired Class—Class 3 (General Unsecured Claims)—voted to accept the Plan.  However, given

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

that Administrative Expense Claims will be paid over a period of time pursuant to the Plan, the Debtors seek confirmation pursuant to section 1191(b) of the Bankruptcy Code.

3.      Notwithstanding the Debtors' efforts, certain aspects of the Plan are contested by the United States Trustee, specifically with respect to the validity of the Third-Party Releases.  As the Debtors will address in further detail below, however, the Third-Party Releases should be approved because this Court has addressed the issue of opt-outs post-*Purdue* in at least three cases, and the opt-out mechanism, like the one provided in the Class 3 Ballot and the "Non-Voting Status Notice with Respect to Debtors' Plan and Release Opt-Out Election" (the "Non-Voting Status Notice and Opt-Out Form"),[2] is sufficient to find it is a consensual release consistent with the requirements of the United States Supreme Court's decision in *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071 (2024).  Importantly, pursuant to the Plan, the only parties that are deemed to consent to the Third-Party Releases are those that are *classified* Holders of Claims or Equity Interests, who also fail to affirmatively opt-out of the Third-Party Releases on their respective Ballot or Non-Voting Status Notice and Opt-Out Form.  No other party, including Holders of Administrative Expense Claims and Priority Tax Claims, are deemed to consent to the Third-Party Releases.

4.      Additionally, Sticky Fingers Restaurants, LLC ("SFR")—the plaintiff in the Pre-Petition IP Litigation, who holds a wholly unliquidated Claim—took issue with the financial projections attached to the Initial Plan, the distributions to General Unsecured Creditors, the three-year term of the Plan, and the Third-Party Releases.  However, none of SFR's arguments have any

---

[2]    Each Holder of a Claim or Interests classified in Classes 1, 3, and 4 received a Non-Voting Status Notice and Opt-Out Form.

merit, particularly considering the extensive detail set forth in the Finley Declaration regarding the Financial Projections and feasibility of the Plan.

5.      In light of the UST Objection and SFR Objection, as well as an unexpected increase in both costs of goods and Administrative Expense Claims, the Debtors determined it was necessary to revise their financial projections attached to the Initial Plan, as well as to raise additional funds to satisfy their obligations pursuant to the revised Financial Projections, which are attached to this Plan.  Therefore, prior to the Effective Date, certain Holders of Equity Interests agreed to infuse $300,000 of new capital into the Debtors in the form of new equity, for the purpose of bolstering the Debtors' balance sheet and making necessary distributions pursuant to the Plan (the "Equity Raise").  This Equity Raise has been completed by the Debtors.

6.      The Plan provides significantly better treatment for Creditors compared to the Initial Plan, including increasing distributions to General Unsecured Creditors from $56,123—as set forth in the Initial Plan—to $260,840 (an increase of over 350%).

7.      The Plan also provides for a settlement with US Foods, given the critical nature of the relationship between US Foods and the Debtors.  As set forth herein, entry into the US Foods Settlement is in the best interests of the Estates and is a sound exercise of the Debtors' business judgment.

8.      Accordingly, the Debtors respectfully submit that the Plan should be confirmed pursuant to section 1191(b) of the Bankruptcy Code.

## BACKGROUND

9.       On the Petition Date, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code as debtors defined in Bankruptcy Code section 1182(1) and the Debtors elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code pursuant to the Small Business Debtor Reorganization Act, as amended.

10.      On April 26, 2024, Natasha Songonuga was appointed as the Subchapter V Trustee (the "Subchapter V Trustee").   No other trustee, examiner, or official committee has been appointed in these cases.   The Debtors are operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### I.       Procedural History

11.      Shortly after the Petition Date, the Debtors took numerous steps to implement their restructuring.   First, the Debtors began the process of analyzing their executory contracts and unexpired leases and determined, in their business judgment, that certain leases and related personal property were unnecessary and burdensome to the Debtors' estates and that the costs incurred under such leases and related personal property constituted an unnecessary drain on the Debtors' already limited resources.   Accordingly, on May 30, 2024, the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing the Rejection of Unexpired Leases; (II) Authorizing the Abandonment of Certain Personal Property, Effective as of May 31, 2024; (III) Offsetting Landlord 1450 Broadway, LLC's Rejection Damages Net of its Exercised Letter of Credit; and (IV) Granting Related Relief* [D.I. 153] (the "First Rejection Motion").   On June 18, 2024, the Bankruptcy Court entered an order approving the First Rejection Motion [D.I. 177]. Additionally, on September 30, 2024, the Debtors filed their *Second Omnibus Motion for Entry of an Order (I) Authorizing the Rejection of Certain Executory Contracts, Effective as of September*

4

*30, 2024 and (II) Granting Related Relief* [D.I. 326] (the "Second Rejection Motion").  On October 22, 2024, the Bankruptcy Court entered an order approving the Second Rejection Motion [D.I. 370].

12.     Further, during these Chapter 11 Cases, the Debtors retained certain professionals to implement their restructuring.  To this end, on the Petition Date, the Debtors filed the *Debtors' Application for Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date* [D.I. 4] (the "Claims Agent Motion" retaining "Verita").[3]  The Court entered an order approving the Debtors' Claims Agent Motion on April 26, 2024 [D.I. 42].

13.     On April 29, 2024, the Debtors filed the *Debtors' Application for Entry of an Order Under Sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016 and Local Rules 2014-1 and 2016-1 Authorizing Retention and Employment of Pashman Stein Walder Hayden, P.C. as Counsel for the Debtors Nunc Pro Tunc to the Petition Date* [D.I. 66].  The Court entered an order approving the retention of Pashman Sten Walder Hayden, P.C. ("Pashman") on May 16, 2024 [D.I. 103].

14.     On May 30, 2024, Debtors filed the *Debtors' Motion for Entry of an Order Approving Procedures for the Retention and Compensation of Ordinary Course Professionals Nunc Pro Tunc to the Petition Date* [D.I. 152] (the "OCP Motion").  To that end, on June 17, 2024, the Court entered a related order approving the OCP Motion, allowing for the Debtors' continued retention of Aprio Wealth Management, LLC, Dine Technology, LLC, and Garden Road Capital Advisors, LLC [D.I. 172].

---

[3]     Kurtzman Carson Consultants, LLC is now doing business as Verita Global.

15.     On October 21, 2024, the Debtors filed the Plan.  The Plan contemplates utilizing all of the Debtors' projected Disposable Income over a period of three (3) years towards payment of Allowed General Unsecured Claims (Class 3), with Administrative Expense Claims and Priority Tax Claims being paid in full over the term of the Plan.  Furthermore, the Plan contemplates that: (a) the SBA's Secured Claim (Class 1) will be reinstated and paid in full in accordance with the terms of the EIDL Loan; (b) the Other Secured Claims (Class 2) will either be reinstated or Holders of such Claims shall receive value that leaves their Secured Claim unimpaired; and (c) Equity Interests will retain those Equity Interests as they existed at the commencement of these Chapter 11 Cases.

16.     On July 30, 2024, the Court entered the *Order (I) Scheduling a Hearing on Plan Confirmation and Deadlines Related Thereto: (II) Approving the Solicitation, Notice and Tabulation Procedures and the Forms Related Thereto; and (III) Granting Related Relief* [D.I. 247] (the "Solicitation Order"), which, among other things, set the hearing to consider the confirmation of the Plan ("Confirmation").

17.     Verita caused solicitation materials, notice of the deadline for objecting to confirmation of the Plan, and related notices, forms, and Ballots to be distributed on July 31, 2024, and continuing thereafter (the "Solicitation Packages"), as evidenced by, among other things, the Certificate of Service [D.I. 262].

18.     On August 21, 2024, the Debtors filed the Plan Supplement [D.I. 268] (the "Plan Supplement"), which contained the List of Assumed Executory Contracts and Unexpired Leases, was distributed on August 28, 2024, as evidenced by, among other things, the Affidavit of Service [D.I. 291].

19.     On August 28, 2024, the United States Trustee filed the UST Objection asserting: (a) the Third-Party Releases (defined below) are inappropriate because the UST believes they are non-consensual under *Purdue*; and (b) the Initial Plan included a section called "Compromise and Settlement of Claims and Controversies" (the "Settlement Provision"), which impermissibly deemed the entire Plan to be a settlement.  In the Plan, the Debtors removed the Settlement Provision.[4]  Therefore, the only issue remaining with respect to the UST Objection is pertaining to the Third-Party Releases.

20.     On August 28, 2024, SFR filed the SFR Objection, generally asserting: (1) the Debtors' financial projections attached to the Initial Plan are not sufficiently detailed to establish feasibility; (2) the Plan does not provide for sufficient distributions to Holders of General Unsecured Claims; and (3) the Third-Party Releases are inappropriate.

21.     On October 21, 2024, the Debtors filed the Plan along with amended Financial Projections.  As set forth in the Plan, the Debtors' equity holders have infused the Debtors with $300,000 of additional liquidity in the form of an Equity Raise to fund Plan payments.

22.     On November 6, 2024, Verita filed the *Declaration of Darlene S. Carlderon with Respect to the Tabulation of Votes on the Subchapter V Debtors' Plan of Reorganization* [D.I. 377] (the "Voting Declaration") to certify the tabulation of votes in connection with the Plan.

23.     Contemporaneous with the filing of this Confirmation Brief, the Debtors are filing the *Declaration of Jamie Greer in Support of Confirmation of Subchapter V Debtors' Modified First Amended Plan of Reorganization* [D.I. 379] (the "Confirmation Declaration"), the *Declaration of Zachary Finley in Support of Confirmation of Subchapter V Debtors' Modified First Amended Plan of Reorganization*  [D.I. 378] (the "Finley Declaration"); and the proposed

---

[4]     Although the Debtors removed the Settlement Provision, the Plan provides for the US Foods Settlement.

Confirmation Order as an exhibit to the *Notice of Proposed Findings of Fact, Conclusions of Law, and Order Confirming Subchapter V Debtors' Modified First Amended Plan of Reorganization* (the "Proposed Confirmation Order").

## II.    The US Foods Settlement

24.    Pursuant to the *Master Distribution Agreement*, effective December 3, 2023, by and between Debtor Sticky's Holdings Inc. and US Foods (the "MDA"), US Foods supplies the Debtors with food and other products that are essential to the continued operation of Debtors' businesses.   Given the essential nature of US Foods's goods and services, it is critical that the Debtors maintain their relationship with US Foods under their currently favorable trade terms. Therefore, as further described in the Plan, the Debtors and US Foods agreed to the US Foods Settlement.

25.    Pursuant to the US Foods Settlement:

a.    The Debtors shall assume the MDA pursuant to the Plan Supplement and List of Assumed Executory Contracts and Unexpired Leases.

b.    US Foods' Administrative Expense Claim and Cure Claim shall be paid on the schedule identified on the Disposable Income Projections (the "US Foods Payment Schedule").

c.    US Foods shall not be permitted to exercise its contractual right to terminate the MDA pursuant to Section 5(a) of the MDA (titled "Termination without Breach") until at least one (1) year following the Effective Date; *provided that* the Debtors timely make the scheduled payments set forth in the US Foods Payment Schedule; *provided further* that if the Debtors fail to timely make a scheduled payment set forth in the US Foods Payment Schedule, US Foods shall provide the Debtors written notice of such default and permit the Debtors the ability to cure such default within five (5) business days after receipt of such notice.   For the sake of clarity, US Foods will maintain its right to terminate the MDA pursuant to Sections 5(b) and (c) of the MDA (titled "Termination for Nonpayment and Termination for Breach") upon written notice.   If the Debtors breach the MDA or US Foods Settlement for non-payment and as a result of such non-payment, US Foods terminates the MDA, the Debtors' obligation to pay US Foods' Administrative Expense Claim and Cure Claim in accordance with the US Foods Payment Schedule will be unaffected.

8

### III.    The Plan Solicitation and Notification Process

26.    Pursuant to Section 1126 of the Bankruptcy Code, only Holders of Class 3 General Unsecured Claims are entitled to vote on the Plan. 11 U.S.C. § 1126.

27.    The following table summarizes the Classes of Claims and Equity Interests under the Plan and whether such Classes are entitled to vote to accept or reject the Plan:

| Class | Description | Treatment | Impairment | Entitled to Vote |
|-------|-------------|-----------|------------|------------------|
| 1 | SBA's Secured Claim | The SBA's Secured Claim shall be reinstated on the Effective Date and paid in accordance with the terms of the EIDL Loan. | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Depending on the applicable Allowed Secured Claim, each Holder shall receive: (1) reinstatement of the subject Allowed Secured Claim; or (2) value that leaves such Allowed Secured Claim otherwise unimpaired. | Unimpaired | No (Presumed to Accept) |
| 3 | General Unsecured Claims | Pro rata payment in monthly installments from Disposable Income commencing in June 2027 and ending on the Last Distribution Date. | Impaired | Yes |
| 4 | Equity Interests | Maintain Existing Equity | Unimpaired | No (Presumed to Accept) |

28.    The voting results, as reflected in the Voting Declaration, are summarized as follows:

| Total Ballots Counted | | | | | |
|---|---|---|---|---|---|
| Voting Class | Accepting | | Rejecting | | Class Voting Results |
| | Number | Amount | Number | Amount | |
| Class 3 General Unsecured Claims | 2 (66.67%) | $417,652.58 (99.99%) | 1 (33.3%) | $1 (>1%) | Accepting |

29.     As set forth above and in the Voting Declaration, Class 3 is the only class entitled to vote under the Plan.  66.67% of ballots submitted by Holders of General Unsecured Claims (Class 3) voted to accept the Plan.

## **ARGUMENT**

### I.     **The Plan Satisfies the Disclosure Requirements of 11 U.S.C. § 1190.**

30.     Pursuant to Section 1190 of the Bankruptcy Code, a plan filed under subchapter V:

> 1)  shall include –
>
> A.   a brief history of the business operations of the debtors;
>
> B.  a liquidation analysis; and
>
> C.  projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization;
>
> 2)  shall provide for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan.

11 U.S.C. § 1190(1)–(2).

31.     These sections describe key events which have transpired before and during the bankruptcy cases, and satisfy section 1190(1)(A) of the Bankruptcy Code.  Further, a Liquidation Analysis, showing that Creditors and Equity Interest Holders will receive at least as much under the Plan as such Holders would receive in a liquidation under Chapter 7 of the Bankruptcy, was attached as Exhibit C to the Plan, thereby satisfying section 1190(1)(B) of the Bankruptcy Code.  Finally, the Debtors attached financial projections, as Exhibit B thereto, evidencing their ability to make payments

under the Plan, and satisfying section 1190(1)(C) of the Bankruptcy Code. Accordingly, the Plan satisfies Section 1190 and should be confirmed.

## II. The Plan Satisfies the Confirmation Requirements of a Plan Under 11 U.S.C. § 1191(b).

32.     A Subchapter V plan can be confirmed consensually under Section 1191(a) of the Bankruptcy Code if all requirements of Section 1129(a) other than Subsection 1129(a)(15) are met. 11 U.S.C. § 1191(a). If a consensual plan is confirmed under Section 1191(a), the Subchapter V Trustee's service is terminated upon "substantial consummation." 11 U.S.C. § 1183(c). Also, if a consensual plan is confirmed under Section 1191(a), the debtor receives its discharge on the effective date of the plan under Section 1141(d). *See also* 11 U.S.C. §§ 1181(c), 1192.

33.     Alternatively, if sections 1129(a)(8), (10), and (15) are not met, a plan can be confirmed on a non-consensual basis under Section 1191(b), so long as the plan does not unfairly discriminate as to classes of creditors and interest that did not accept the plan. Also, "a plan that provides for the payment through the plan of a claim of a kind specified in paragraph (2) or (3) of 507(a) [of the Bankruptcy Code]" may be confirmed under section 1191(b) of the Bankruptcy Code. *See* 11 U.S.C. § 1191(e).

34.     Here, the Plan is consensual given that the only class entitled to vote on the Plan, Holders of Class 3 General Unsecured Claims, voted to accept the Plan. Accordingly, sections 1129(a)(8) and 1129(a)(10) are satisfied. Additionally, Administrative Expense Claims are being paid in full through the Plan in accordance with section 1191(e) of the Bankruptcy Code. As set forth below, the Plan is confirmable under Section 1191(b) as it meets all other applicable requirements of Section 1129(a) and is "fair and equitable" as that term is defined in section 1191(c) of the Bankruptcy Code.

35. Thus, as outlined below, the Plan satisfies Section 1191(b) and should be confirmed under Subchapter V.

### III. The Plan Satisfies the Applicable Provisions of 11 U.S.C. § 1129(a).

#### A. The Plan Complies with Section 1129(a)(1).

36. Section 1129(a)(1) of the Bankruptcy Code requires that a plan "complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of 11 U.S.C. § 1129(a)(1) explains that this provision encompasses the requirements of 11 U.S.C. §§ 1122 and 1123 governing classification of claims and contents of a plan, respectively. H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986); *In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

37. As discussed herein, the Plan fully complies with all of the applicable provisions of the Bankruptcy Code, including Sections 1122 and 1123 of the Bankruptcy Code and, therefore, it should be confirmed.

#### a. The Plan Complies with the Requirements of Section 1122.

38. Section 1122 provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to other claims or interests of such class." 11 U.S.C. § 1122(a). Courts have recognized that plan proponents have significant flexibility under Section 1122 in classifying claims. *See Frito-Lays Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (affirming separate classification where rational basis existed for classification scheme). Indeed, as one court noted, "even in the context of reorganization, a majority of both cases and commentators have rejected the concept that all

creditors of equal rank must receive equal treatment." *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989). Courts will generally approve placement of similar claims in different classes, provided there is a rational or reasonable basis to do so. *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar.") (citation omitted); *see also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987) ("The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes.").

39.     Here, the Plan contains four (4) separate classes of claims and interests, with each class containing substantially similar claims or interests as required by Section 1122—Small Business Administration's Secured Claim (Class 1), Other Secured Claims (Class 2), General Unsecured Claims (Class 3), and Equity Interests (Class 4). Each of the four classes are dissimilar and, therefore, are properly classified separately under the Plan. Based on the foregoing, the Debtors submit that the Plan complies with the provisions of Section 1122 and should be confirmed.

### b.  The Plan Satisfies the Mandatory Requirements of Section 1123(a).

40.     The Plan complies with the applicable provisions of Section 1123(a).

### i.      Section 1123(a)(1)

41.     Section 1123(a)(1) requires a plan to designate classes for all claims and interests, other than the types of claims specified in Section 507(a)(2) (administrative expense claims), Section 507(a)(3) (claims arising during the "gap" period in an involuntary bankruptcy case) and 507(a)(8) (priority tax claims). 11 U.S.C. § 1123(a)(1). The Plan expressly classifies all claims

and interests against the Debtors, other than Administrative Claims and Priority Tax Claims, which are unclassified under the Plan.

### ii.    Section 1123(a)(2)

42.    Section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. §1123(a)(2).  Article 2 of the Plan identifies the Small Business Administration's Secured Claim (Class 1), Other Secured Claims (Class 2), and Equity Interests (Class 4) as unimpaired.  This requirement is satisfied.

### iii.    Section 1123(a)(3)

43.    Section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3).  Article 2 of the Plan details the treatment of General Unsecured Claims (Class 3) as an impaired class under the Plan.  This requirement is satisfied.

### iv.    Section 1123(a)(4)

44.    Section 1123(a)(4) requires that a plan provide that each claim or interest in a particular class receive the same treatment as other members of the same class. 11 U.S.C. § 1123(a)(4).  Article 2 of the Plan satisfies this requirement by providing that each claim or interest that is classified in a particular Class under the Plan will receive the same treatment as the other claims and interests included in such Class.

### v.    Section 1123(a)(5)

45.    Section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and sets forth examples of typical means for implementing a plan.  11 U.S.C. § 1123(a)(5).  The Plan provides that it will be funded by the proceeds realized from operations of the Debtors.  Additionally, the Plan will also be funded by the Equity Raise, which will bolster the

Debtors' balance sheet and allow the Debtors to make necessary distributions.  On Confirmation of the Plan, all property of the Debtors, both tangible and intangible, will revert to the Debtors, free and clear of all Claims and Equity Interests except as provided in the Plan.  Based on the foregoing, the Debtors submit the Plan complies with the requirements of section 1123(a)(5) of the Bankruptcy Code.

### vi.  Section 1123(a)(6)

46.     Section 1123(a)(6) of the Bankruptcy Code prohibits the issuance of non-voting equity securities and requires that reorganized debtors' charters so provide.  The Plan does not provide for issuance of non-voting equity securities and so this section of the Bankruptcy Code is inapplicable.

### vii.  Section 1123(a)(7)

47.     Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).  Here, Holders of Equity Interests will maintain their existing Equity Interests as they existed on the Petition Date and applicable non-bankruptcy law.  Further, the Plan specifies the Reorganized Debtors' post-confirmation management in Article 2.7 of the Plan.  As such, the Plan complies with this section.

### viii.  Section 1123(a)(8)

48.     Section 1123(a)(8) requires that, in a case in which the debtor is an individual, the plan provides for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future

income of the debtor as is necessary for the execution of the plan. 11 U.S.C. § 1123(a)(8). This section of the Bankruptcy Code is inapplicable because the Debtors are corporations.

**c. The Consensual Release Provisions and the Exculpation Provision Under the Plan Are Consistent with Section 1123(b)**

49.     The Plan provides for the releases of certain claims by the Debtors and the Reorganized Debtors (the "<u>Debtors' Releases</u>"), as well as consensual releases for the Debtors' pre- and post-petition professionals (the "<u>Third-Party Releases</u>," and together with the Debtors' Releases, the "<u>Release Provisions</u>"). Furthermore, the Plan exculpates estate fiduciaries that are critical to the Chapter 11 Cases (the "<u>Exculpation Provision</u>"). The Release Provisions and Exculpation Provision are integral components of the Plan, are consistent with the Bankruptcy Code, and comply with applicable case law and recent precedent, and, as such, should be approved.

50.     But for *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071 (2024), it is likely that this Court would overrule the UST Objection, given the favor with which this Court historically viewed release opt-out procedures, particularly where, as here, creditors who vote to accept the plan may affirmatively opt out of the third-party releases. Put simply, this Court may rule on the third-party release issues presented as if *Purdue* did not exist because *Purdue* is abundantly clear that the law relating to (i) consensual releases and (ii) what constitutes consent, remain undisturbed.

**i. The Debtors' Releases Are Appropriate and Should be Approved**

51.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a Chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or the estate." *See* 11 U.S.C. § 1123(b)(3)(A); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that the standard for approval of a settlement under section 1123 of the Bankruptcy Code is generally the same as under Bankruptcy Rule 9019). Courts in

16

the Third Circuit typically approve a settlement by a debtor if the settlement "exceed[s] the lowest point in the range of reasonableness." *See, e.g.*, *In re Coram Healthcare*, 315 B.R. at 330 (citations omitted); *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (citations omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that the settlement must be "within the reasonable range of litigation possibilities") (internal quotation marks omitted).  Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."  *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citing section 1123(b)(3)(A) of the Bankruptcy Code) (internal quotation marks omitted).

52.     Article 6 of the Plan provides for a customary release of any and all Causes of Action, including derivative claims, of the Released Parties,[5] each Holder of a Claim or Equity Interest entitled to vote to accept or reject the Plan that votes to accept the Plan, each Holder of a Claim or Equity Interest that is unimpaired and presumes to accept the Plan, and parties related to each of the foregoing in connection with, among others, the Debtors, their restructuring efforts and documents, the Chapter 11 Cases, and the Plan.

53.     The Debtors' Releases are a valid exercise of the Debtors' business judgment, and are fair, reasonable, and in the best interests of the Debtors' Estates.  The Released Parties made valuable contributions to the restructuring process and efforts to negotiate and implement the Plan. Among other things, the Released Parties participated in negotiations with the Debtors in

---

[5]   "Released Party" means each of the following (a) the Debtors (but only if the Plan is confirmed under section 1191(a) of the Bankruptcy Code); (b) Greer; (c) the Debtors' officers and directors; (d) Pashman; (e) Aprio Wealth Management, LLC; (f) Dine Technology, LLC; (g) Garden Road Capital Advisors, LLC and (h) Kurtzman Carson Consultants LLC (dba Verita); *provided that*, if the Plan is confirmed under section 1191(b), such parties shall only be Released Parties on the Last Distribution Date.

connection with the development of the Plan that ultimately resulted in a confirmable Plan and are integral for implementation of the Plan.

54.     The Debtors' Releases are essential to the Plan because they constitute an integral part of the restructuring.  As described above, each of the Released Parties made contributions to the Chapter 11 Cases or will do so as a means to implement the Plan, and did or will do so with the understanding that they will receive releases from the Debtors.  Without the Released Parties' support, the Debtors would not be in a position to confirm the Plan.

55.     Accordingly, the Debtors' Releases are fair and equitable and in the best interests of the Debtors' Estates and should be approved.

### ii.     The Third-Party Releases Are Consensual and Should Be Approved.

56.     The UST Objection argues that the Plan "extracts non-consensual third-party releases from holders of claims or interests that (a) vote to accept the Plan, unless they also check an opt-out box on the ballot, (b) vote to reject the Plan, unless they also check an opt-out box on the ballot, (c) are entitled to vote and do not cast a ballot, including those who may not have received the solicitation materials, and (d) are presumed to accept the plan, unless they opt out of the third-party releases by completing and returning an opt-out, despite these parties not being entitled to vote . . ."  *See* D.I. 292 at 1.  Additionally, the SFR Objection notes that SFR believes "the overly broad release, injunction and exculpation provisions, regardless of the 'Opt-Out' provision, create impermissible third-party releases."  *See* D.I. 293 at 23.  For the reasons set forth below, these UST Objections should be overruled, as they rehash arguments which have been rejected by this Court and others.  But for *Purdue*, it is likely that this Court would overrule these UST Objections, given the favor with which this Court historically viewed opt-out procedures, particularly where, as here, only *classified* Holders of Claims or Equity Interests, who also fail to

affirmatively opt-out of the Third-Party Releases on their respective Ballot or Non-Voting Status Notice and Opt-Out Form, consent to the Third-Party Releases.  Put simply, this Court may rule on the third-party release issues presented as if *Purdue* does not exist because *Purdue* is abundantly clear that the law relating to (i) consensual releases and (ii) what constitutes consent, remain undisturbed.

57.     The Third-Party Releases should be approved because this Court has addressed the issue of opt-outs both pre- and post-*Purdue* in *In re Jambys, Inc.*, No. 24-10913 (KBO); *In re Smallhold, Inc.*, No. 24-10267 (CTG), 2024 Bankr. LEXIS 2332, at *1 n.1 (Bankr. D. Del. Sep. 25, 2024); *In re Gigamonster Networks, LLC*, No. 23-10051 (JKS), *In re Arsenal Intermediate Holdings, LLC*, 2023 WL 2655592 (CTG) (Bankr. D. Del. Mar. 27, 2023) and *In re Essar Steel Minn.*, 652 B.R. 709, 720 (Bankr. D. Del. 2023), and the proposed opt-out mechanism in these cases, like the one provided in the Non-Voting Status Notice and Opt-Out Form and Class 3 Ballots, is sufficient to find it is a consensual release consistent with *Purdue*.

58.     The UST Objection does not explain how *Purdue* changed existing law concerning consensual releases, and indeed cannot explain how *Purdue* changed such existing law, because *Purdue* itself held that it has no effect on the current state of the law on consensual third-party releases.  The holding in *Purdue* is limited to the validity of nonconsensual third-party releases, and has no effect on the existing law regarding consensual third-party releases.

59.     No part of the *Purdue* decision disturbs the forgoing approach and interpretation of this Court.  In *Purdue*, the Supreme Court held that the Bankruptcy Code does not "authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants."  *Purdue Pharma*, 144 S. Ct. at 2088.  The Supreme Court went on to expressly, carefully note that its

holding applied only to nonconsensual third-party releases like those suggested in favor of the Sackler family in the *Purdue* plan, cautioning that ""[a]s important as the question we decide today are ones we do not.  Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan ..."" *Purdue Pharma*, 144 S. Ct. at 2087-88 (emphasis in original).  The Supreme Court further noted that it declined to "express a view on what qualifies as a consensual release …" *Id.* at 2088.  Put simply, *Purdue* does not impact the analysis this Court has historically relied upon in considering consensual third-party releases.

60.     Third-party release provisions containing opt-out mechanisms have been approved in this Court and others.  *See, e.g.*, *In re Smallhold, Inc.*, No. 24-10267 (CTG), 2024 Bankr. LEXIS 2332, at *1 n.1 (Bankr. D. Del. Sep. 25, 2024) (confirming a plan containing a plan containing third-party releases with an opt-out provision); *In re Cano Health, Inc.*, No. 24-10164 (KBO) (confirming a plan containing an opt-out box for parties voting to accept and holding that the third party releases "are consensual in nature because all Releasing Parties have either affirmatively consented to such releases or were given due and adequate notice thereof and sufficient opportunity and instruction to elect to opt out of such releases."); *In re Gigamonster Networks, LLC*, No. 23-10051 (JKS) (Bankr. D. Del. Aug. 30, 2024) (post-*Purdue* ruling confirming a plan containing third-party releases with an opt-out provision); *In re Bowflex Inc.*, Case No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024) (post-*Purdue* ruling confirming a plan containing third-party releases with an opt-out provision where the applicable ballot and notice "was reasonably calculated to ensure that each Holder of Claims and Interest in each Class was informed of its ability to opt-out of the Third-Party Releases and the consequences for doing so"); *In re Robertshaw US Holding Corp.*, No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) (holding

that "[t]here is nothing improper with an opt-out feature for consensual third-party releases in a Chapter 11 plan"); *In re Invitae Corp.*, Case No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) (confirming a Plan containing third-party releases with an opt-out provision holding that the opt-out procedures are "good, sufficient and adequate to bind the applicable parties to the Third-Party Release and are approved in all aspects."); *In re Appgate Inc.*, No. 1:24-10956 (CTG) (Bankr. D. Del. July 15, 2024) (suggesting that an opt-out box is a "helpful mechanic"); *Arsenal*, 2023 WL 2655592, at *3 (holding that opt-out forms were sufficient for purposes of approving consensual releases); *Essar*, 652 B.R. at 720 (Bankr. D. Del. 2023) ("Giving creditors the ability to 'opt out' … rather than requiring them to file plan objections, is a good and sensible practice.").[6]

61.     More specifically, the Court in *Arsenal* concluded, generally, "conspicuous disclosure coupled by a simple means of opting out" was sufficient to protect the interests of creditors that opposed a third-party release. 2023 WL 2655592 at *8. While the United States Trustee cites *Indianapolis Downs*, *see* UST Plan Obj. ¶ 32 n.3, it ignores this Court's rulings in *Gigamonster*, *Cano*, *Arsenal* and suggestions in *Essar* which would certainly be instructive in this Bankruptcy Case and remain undisturbed by *Purdue*.

62.     Notably, the releases approved in *Robertshaw*, *Invitae*, and *Bowflex* all deemed creditors who voted to accept the applicable plan to have consented to the third party releases with no ability to opt out. In each of those cases, only parties who voted to reject or who abstained from voting or were deemed to reject were able to opt out of the third party releases. In stark contrast, the Debtors' ballots here, like those approved in *Jambys*, and *Cano*, are distinguishable and provide even more protection to the voting class: even if a Holder affirmatively voted to

---

[6]     Creditors who voted to accept the plans in *Robertshaw* and *Invitae* were deemed to consent to releases and were not entitled to opt out. Here, even those creditors who vote to accept the plan are entitled to opt out of the Third-Party Releases.

accept, such Holder still had the ability to opt-out.  And to be entirely clear, notwithstanding the statements in the UST Objection to the contrary, **only *classified* Holders of Claims or Equity Interests are subject to the release provisions**.  Therefore, the UST's statement that "the non-consensual Third-Party Releases will apparently be imposed on holders of administrative claims and priority tax claims" (*see* D.I. 292 at 34) is not accurate.

63.     Here, as in *Jambys*, and *Cano*, the Ballots and Non-Voting Status Notice and Opt-Out Form provided a plain and conspicuous opportunity to opt out to all Classes.  There is no questioning the consensual nature of the releases.  All classified Holders of Claims or Equity Interests had notice and an opportunity to opt out by checking the appropriate box or objecting on or before the confirmation objection deadline.  The Debtors explicitly included the full text of the release provision in the Ballots and Non-Voting Status Notice and Opt-Out Form, which expressly alerted parties of the deadlines to vote (if applicable) and object on the Plan, and that unless a party opts out or objects to the Plan, it shall be deemed to release the Released Parties under the Plan.  Precedent dictates that a claim holder's failure to exercise their opt-out rights pursuant to a conspicuous, appropriate opt out mechanism constitutes consent, and this Court should not rule any differently.  Those Creditors or Equity Holders who wished to opt out of the release provisions did so, as evidenced by the actions of SFR, which voted to reject the Plan and also chose to opt out of the Third-Party Releases.

64.     Moreover, the Third-Party Releases are integral provisions of the Plan and help provide finality for the Released Parties, in exchange for good and valuable consideration provided by the Released Parties.  Further, each Creditor was given due notice and was given an opportunity to be heard as it relates to the Third-Party Releases as evidenced by the *Certificate of Service* of

the Solicitation Materials [D.I. 262].  For the foregoing reasons, the Third-Party Releases are permissible and should be approved in these cases.

65.    Additionally, Section 1141(a) of the Bankruptcy Code binds holders of claims and interests to a plan's provisions—including third-party releases contained therein—if such party in interest receives proper notice but fails to object to confirmation of the plan.  Section 1141(a) describes the effect of confirmation of a Chapter 11 plan; it states that the provisions of a confirmed plan bind the debtor, any entity issuing securities or acquiring property under the plan, and any creditor of, or equity security holder in, the debtor.  *See* 11 U.S.C. § 1141(a) (providing that a confirmed plan binds, among others, "any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan . . . .").  A Chapter 11 plan binds parties even if they are not scheduled, have not filed a claim, are not receiving a distribution, or retain any interest under the plan. *See, e.g.*, *In re Platinum Oil Props., LLC*, 465 B.R. 621, 638 (Bankr. D.N.M. 2011) ("A confirmed Chapter 11 plan is binding on all parties described in 11 U.S.C. § 1141(a) who received proper notice . . . . In fact, confirmation binds creditors and other parties in interest even if those parties have not accepted the plan . . . 'even if it had a different understanding of [the plan's terms] or did not realize their effect.'") (quoting *In re K.D. Co., Inc.*, 254 B.R. 480, 491 (B.A.P. 10th Cir. 2000).)

66.    A confirmation order also operates as a final judgment.  *Silverman v. Tracar, S.A. (In re Am. Preferred Prescription, Inc.)*, 255 F.3d 87, 92 (2d Cir. 2001).  A confirmation order "is a judgment in rem—a determination of the debtor's status as a Chapter 11 debtor and is binding upon all parties in interest, whether or not they have appeared to contest entry of the order." 8 Collier on Bankruptcy ¶ 1141.02[4] (16th ed. 2019).  Consequently, the confirmation order serves as *res judicata* as to any issues that were or could have been raised at the confirmation

hearing.  *See Iberiabank v. Geisen (In re FFS Data, Inc.)*, 776 F.3d 1299, 1306 (11th Cir. 2015).

For these reasons, a party must file an objection if it disagrees with its treatment under a plan,

including if it does not want to release any third party.  *See* Confirmation Hr'g Tr. 62:10–14, *In re*

*Gibson Brands*, No. 18-11025 (CSS) (Bankr. D. Del. Oct. 2018) ("I have ruled numerous times

that 'check the box' isn't required for a creditor to be deemed – to have been deemed to consent

to something, that it's sufficient to say, here's your notice, this is what's going to happen and if

you don't object, you'll have been deemed to consent."); *Arsenal*, 2023 WL 2655592 at *5–7

(Bankr. D. Del. Mar. 27, 2023) (suggesting that if a party-in-interest does not opt out of the third-

party releases nor objections to the plan after prominent and conspicuous disclosure, the release

provisions can be deemed consensual or technically forfeited).

67.    Only those claim holders that received notice of Confirmation that affirmatively

voted to accept the Plan and chose not to opt out of the release provision are bound by the Third-

Party Releases.   Accordingly, the Debtors respectfully urge this Court to overrule the UST

Objection in accordance with settled caselaw, and should find, as in *Jambys*, *Smallhold*, *Cano*,

*Gigamonster*, *Arsenal*, and *Essar* that the Third-Party Release provisions are appropriate and

confirm the Debtors' Plan.

### iii.    The Exculpation Provision Should Be Approved

68.    In addition to the releases, Article 7 of the Plan provides for the Exculpation

Provision.  The Exculpation Provision is intended to prevent collateral attacks against estate

fiduciaries that have acted in good faith to help facilitate the Debtors' restructuring.  Moreover,

the Exculpation Provision is an integral part of the Plan and otherwise satisfies governing standards

in the Third Circuit as it provides necessary and customary protections to estate fiduciaries whose

efforts were, and continue to be, vital to implementing the Plan.  Accordingly, the Exculpation Provision should be approved.

69.     An exculpation provision is not a mandatory release of all liability, but instead, establishes the appropriate standard of liability with respect to the parties exculpated*.  See In re PWS Holding Corp.*, 228 F.3d 224, 247 (3d Cir. 2000) (reasoning that the exculpation provision "does not affect the liability of third parties, but rather sets forth the appropriate standard of liability"); *see also In re Enron Corp.*, 326 B.R. 497, 501 (S.D.N.Y. 2005) (in finding creditors' appeal of confirmation based on the plan's exculpation provision moot, the court specifically noted that the bankruptcy court addressed the exculpation provision and found it appropriate because it excluded gross negligence and willful misconduct).  In order to confirm a plan of reorganization, this Court must find, under Section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, the Court must find, under Section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings evidence that the Plan was negotiated at arm's length and in good faith.  Insofar as the Debtors negotiated the myriad issues during the course of the Chapter 11 Cases, as well as the terms of the Plan, with the other Exculpated Parties, the Courts' good faith findings with respect to the Debtors' Chapter 11 Cases should extend to them.

70.     In the Third Circuit, exculpation provisions like the one set forth in the Plan are regularly approved.  *See In re Laboratory Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan Sponsor was appropriate under

25

section 1123(b)).  Exculpation provisions that are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.  *See In re Wash. Mut., Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011) (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

71.     Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se* but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the debtor's restructuring.  *See PWS Holding Corp.*, 228 F.3d at 245 (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code."); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. April 16, 2010) (same).

72.     Further, it is well-established that exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.  *See In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) ("I believe that an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.");  *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *Enron Corp.*, 326 B.R. at 503 (excising similar exculpation

provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

73.     Further, to confirm the Plan, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code. Additionally, the Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law. These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals. Further, these findings evidence that the Plan was negotiated at arm's length and in good faith. Insofar as the Debtors negotiated the myriad issues during the course of the Chapter 11 Cases, as well as the terms of the Plan, with the other Exculpated Parties, the Court's good faith findings with respect to the Debtors' Bankruptcy Cases should extend to them.

74.     Article 7.11 of the Plan exculpates parties with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Debtors' Chapter 11 Cases. The Exculpated Parties were critical to the Chapter 11 Cases, and specifically, the formulation of the Plan. The Debtors ask that the Court find that the Exculpated Parties participated in good faith with respect to these Chapter 11 Cases for the same reasons discussed in Section III.C. *infra*. Negotiation and compromise were crucial to the conduct of these Chapter 11 Cases generally and the formulation of a feasible Plan and could not have occurred without the protection from liability that the Exculpation Provision provides to the Exculpated Parties.

75.     The Exculpation Provision, which is limited to estate fiduciaries and includes the carve out for gross negligence and willful misconduct, is consistent with established practice in this jurisdiction and others and should be approved. *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d

224, 245 (3d Cir. 2000) (approving plan provision that released claims except as to willful misconduct or gross negligence, and characterizing such a provision as "commonplace . . . in Chapter 11 plans"); *In re Wash Mut. Inc.*, 442 B.R. at 350 (noting that the "Third Circuit has held that a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence"). Accordingly, the Exculpation Provision does not amount to a stark departure from other chapter 11 plans confirmed in this district.  *See, e.g.*, *In re VER Technologies HoldCo, LLC*, No. 18-10834 (KG) (Bankr. D. Del. July 26, 2018); *In re Sea Containers Ltd.*, No. 06-11156 (KJC) (Bankr. D. Del. Nov. 24, 2008); *In re ACG Holdings*, No. 08-11467 (CSS) (Bankr. D. Del. Aug. 6, 2008*); see also In re DJK Residential LLC*, No. 08-10375, (Bankr. S.D.N.Y. May 7, 2008) (approving an exculpation provision that excluded gross negligence and willful misconduct without unresolved objections); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (Bankr. S.D.N.Y Sept. 7, 2007).

76.     The Debtors' Releases are essential to the Plan because they constitute an integral part of the restructuring.  As described above, each of the Released Parties made contributions to the Chapter 11 Case or will do so as a means to implement the Plan, and did or will do so with the understanding that they would receive releases from the Debtors.  Without the Released Parties' support, the Debtors would not be in a position to confirm the Plan.

77.     Therefore, the Court should approve the Exculpation Provision and adopt the appropriate standard of liability for the Exculpated Parties with respect to Exculpated Claims.

### B.  The Plan Complies with Section 1129(a)(2).

78.     Section 1129(a)(2) of the Bankruptcy Code requires that the plan "compl[y] with the applicable provisions" of the Bankruptcy Code, which generally is intended to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code governing the

solicitation of acceptances of a plan. *See In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988).

79. In accordance with the Solicitation Order, the Debtors, via their counsel and claims agent, have tabulated the ballots submitted by creditors and timely filed their Voting Declaration. The Debtors, therefore, submit that Section 1129(a)(2) of the Bankruptcy Code has been satisfied.

**C. The Plan Complies with Section 1129(a)(3).**

80. Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code" in light of the particular facts and circumstances of the case. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004); *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 424-25 (7th Cir. 1984)); *In re Burns & Roe Enters.*, No. 08-4191 (GEB), 2009 U.S. Dist. LEXIS 13574, at *78 (D.N.J. Feb. 20, 2009).

81. The Debtors' good faith in proposing the Plan is more than evident. Although not defined by the Bankruptcy Code, "good faith" has been described to include (i) a showing the plan was proposed with honesty and good intentions, and (ii) the existence of a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *see also Traders State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.)*, 917 F.2d 1210, 1214 (9th Cir. 1989) (interpreting analogous provision under chapter 12); *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D. Cal. 1982). Moreover, "[w]here the plan is proposed with the legitimate and honest purpose

to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *Id.*

82.    The Plan is the product of arms-length negotiation with Holders of Claims and Equity Interests, the Subchapter V Trustee, and the US Trustee. This groundwork resulted in the only voting class—General Unsecured Claims (Class 3)—voting to accept the Plan. Additionally, as noted in the Finley Declaration, the Plan, as well as the Financial Projections, were proposed in good faith. Thus, there is substantial support for a finding that the Plan has been proposed in good faith and not by any means forbidden by law. Therefore, the Plan complies with Section 1129(a)(3) of the Bankruptcy Code and should be confirmed.

### D. The Plan Complies with Section 1129(a)(4).

83.    Section 1129(a)(4) requires that payments "for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case," be approved by the Court as reasonable. Section 1129(a)(4) requires that the Court review and approve any payments on account of non-ordinary course administrative expenses. *See, e.g.*, *In re Resort Int'l, Inc.*, 145 B.R. 412, 475–76 (Bankr. D.N.J. 1990); *In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (Bankruptcy Code Section 1129(a)(4) satisfied where plan provides for payment of "allowed" administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988). Under the Plan, each estate Professional must file and serve a properly noticed fee application, and pursuant to the Bankruptcy Code, only the amount of fees allowed by the Court will be paid. Accordingly, this section of the Bankruptcy Code is satisfied.

**E.  The Plan Complies with Section 1129(a)(5).**

84.     Section 1129(a)(5) requires that (i) the plan proponent disclose the identity of any individual that will serve after confirmation of the plan as a director, officer, or voting trustee of the debtor or that will be a successor to the debtors under the Plan and that the appointment of any such individual be consistent with the interests of creditors and shareholders and public policy and (ii) the plan proponent disclose the identity of any insider that will be employed by the reorganized debtor and the nature of the compensation that they will receive.  11 U.S.C. §§ 1129(a)(5)(A), (B). This Section is satisfied as Article 2.7 of the Plan describes the Reorganized Debtors' post-confirmation management.

85.     Therefore, section 1129(a)(5) of the Bankruptcy Code is satisfied.

**F.  Section 1129(a)(6) Is Inapplicable.**

86.     Section 1129(a)(6) requires that any regulatory commission with jurisdiction over the rates of a debtor approve any changes in rate regulations provided in a plan.  11 U.S.C. § 1129(a)(6).  The Debtors are not subject to any such regulation and the Plan does not propose any such rate changes, thus this section is inapplicable.

**G.  The Plan Complies with Section 1129(a)(7).**

87.     Section 1129(a)(7) requires that, with respect to each class of impaired claims or interests under a plan, every holder of a claim or interest in such impaired class either (i) accept the plan, or (ii) receive or retain property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  11 U.S.C. § 1129(a)(7).  This is often referred to as the "best interests test."  Under the best interests test, the court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were

liquidated [under chapter 7 of the Bankruptcy Code]." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 440 (1999); *United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213, 228 (1996).   The best interests test focuses on individual dissenting creditors rather than classes of claims.   *See 203 N. LaSalle St. P'ship*, 526 U.S. at 440.

88.     Here, as described in the Plan, the Debtors have put forth affirmative evidence showing that general unsecured creditors will fare better under the Plan than in a chapter 7 liquidation.   The Liquidation Analysis demonstrates that Holders of Claims and Equity Interests are projected to receive at least as much under the Plan as they would expect to receive in a hypothetical chapter 7 liquidation.   The Debtors have also filed concurrently herewith the Confirmation Declaration and the Finley Declaration, which reaffirms both the liquidation and disposable income analysis in the Plan.   Accordingly, the Plan satisfies the best interest of creditors test.

### H.   The Requirements of Section 1129(a)(8) is Inapplicable Because the Debtors are Seeking Confirmation Pursuant to Section 1191(b) of the Bankruptcy Code

89.     Section 1129(a)(8) requires that each class of claims and interests established under a plan either accept the plan or not be impaired under the plan.   11 U.S.C. § 1129(a)(8).   A class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class vote to accept the plan, counting only those claims whose holders actually vote.   *See* 11 U.S.C. §§ 1126(c)–(d).   As set forth above, the Plan satisfies this requirement.   Despite that vote, because the Debtors are seeking confirmation pursuant to section 1191(b) of the Bankruptcy Code, section 1129(a)(8) is not applicable.   *See* 11 U.S.C. § 1191(b) ("[I]f all of the applicable requirements of section 1129(a) of this title, *other than paragraphs (8), (10)* and (15) of that section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan *notwithstanding the requirements of such paragraphs . . . .*") (emphasis

added).  As set forth more fully below, the Debtors submit that the Plan satisfies the standard for

non-consensual confirmation under section 1191(b) of the Bankruptcy Code.

90.      Here, General Unsecured Claims (Class 3) are impaired and entitled to vote on the

Plan.  As detailed in the Voting Declaration, Class 3 has voted to accept the Plan.  Based on the

foregoing, Section 1129(a)(8) is inapplicable.

**I.   The Plan Complies with Section 1129(a)(9).**

91.      Bankruptcy Code section 1129(a)(9) provides that, unless the holder of a claim

agrees to a different treatment of its claim:

a.   the holder of a claim entitled to priority under section 507(a)(2) or (3) must receive cash
     equal to the allowed amount of its claim on the effective date of the plan;

b.   the holder of a claim entitled to priority under section 507(a)(1), (4), (5), (6), or (7) must
     receive either cash in the allowed amount of such claim on the effective date of the plan or
     deferred cash payments of a value, as of the effective date, equal to the allowed amounts
     of such claim; and

c.   the holder of a tax claim entitled to priority under section 507(a)(8) must receive on account
     of such claim deferred cash payments, over a period not exceeding six years after the date
     of assessment of such claim, of a value, as of the effective date of a plan, equal to the
     allowed amount of such claim.

11. U.S.C. § 1129(a)(9).

92.      However, in a subchapter V bankruptcy, like this one, notwithstanding section

1129(a)(9)(A), a plan that provides for the payment through the plan of a claim of a kind specified

in paragraph (2) or (3) of section 507(a) of this title may be confirmed under 11 U.S.C. § 1191(b).

11 U.S.C. § 1191(e).  In other words, the foregoing types of administrative expense claims can be

paid through the life of the plan of reorganization.

93.      The Plan and its proposed treatment of Allowed Administrative Claims and Priority

Tax Claims satisfy the requirements of section 1129(a)(9).  With respect to the Allowed

Administrative Claims, the Plan provides that Allowed Administrative Claims will be paid in full

as soon as practicable *pro rata* on a monthly basis in accordance with the Debtor's Disposable Income projections, as is permitted by section 1191(e), unless the Holder agrees or shall have agreed to other treatment of such claim.

94.    Holders of Administrative Expense incurred post-petition in the ordinary course of Debtors' business shall be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court and that cure amounts related to leases and/or executory contracts that are assumed shall be paid in full in connection with such assumption as set forth in the Plan.

95.    Further, the Debtors will pay cure claims in full and within a reasonable time after the Plan Effective Date.  Pursuant to the Plan, "Cure" means "the payment or other honoring of all obligations required to be paid or honored in connection with the assumption of an Executory Contract including (a) the cure of any non-monetary defaults to the extent required, if it all, pursuant to § 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, **within a reasonable period of time following the Effective Date**, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court." *See* Plan Section at 11.34 (emphasis added).  Here, Holders of Cure Claims will be paid in full within the three - year term of the Plan.

96.    Additionally, section 1129(a)(9)(C) provides that claims specified under section 507(a)(8) may be paid in regular installments (i) of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such claim, (ii) over a period ending not later than 5 years after the date of the order for relief, and (iii) in a manner not less favorable that the most favored nonpriority unsecured claim provided for by the Plan.  11 U.S.C. § 1129(a)(9)(C). The Plan, including provisions under Article 2.1, provides for payment of Priority Tax Claims in monthly

installments commencing and completing in December 2024 or otherwise. Accordingly, the Plan can be confirmed.

### J. The Requirements of Section 1129(a)(10) is Inapplicable Because the Debtors are Seeking Confirmation Pursuant to Section 1191(b) of the Bankruptcy Code

97.     Section 1129(a)(10) requires that at least one class of claims that is impaired under the plan has voted to accept the plan, determined without including any acceptance of the plan by any insider. 11 U.S.C. § 1129(a)(10).  As set forth in the Voting Declaration, Class 3, the only impaired class, voted to accept the Plan.  However, because the Debtors are seeking confirmation pursuant to section 1191(b) of the Bankruptcy Code, section 1129(a)(10) is not applicable.  *See* 11 U.S.C. § 1191(b) ("[I]f all of the applicable requirements of section 1129(a) of this title, *other than paragraphs (8), (10)* and (15) of that section, are met with respect to a plan, the court, on request of the debtor, shall confirm the plan *notwithstanding the requirements of such paragraphs . . . .*") (emphasis added).  As set forth more fully below, the Debtors submit that the Plan satisfies the standard for confirmation under section 1191(b) of the Bankruptcy Code.

### K. The Plan Complies with Section 1129(a)(11).

98.     Section 1129(a)(11) requires a court to find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).  A plan proponent must prove a chapter 11 plan's feasibility by the preponderance of evidence.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (rejecting "clear and convincing" as the applicable standard).  The threshold of proof necessary to satisfy the requirement is relatively low.  *See In re Sea Garden Motel and Apartments*, 195 B.R. 294, 304 (Bankr. D. N.J. 1996).  To demonstrate that a plan is feasible, it is not necessary that success be

guaranteed.  *See In re Landing Assoc., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993) (noting that no plan can offer absolute certainty and that section 1129(a)(9) requires only that the plan offer a reasonable probability of success).  Rather, a bankruptcy court must determine whether a plan is workable and has a reasonable likelihood of success.  *See U.S. v. Energy Res. Co*., 495 U.S. 545, 549 (1990); *IRS v. Kaplan (In re Kaplan)*, 104 F.3d 589, 597 (3d Cir. 1997).

99.     Here, the Plan includes the Financial Projections filed on October 21, 2024, which demonstrate the Debtors' ability to make all of the payments due on the Effective Date, the First Distribution Date, and thereafter.  These Financial Projections reflect that, after reviewing the SFR and UST Objections, the Debtors contemplated their objections and determined that, in light of both increased costs of goods sold and Administrative Expense Claims, a cash infusion was needed to meet those increased costs.  Pursuant to Article 8 of the Plan, consummation of the Equity Raise is a condition precedent to the Effective Date.  The Equity Raise required pursuant to the Plan has been completed by the Debtors.

100.    The Plan will be funded with funds that are not for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtors, along with the Equity Raise.  The Debtors' financial projections show that the Debtors will have sufficient cash flow after paying operating expenses and post-confirmation taxes to meet their obligations under the Plan.  All Disposable Income is devoted to paying Allowed Claims under the Plan.

101.    To the extent the SFR Objection takes issue with the Financial Projections and feasibility of the Plan, such objections should be overruled in light of the detail set forth in the Finley Declaration.

102.    In response to the SFR Objection that the Financial Projections do not sufficiently itemize expenses and overhead costs (*see* D.I. 293 at 13), the Finley Declaration provides sufficient details with respect to such expenditures.  Therefore, the SFR Objection should be overruled to the extent it asserts that the Debtors failed to provide sufficient detail regarding the Financial Projections.

103.    Additionally, the SFR Objection should be overruled to the extent it questions the feasibility of the Plan.  The Debtors filed amended Financial Projections on October 21, 2024, which reflect the Debtors' Equity Raise.  As reflected in the Financial Projections and the Finley Declaration, the Debtors are more than capable of satisfying Allowed Claims in the three-year period.  Notably, the amended Financial Projections provide for a far greater recovery to General Unsecured Claimants than the financial projections filed in the Initial Plan, thus giving Holders of General Unsecured Claims a greater recovery than anticipated.  Importantly, SFR raised no timely objections to the Debtors' amended Plan and Financial Projections.

104.    Furthermore, as detailed in the Finley Declaration, the Debtors will have sufficient cash on hand on the Effective Date to pay all of the Claims and expenses that are entitled to be paid on that date.  Finally, the Debtors will be able to satisfy Allowed General Unsecured Claims, as set forth in the Plan, until the Last Distribution Date, with the Debtors' Disposable Income.

105.    Therefore, Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors, thereby satisfying (or eliminating the need to consider) section 1129(a)(11) of the Bankruptcy Code.

**L.  Section 1129(a)(12) is Inapplicable.**

106.    Section 1129(a)(12) of the Bankruptcy Code requires that a plan provide that all fees payable under 28 U.S.C. § 1930 be paid on or before the effective date of the plan.  Here, the

Debtors have elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code where such fees are not due by the Debtors. Accordingly, this section of the Bankruptcy Code is inapplicable.

**M. Section 1129(a)(13) is Inapplicable.**

107.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue to be paid post confirmation at any levels established in accordance with Section 1114 of the Bankruptcy Code. The Debtors do not have any present obligations to pay retiree benefits within the meaning of Section 1129(a)(13). Accordingly, this section of the Bankruptcy Code is inapplicable.

**N. Section 1129(a)(14) is Inapplicable.**

108.    Section 1129(a)(14) requires that, if applicable, the debtors pay all domestic support obligations. Here, the Debtors are corporations and are not required by any judicial or administrative order to pay domestic support obligations. As such, this section of the Bankruptcy Code is inapplicable.

**O. Section 1129(a)(15) is Inapplicable.**

109.    Pursuant to Section 1181(a), Section 1129(a)(15) of the Bankruptcy Code is inapplicable in this Subchapter V case. Section 1191(a) also expressly provides that a consensual plan confirmed under Section 1191(a), as is the situation here, need not comply with Section 1129(a)(15). In either case, section 1129(a)(15) of the Bankruptcy Code is inapplicable.

**P. Section 1129(a)(16) is Inapplicable.**

110.    Section 1129(a)(16) requires that transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of

property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  This section is inapplicable as the Plan calls for no such transfers.

### IV.    The Plan Meets All of the Confirmation Requirements Under Section 1191(b) and (c) of the Bankruptcy Code.

111.    Pursuant to Section 1191(b), to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.  In turn, Section 1191(c) provides how a plan is "fair and equitable."

112.    Class 3 Creditors (General Unsecured Claims) are impaired under the Plan and voted to accept the Plan.  The Plan does not unfairly discriminate and it is fair and equitable with respect to Class 3.

### A.    The Plan is Fair and Equitable Pursuant to Section 1191(c) of the Bankruptcy Code

113.    Section 1191(c) of the Bankruptcy Code sets forth the requirements for "fair and equitable" treatment under a non-consensual plan in a Subchapter V case:

For purposes of this section, the condition that a plan be fair and equitable with respect to each class of claims or interests includes the following requirements:

(1) With respect to a class of secured claims, the plan meets the requirements of section 1129(b)(2)(A) of this title.

(2) As of the effective date of the plan—

(A) the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or

(B) the value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor.

39

(3) (A)(i) The debtor will be able to make all payments under the plan; or

(B)(i) there is a reasonable likelihood that the debtor will be able to make all payments under the plan;

and

(ii) the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.

11. U.S.C. § 1191(c).

### a. The Plan Satisfies the First Requirement of Section 1191(c)

114.    The first requirement addresses secured claims which are impaired under the Plan. This requirement is inapplicable since there are no secured claims that are impaired.  To the extent this requirement is applicable to unimpaired claims, it is satisfied because Class 1 will be treated in accordance with section 1129(b)(2)(A) of the Bankruptcy Code and therefore will receive fair and equitable treatment under the Plan.

### b. The Plan Satisfies the Second Requirement of Section 1191(c)

115.    The Plan satisfies the second requirement of section 1191(c). As evidenced in the Financial Projections, the Debtors will apply all projected Disposable Income to make payments under the Plan.

116.    SFR made a number of meritless arguments that the initial Plan was not fair and equitable with respect to Holders of General Unsecured Claims.

117.    First, SFR took issue that the Debtors' initial Plan did not provide for distribution of amounts in excess of the Debtors' financial projections. *See* D.I. 293 at 14.  However, that argument ignores prevailing case law.  Section 1191(c)(2)(A) of the Bankruptcy Code provides that a plan is fair and equitable as to unsecured creditors if "all *projected* disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court

may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." 11 U.S.C. § 1191(c)(2)(A) (emphasis added).  Therefore, the Debtors are only required to pay the Holders of General Unsecured Claims projected disposable income *as of confirmation* of the Plan.  Importantly, the Debtors are not required to pay their Creditors with *actual* disposable income as several cases outside of this venue have recently held.  *See In re Urgent Care Physicians, Ltd.*, 2021 WL 6090985, at *6 (Bankr. E.D. Wis. Dec. 20 2021) (noting that paying creditors the difference between actual disposable income and projected disposable income is "more than what the [Bankruptcy Code] requires"); *see also In re Young*, 2021 WL 1191621, at *4 (Bankr. D.N.M. Mar. 26, 2021) (quoting William L. Norton III and James B. Bailey, The Pros and Cons of the Small Business Reorganization Act of 2019, 36 Emory Bankr. Dev. J. 383, 390 (2020)) ("§ 1191 does require the debtor to devote *projected* disposable income or its value to pay creditors.") (emphasis added); *In re Channel Clarity Holdings LLC*, 2022 WL 3710602, at *6 (Bankr. N.D. Il. July 19, 2022) (citing § 1191(c)(2)(A)) ("[T]he requirement from section 1191(c)(2)(A) [is] that '*all the projected disposable income* of the debtor ... be applied to make payments under the plan.'") (emphasis added).  As discussed in the Finley Declaration, the Financial Projections reflect a good-faith estimation of cash flow over the term of the Plan.  To the extent actual Disposable Income exceeds the estimated Disposable Income reflected in the Financial Projections, the Debtors are not obligated to distribute amounts above what was estimated in good faith.

118.    Second, SFR took issue that the initial Plan only committed to paying Creditors for three years, rather than five.  *See* D.I. 293 at 14.  However, courts have held that plans under Subchapter V only need to include a three-year term, assuming the plan is otherwise fair and equitable.  *See, e.g.*, *In re Trinity Family Practice & Urgent Care PLLC*,  2024 WL 2704056, No.

23-70068 (SMR) (Bankr. W.D. Tex. May 24, 2024) (holding that a three year plan period may be confirmed so long as the debtor meets its burden to show that the period to make payments is fair and equitable and that "the language of § 1191(c)(2)(A) creates a baseline (or default) plan term of three years."); *In re Alecto Healthcare Services, LLC*, 2024 WL 1208355 at *2, No. 23-10787 (JKS) (Bankr. D. Del. Mar. 20, 2024) (confirming debtors' plan containing a three (3)-year payout where the plan, income statement, and debtors' vice president's testimony demonstrated "a reasonable likelihood that the Debtor will be able to make all payments under the Plan."); *In re Urgent Care Physicians, Ltd.,* 2021 WL 6090985 (Bankr. W.D. Wi. Dec. 20, 2021) (holding that a three-year plan term was fair and equitable).  To determine whether a plan is fair and equitable with respect to its term, the Court in *Trinity* considered the following factors: (1) whether there are any capital reserves or capital expenditures during the period of plan payment; (2) the reasonableness of income and expenses compared to historical operations; (3) any salary and other payments to insiders during the period of plan payments; (4) the risks and consequences of a longer period of plan payments; and (5) any other unique or extraordinary facts specific to the case.  *See Trinity*, 2024 WL at *18.  Here, the Plan is fair and equitable with the three-year plan term for the following reasons, as set forth in the Finley Declaration:

- First, there are no capital reserves or capital expenditures projected over the next three years.  Rather, all Disposable Income is being utilized to satisfy Creditors.

- Second, the Financial Projections are reasonable, as detailed in the Finley Declaration.  In particular, the Financial Projections are reasonable and conservative based on gross sales, gross profit, profit margin, and operating expenses.

- Third, the Financial Projections do not reflect any increase in payment to insiders over the three-year term of the Plan.

- Fourth, the Financial Projections reflect that under the Plan—as compared to the Initial Plan—recoveries for General Unsecured Creditors have increased from a total of $56,123 to $260,840 (over 350%), with monthly payments beginning in June, 2027.

119.    Because the Plan is fair and equitable, SFR's objection should be viewed simply as an effort by a disgruntled litigant to harm or destroy the Debtors' efforts to reorganize.  SFR is attempting to defeat the Plan despite no economic benefit to SFR if it were successful in undermining the Debtors' efforts.

120.    Therefore, SFR's objection that the Plan is not fair and equitable should be overruled.

### c.   The Plan Satisfies the Third Requirement of Section 1191(c)

121.    The Plan satisfies the third requirements of section 1191(c) because as evidenced by the financial projections, there is a reasonable likelihood that the Debtors will be able to make all payments under the Plan for the next three years.

### B.   The Plan Does Not Unfairly Discriminate as to Class 3

122.    Neither section 1129(b) nor 1191(b) of the Bankruptcy Code set forth a standard for determining "unfair discrimination" but courts typically examine the facts and circumstances of the particular cases to determine whether "unfair discrimination" exists.  *See In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances."); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination."); *see In re 203 N. LaSalle St. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established").

123.    Generally, courts have found that a plan unfairly discriminates if similarly situated claims are treated differently *without a reasonable basis for the disparate treatment*. *See In re Exide Techs.*, 303 B.R. 48, 78 (Bankr. D. Del. 2003) ("The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination."). Conversely, no unfair discrimination exists if, taking into account the particular facts and circumstances of these cases, there is a reasonable basis for the disparate treatment of similar claims. *See id.* ("[I]n order to confirm the Plan, the Debtor must show that (i) there is a reasonable basis for the Debtor's separate classification [of the classes]… and (ii) that the Debtor cannot confirm a plan absent the separate classification of unsecured claims."). The "unfair discrimination" analysis involves a comparison of the treatment of different classes, and therefore differs from the equal treatment analysis of section 1123(a)(4) of the Bankruptcy Code, which involves a comparison of the treatment of claims within a particular class.

124.    Here, there are no Classes with similarly situated claims that are receiving different treatment under the Plan.  Thus, the Plan's treatment of Claims and Equity Interests is proper because all similarly situated Holders of Claims and Equity Interests will receive substantially similar treatment.

**V.    The Settlement with US Foods Should be Approved Pursuant to Bankruptcy Rule 9019**

125.    The US Foods Settlement is a sound exercise of the Debtors' reasonable business judgment and should therefore be approved pursuant to Bankruptcy Rule 9019(a).  Additionally, pursuant to 1123(b), a plan may include a compromise between the Debtors and a claimant.

126.    Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).

127.    In determining whether to approve a proposed settlement pursuant to Bankruptcy Rule 9019(a), the Third Circuit requires a bankruptcy court to "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimate[] the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." *In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979). A court generally gives deference to a debtor's business judgment in deciding whether to settle a matter. *See In re Key3Media Group, Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005).

128.    The approval of a settlement under Bankruptcy Rule 9019 is within the sound discretion of the bankruptcy court. *In re Martin*, 91 F.3d 389, 396 (3d Cir. 1996). The Court, however, need not substitute its judgment for that of the Parties. *See In re Neshaminy Office Bldg. Assoc's*, 62 B.R. 798, 803 (Bankr. E.D. Pa. 1986). The Court does not have to be convinced that the settlement is the best possible compromise, but only that the settlement "falls below the lowest point in the range of reasonableness." *In re Penn. Truck Lines, Inc*., 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993) (holding that to approve a compromise or settlement pursuant to Bankruptcy Rule 9019, the court must conclude that the compromise or settlement falls above the lowest point in the range of reasonableness).

129.    The Third Circuit has enumerated four factors that should be considered in determining whether a settlement should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin,* 91 F.3d at 393 (citing *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *Neshaminy Office Bldg. Assocs*., 62

B.R. at 803).   Consideration of these factors requires the Court to make an objective, informed comparison of the results of litigation versus the benefits of compromise.   *See TMT Trailer*, 390 U.S. at 424.

130.   **Probability of Success of Litigation.**   The first factor is satisfied here because US Foods holds a valid Administrative Expense Claim and Cure Claim, both of which must be paid in full in accordance with the Bankruptcy Code.   Absent the US Foods Settlement, US Foods will be able to exercise its rights to terminate the MDA pursuant to the "Termination without Breach" provision, which would cause an extraordinary disruption to the Debtors' supply chain and business.   For that reason, expedited payment of the US Foods Administrative Expense Claim and Cure Claim is crucial for the Debtors' continued success.   Therefore, approval of the US Foods Settlement will eliminate any uncertainty surrounding the MDA and US Foods' continued relationship with the Debtors.

131.   **Difficulties in Collection.**   The second criterion favors approval of the US Foods Settlement.   As noted herein, US Foods holds a valid Administrative Expense Claim and Cure Claim, and could therefore collect against the Debtors in full.

132.   **The Complexity of Litigation Involved.**   The third criterion strongly favors approval of the US Foods Settlement.   The Debtors, in consultation with their professionals, have determined that the US Foods Settlement will greatly benefit the Debtors' Estates, particularly given that it will maintain the MDA.   Any potential litigation with US Foods will unnecessarily burden the Debtors' Estates, especially given that US Foods holds a valid Administrative Expense Claim and Cure Claim.   Thus, the Debtors submit that the complexity-and-expense factor weighs in favor of approving the US Foods Settlement.

133. **Paramount Interest to Creditors.** The fourth and final factor is also satisfied and is important in this instance. The US Foods Settlement is in the best interests of the Debtors' Creditors because, without the US Foods Settlement, US Foods will likely terminate the favorable MDA, causing a massive disruption to the Debtors' supply chain and business. In fact, given the importance of the business relationship, it is questionable whether the Debtors would be able to make payments to Creditors in accordance with the Financial Projections if US Foods terminated the MDA. US Foods is simply critical to the Debtors' business. Thus, the Debtors submit that the interests of creditors factors heavily in favor of approving the US Foods Settlement.

134. Accordingly, the Debtors respectfully submit that consideration of the factors set forth above dictates that the US Foods Settlement satisfies the Third Circuit's requirements under Bankruptcy Rule 9019 in all respects, is a sound exercise of the Debtors' business judgment, and is in the best interests of the Debtors' Estates.

*[Remainder of page left blank intentionally]*

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtors respectfully request that the Court (a) enter the proposed Confirmation Order, confirming the Plan, (b) overrule any remaining objections, and (c) grant such other and further relief as is just and proper.

Dated: November 6, 2024
      Wilmington, Delaware

**PASHMAN STEIN WALDER HAYDEN, P.C.**

*/s/ Joseph C. Barsalona II*
John W. Weiss (No. 4160)
Joseph C. Barsalona II (No. 6102)
824 North Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 592-6496
Email: jweiss@pashmanstein.com
      jbarsalona@pashmanstein.com

-and-

Amy Oden (admitted *pro hac vice*)
Katherine R. Beilin (admitted *pro hac vice*)
Court Plaza South, East Wing
21 Main Street, Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200
Email: aoden@pashmanstein.com
      kbeilin@pashmanstein.com

*Counsel to the Debtors and*
*Debtors in Possession*