# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Sticky's Holdings LLC, *et al.*, | Case No. 24-10856 (JKS) |
| Reorganized Debtors.[1] | Jointly Administered |
| | **Hearing Date:** TBD |
| | **Obj. Deadline:** Feb. 24, 2025 at 4:00 p.m. (ET) |

### MOTION OF REORGANIZED DEBTORS TO CONVERT THE CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

The above-captioned debtors (the "Debtors" or "Reorganized Debtors," as applicable), by and through their undersigned counsel, hereby file this motion (the "Motion") pursuant to section 1112 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). In support of the Motion, the Reorganized Debtors respectfully state as follows:

### JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of the Reorganized Debtors' Chapter 11 Cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicate for the relief sought herein are sections 105 and 1112 of the Bankruptcy Code.

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Sticky's Holdings LLC (3586); Sticky Fingers LLC (3212); Sticky Fingers II LLC (7125); Sticky Fingers III LLC (3914); Sticky Fingers IV LLC (9412); Sticky Fingers V LLC (1465); Sticky Fingers VI LLC (0578); Sticky's BK I LLC (0423); Sticky's NJ 1 LLC (5162); Sticky Fingers VII LLC (1491); Sticky's NJ II LLC (6642); Sticky Fingers IX LLC (5036); Sticky's NJ III LLC (7036); Sticky Fingers VIII LLC (0080); Sticky NJ IV LLC (6341); Sticky's WC 1 LLC (0427); Sticky's Franchise LLC (5232); Sticky's PA GK I LLC (7496); Stickys Corporate LLC (5719); and Sticky's IP LLC (4569). The Reorganized Debtors' mailing address is 21 Maiden Lane, New York, NY 10038.

3. Pursuant to Local Rule 9013-1(f), the Reorganized Debtors consent to the entry of a final order by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**PROCEDURAL BACKGROUND**

4. On April 25, 2024 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware as a debtors defined in Bankruptcy Code section 1182(1) and the Debtors elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code pursuant to the Small Business Debtor Reorganization Act, as amended.

5. On April 26, 2024, the United States Trustee appointed Natasha Songonuga of Archer & Greiner, P.C. to serve as the Subchapter V trustee (the "Subchapter V Trustee") in these cases pursuant to Bankruptcy Code section 1183(a). No official committee has been appointed in these cases. The Reorganized Debtors are operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6. Additional detail regarding the Debtors, their businesses, the events leading to commencement of these cases, and the facts and circumstances supporting the relief requested herein are set forth in the *Declaration of Jamie Greer in Support of First Day Relief*, sworn to on April 25, 2024 [D.I. 13] (the "First Day Declaration") and incorporated herein by reference.

7. On November 13, 2024, the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming Subchapter V Debtors' Modified First Amended Plan of Reorganization* [D.I. 398] (the "Confirmation Order").

8. Each condition precedent to the effectiveness of the Plan occurred in accordance with the provisions of the Plan. Accordingly, the Plan went effective on November 29, 2024 (the "Effective Date").

## FINANCIAL BACKGROUND

9. Due to the severe financial situation the Reorganized Debtors have undergone, the Reorganized Debtors no longer have sufficient cash on hand to administer these Chapter 11 Cases and continue as a going concern.

**A.    Extreme Temperatures Led to Significant Lost Sales in December 2024.**

10. The Debtors' sales have historically been very sensitive to extreme temperatures in New York City, particularly during the winter months. Unfortunately, with an average temperature of 38.2 degrees Fahrenheit, December 2024 was the coldest December New York has experienced in the past 7 years, and the second coldest in the past fifteen years.[2] These extreme and unusual temperatures caused the Reorganized Debtors' December revenue to drop by approximately 12% (or $200,000) below forecast. Because most of the Reorganized Debtors' expenses are fixed or semi-fixed (including monthly lease payments, a minimum headcount required during operating hours, corporate overhead, etc.), this $200,000 of lost revenue translated to approximately $70,000 in reduced profits. Therefore, rather than realizing approximately $26,000 of profit for the month (as projected in their forecast), the Reorganized Debtors instead had an operating loss of approximately $43,000 for December 2024.

**B.    Management Responded by Raising Additional Capital.**

11. In response to the unanticipated losses experienced in December 2024, and believing them to be attributable to a one-off, "chance" event, the Reorganized Debtors were able

---

[2] *See Average Monthly & Annual Temperatures at Central Park,* NATIONAL WEATHER SERVICE, https://www.weather.gov/media/okx/Climate/CentralPark/monthlyannualtemp.pdf (last updated Jan. 22, 2025).

3

to raise an additional $150,000 of equity capital from existing investors and board members, which funds were received on January 2, 2025. Additionally, the Reorganized Debtors were in advanced discussions to obtain a $500,000 line of credit that could serve as a "buffer" if any additional unanticipated challenges arose.

12. Despite the operating losses caused by the extreme and unusual December temperatures, the Reorganized Debtors were able to make their Plan distribution payments of nearly $50,000 for the month of December 2024 because of the infusion of this additional equity capital. The Reorganized Debtors entered January 2025 with an optimistic forecast that local temperatures (and, by extension, store revenues) would revert to anticipated levels.

**C.     Impact of New York City's Congestion Pricing.**

13. New York City's congestion pricing initiative, which had been contemplated since 2007 but never enacted, was postponed indefinitely by Governor Hochul in June 2024. It was in the months that followed this announced postponement that the Debtors prepared the Plan and accompanying financial projections.

14. On November 14, 2024 (the day after the Plan was confirmed), Governor Hochul announced that the congestion pricing initiative would be revived. Because of, to that point, the historical uncertainty around if and when Congestion Pricing might ever be implemented, the Confirmed Plan did not reflect the theoretical risk that congestion pricing might impose on the future of the business, should it ever be implemented by the city.

15. On January 5, 2025, the congestion pricing went into effect which implemented new toll charges for vehicles entering certain areas in Manhattan.[3] With five of the Reorganized Debtors' ten stores—and more than 50% of their revenue—coming from locations located inside

---

[3] *See Congestion Relief Zone Toll Information*, METROPOLITAN TRANSPORT AUTHORITY, https://congestionreliefzone.mta.info/tolling (last visited February 10, 2025).

of Manhattan's "congestion zone," the impact that congestion pricing had on the Reorganized Debtors' business was as swift as it was severe. To put the impact that congestion pricing has had on the Reorganized Debtors' business into perspective, revenue from their two highest-grossing stores (the 45th & Lexington and Union Square locations), which are both located squarely in the middle of the congestion zone, are down 31% and 24% (year-over-year), respectively.

16. In total, gross sales are more than $250,000 below forecast since congestion pricing went into effect, and there have been no indications that its impact on the Reorganized Debtors' business will improve.

**D.  Actions Taken Since Congestion Pricing Went into Effect.**

17. Within days of congestion pricing going into effect and management observing its impact on the business, it swiftly took action to minimize the unanticipated operating losses it was now suffering on a daily basis. Among other actions, it quickly eliminated nearly all corporate staff, eliminating several full-time positions and shrinking corporate overhead costs by more than $25,000 per month.

18. Unfortunately, this reduction in overhead was not enough to offset the impact of significantly lower sales, and the Reorganized Debtors lost nearly $200,000 in January (as opposed to a forecasted profit of $2,000). Any further headcount reductions would have to come from individual stores, and thus are not possible without having to close a location completely (which would only further reduce revenue).

19. These losses (and the anticipated continued negative forces of congestion pricing on the business) also caused an investor contemplating providing a $500,000 line of credit to withdraw, and has made any other source of funding nonviable.

20. The Reorganized Debtors have attempted to have conversations with a small number of groups which had previously expressed some level of interest in purchasing the business, but none of these discussions have progressed to a point where the Reorganized Debtors have confidence that any deal could be consummated on a timetable that would allow the business to survive.

21. The Reorganized Debtors ended January 2025 with approximately $200,000 in cash on hand, which was insufficient to make February rent payments for its ten stores. Given the Reorganized Debtors' lack of available funds, inability to obtain additional financing, and inability to find a purchaser, the Reorganized Debtors are no longer able to pay the continually accruing administrative expenses that are required to continue these Chapter 11 Cases.

## RELIEF REQUESTED

22. By this Motion, the Reorganized Debtors seek the entry of an order converting its Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.

## BASIS FOR RELIEF

23. Bankruptcy Code section 1112(b) provides in relevant part as follows:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, ***for cause*** . . . .

11 U.S.C. § 1112(b)(1) (emphasis added).

24. Section 1112(b) was enacted to avoid the costs of chapter 11 in cases in which they are not justified. *In re Ramreddy, Inc.*, 440 B.R. 103, 115 (Bankr. E.D. Pa. 2009) (citing 7 Collier on Bankruptcy ¶ 1112.04[2], at 1112–22 (15th ed. rev. 2009) ("In order avoid the costs of chapter 11 in cases in which they are not justified, section 1112(b) was designed to provide the court with a powerful tool to weed out inappropriate chapter 11 cases at the earliest possible stage.")).

6

25. Bankruptcy Code section 1112(b)(4) contains a non-exclusive list of what constitutes "cause." *In re Midwest Properties of Shawano, LLC*, 442 B.R. 278, 283 (Bankr. D. Del. 2010); *see also* 7 Collier on Bankruptcy ¶ 1112.04[6] ("Courts that have analyzed section 1112(b)(4) almost unanimously conclude that the list of the items that constitute cause is not exclusive and the use of the word 'and' at the end of section 1112(b)(4)(O) is a scrivener's error. The list should read in the disjunctive . . . [o]therwise, this section would lead to an absurd result."). Upon a finding of cause, the court is empowered to either convert or dismiss the chapter 11 case, whichever is in the best interests of creditors. 11 U.S.C. § 1112(b)(1).

26. "Cause" as defined under section 1112(b)(4) includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). In general, this standard contemplates a two-fold inquiry: (i) whether the debtor has incurred a substantial loss or is continuing to incur losses, or the estate is continuing to diminish; and (ii) whether there is an absence of a reasonable likelihood of rehabilitation. *In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007) ("First, the Court must look at the track record of the Debtor to determine if it is suffering losses or making gains. Second, the Court must determine whether rehabilitation is likely given the evidence presented at hearing."); *see also* 7 Collier on Bankruptcy ¶ 1112.04[6][a].

27. Under the first prong, the analysis looks to whether the debtor has incurred a substantial loss since filing the petition, continues to incur operating losses in operating its business, or the estate is diminishing. When estate assets continue to diminish due to increasing administrative costs, this prong will be satisfied. *See In re Gateway Access Solutions*, 374 B.R. at 560 (finding cause existed to convert the debtor's case where the estate was diminishing at the

expense of creditors as extensive administrative costs from professional fees were accumulating while the case lingered in chapter 11).

28. Under the second prong, the analysis looks to whether there is an absence of a reasonable likelihood of rehabilitation. Rehabilitation means that the debtor will be able to re-establish a sound financial basis, "a concept which necessarily involves establishing a cash flow from which current obligations can be met." *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1986); *see also In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y 2003) (granting motion to convert case from chapter 11 to chapter 7 where debtor failed to sustain burden of demonstrating the possibility of rehabilitation).

29. Here, both prongs of the conversion analysis are met. First, the Reorganized Debtors lack any meaningful positive cash flow and have not been able to obtain additional financing or a purchaser for the business. Administrative costs in the Chapter 11 Cases continue to accrue and there is insufficient cash to meet such expenses. For that reason, the Reorganized Debtors' estates are increasingly declining in value.

30. Second, in light of the Reorganized Debtors' lack of cash on hand to meet expenses, the Reorganized Debtors are administratively insolvent, can no longer make the committed Distributions under the Plan, and there is no possibility that these Chapter 11 Cases will lead to a successful rehabilitation.

31. Accordingly, these Chapter 11 Cases must be converted to chapter 7 to preserve whatever value remains for the estates' assets.

**NOTICE**

32. Notice of this Motion will be provided to: (i) the Office of the United States Trustee; (ii) the Subchapter V Trustee; (iii) the Internal Revenue Service; (iv) the Securities and Exchange

Commission; (v) the Delaware Secretary of State; (vi) the Delaware Secretary of the Treasury; (vii) the Reorganized Debtors' creditor matrix; and (viii) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Reorganized Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Reorganized Debtors respectfully request that the Court enter an Order (a) converting the Reorganized Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code and (b) granting any other and further relief that the Court deems just and proper under the circumstances.

Dated: February 10, 2025
Wilmington, Delaware

**PASHMAN STEIN WALDER HAYDEN, P.C.**

*/s/ John W. Weiss*
John W. Weiss (No. 4160)
Joseph C. Barsalona II (No. 6102)
824 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 592-6496
Email: jweiss@pashmanstein.com
       jbarsalona@pashmanstein.com

-and-

Amy M. Oden (admitted *pro hac vice*)
Katherine R. Beilin (admitted *pro hac vice*)
Court Plaza South, East Wing
21 Main Street, Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200
Email: aoden@pashmanstein.com
       kbeilin@pashmanstein.com

*Counsel to the Reorganized Debtors*