# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>STICKY'S HOLDINGS LLC, *et al.*[1]<br>Debtors. | Chapter 11<br><br>Case No. 24-10856 (JKS)<br><br>Jointly Administered<br><br>Hearing Date: June 6, 2025, at 10:30 a.m.<br>Objection Deadline: June 2, 2025, at 4 p.m. ET<br>(extended for U.S. Trustee)<br><br>Re: Docket No. 595 |

**OBJECTION OF THE U.S. TRUSTEE TO REORGANIZED DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE REORGANIZED DEBTORS TO MODIFY, AND APPROVING MODIFICATIONS TO, THE CONFIRMED PLAN OF REORGANIZATION, (II) CONFIRMING THE SUBCHAPTER V REORGANIZED DEBTORS' SECOND MODIFIED FIRST AMENDED PLAN OF REORGANIZATION, AND (III) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Regions 3 and 9 ("U.S. Trustee"), by and through his undersigned attorney, hereby submits this objection to the *Reorganized Debtors' Motion for Entry of an Order (I) Authorizing the Reorganized Debtors to Modify, and Approving Modifications to, the Confirmed Plan of Reorganization, (II) Confirming the Subchapter V Reorganized Debtors' Second Modified First Amended Plan of Reorganization, and (III) Granting Related Relief* [D.I. 595] (the "Motion"), and in support of that Objection states as follows:

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Reorganized Debtor's federal tax identification number are as follows: Sticky's Holdings LLC (3586); Sticky Fingers LLC (3212); Sticky Fingers II LLC (7125); Sticky Fingers III LLC (3914); Sticky Fingers IV LLC (9412); Sticky Fingers V LLC (1465); Sticky Fingers VI LLC (0578); Sticky's BK I LLC (0423); Sticky's NJ 1 LLC (5162); Sticky Fingers VII LLC (1491); Sticky's NJ II LLC (6642); Sticky Fingers IX LLC (5036); Sticky's NJ III LLC (7036); Sticky Fingers VIII LLC (0080); Sticky NJ IV LLC (6341); Sticky's WC 1 LLC (0427); Sticky's Franchise LLC (5232); Sticky's PA GK I LLC (7496); Stickys Corporate LLC (5719); and Sticky's IP LLC (4569). The Reorganized Debtors' mailing address is 21 Maiden Lane, New York, NY 10038.

**PRELIMINARY STATEMENT**

1.  Bankruptcy courts may not approve structured final distributions of estate property that violate the Code's priority rules without the affected creditors' consent. *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017). In *Jevic*, The United States Supreme Court reaffirmed the Code's bedrock priority rules by holding that they must be respected and applied when estate property is finally distributed. Accordingly, this Court should deny the Motion because, in the Modified Plan, the Debtors provide for the pro rata payment of general unsecured claims without the full satisfaction of administrative claims.

2.  The Motion also should be denied for the following separate and distinct reasons: (a) Section 1191(e) does not permit the partial payment of administrative claims; (b) Section 1191(e) does not permit the deferred payment of administrative rent claims; and (c) the exculpation provision, as modified, (i) includes as an Exculpated Party the proposed Purchaser, an entity which is not an estate fiduciary, and (ii) covers acts after the Effective Date.

3.  For these reasons, set forth in more detail below, the U.S. Trustee respectfully requests that the Motion be denied.

**JURISDICTION & STANDING**

4.  Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine the Motion and this objection.

5.  Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District. Such oversight is part of the U. S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294,

295-96 (3d Cir. 1994) (noting that the U. S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U. S. Trustee as a "watchdog").

6. Under 11 U.S.C. § 307, the U. S. Trustee has standing to be heard on the issues raised by the Motion.

## FACTUAL BACKGROUND

7. On April 25, 2024, the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code.

8. On April 26, 2024, the United States Trustee appointed Natasha Songonuga of Archer & Greiner, P.C. to serve as the Subchapter V trustee (the "Subchapter V Trustee") in these cases pursuant to section 1183(a) [D.I. 26]. No official committee was appointed in these cases.

9. On December 2, 2025, this Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming Subchapter V Debtors' Modified First Amended Plan of Reorganization* [D.I. 431] ("Confirmed Plan Confirmation Order").

10. Each condition precedent to the effectiveness of the *Subchapter V Debtors' Modified First Amended Plan of Reorganization* [D.I. 368] (the "Confirmed Plan") occurred in accordance with the provisions of the Confirmed Plan, and the Confirmed Plan went effective November 29, 2024 (the "Effective Date"). Mot. ¶ 12.

11. On February 10, 2025, Debtors filed the *Motion of Reorganized Debtors to Convert the Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [D.I. 481] (the "Motion to Convert"). The Motion to Convert was initially scheduled for a hearing on February 26, 2025. *See* D.I. 491. On February 24, 2025, the hearing was cancelled and converted to a status conference

to be held on March 4, 2025. *See* D.I. 500.

12. The Court held multiple status conferences following the Motion to Convert.

13. On March 30, 2025, the Debtors received the proposed Harker Palmer Letter of Intent ("Harker Palmer LOI").

14. On April 3, 2025, the Debtors filed the *Reorganized Debtors' Motion for Entry of an Order (I) Authorizing Entry into Proposed Letter of Intent with Harker Palmer Investors LLC; (II) Authorizing Reorganized Debtors and their Professionals to Perform Obligations Thereunder; and (III) Granting Related Relief* [D.I. 545] (the "LOI Motion").

15. On April 30, 2025, the Court entered the Order *(I) Authorizing Entry into Proposed Letter of Intent with Harker Palmer Investors LLC; (II) Authorizing Reorganized Debtors and their Professionals to Perform Obligations Thereunder; and (III) Granting Related Relief* [D.I. 585] (the "LOI Order").

16. Pursuant to the LOI Order, the Debtors filed the Motion for authority to modify their Confirmed Plan and Confirmation of the Modified Plan ("Modified Plan").

17. The Modified Plan includes the following material modifications to the Confirmed Plan, without limitation:

   a. The Purchased Assets will be sold to the Purchaser Free and Clear.

   b. The Purchase Price will be used to fund the Modified Plan, including to establish an Administrative Expense Claims Reserve and an Allowed General Unsecured Claims Reserve.

   c. The Administrative Expense Claims Reserve shall fund the costs and expenses of administering the Administrative Expense Claims Reserve and Pro Rata payments to Allowed Administrative Expenses Claims, including those on account of Unpaid Ordinary Course Expenses, Post-Confirmation Unpaid and Allowed Professional Fees and Expenses, Professional Fees as of the Confirmed Plan Effective Date, Administrative Tax Claims, the U.S. Foods Settlement, Cure Claims, and Lease Rejection Administrative Claims, to the extent such Claims are Allowed.

      d.      The General Unsecured Claims Reserve shall fund the costs and expenses of administering the General Unsecured Claims Reserve and Pro Rata payments to each holder of an Allowed General Unsecured Claim.

      e.      With respect to Allowed Secured Claims: (1) the SBA's Secured Claim will be assumed by the Purchaser and paid in accordance with the terms of the EIDL Loans; (2) each holder of Other Secured Claims shall receive in satisfaction of such Claim the collateral securing such Claim, and any remaining Allowed Claim shall be paid Pro Rata from the General Unsecured Claims Reserve.

      f.      The Reorganized Debtors will surrender all furniture, fixtures, and equipment subject to a lien in favor of the lessor of a furniture, fixtures, and equipment lease to such lessor (to the extent not earlier surrendered) and in the absence thereof, to the applicable landlord.

      g.      The Reorganized Debtors other than Reorganized Sticky's will be dissolved, and Reorganized Sticky's will continue to exist for the purpose of implementing the Modified Plan.

Mot. ¶ 21.

## ARGUMENT

**I.**    **The Motion Should be Denied Because it Seeks to Distribute Estate Assets in Violation of the Bankruptcy Code's Distribution System**

    **A.**    **Under the Reasoning of the Supreme Court's *Jevic* Decision, the Priority-Skipping Distribution Proposed in the Modified Plan Is Impermissible.**

18.    Through the Motion, the Debtors seek approval of the Modified Plan, through which they propose to distribute approximately $2 million of the proceeds of the sale pursuant to the Harker Palmer LOI. Under the Modified Plan, the Debtors will pay administrative claimants at a significant unspecified discount on a pro rata basis without their consent. The Debtors also propose to pay the general unsecured creditors a portion of their claims on a pro rata basis. As the discussion below demonstrates, this is an impermissible attempt to circumvent the priority scheme in the Bankruptcy Code, which ensures that administrative claims will be paid in full before junior classes are paid. Consequently, the Motion should be denied.

19. In *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017), the Supreme Court rejected a non-plan priority-skipping distribution of the assets of a chapter 11 estate as part of a structured dismissal, which the lower courts had approved. The bankruptcy court was asked to approve a settlement that would have ended the bankruptcy case and distributed funds to lower-priority general unsecured creditors while skipping higher priority creditors. *Jevic*, 137 S. Ct. at 981. The debtor and creditors' committee had agreed to dismiss a fraudulent conveyance claim against two secured creditors, Sun Capital Partners and CIT Group. In turn, CIT offered to pay $2 million for the committee's legal fees and administrative expenses, while Sun agreed to assign its lien on $1.7 million of the debtor's cash to a trust that would pay taxes and administrative expenses, with the remainder to be distributed ratably to non-priority unsecured creditors. *Id.* Sun had insisted that no distribution be made to the priority claimants, who had a pending lawsuit against it. *Id.*

20. The bankruptcy court in *Jevic* had approved the settlement, reasoning that structured dismissals need not follow the priority rules, and absent the settlement, only the secured creditors would recover anything, so the priority creditor is no worse off from the exclusion. *Id.* at 982, 986. The Supreme Court reversed. *Id.* at 983.

21. As an initial matter, the Court noted that "Chapter 11 foresees three possible outcomes." *Id.* at 979. These outcomes are:

    (a) a "bankruptcy-court-confirmed plan;"

    (b) conversion to a chapter 7 liquidation case; or

    (c) dismissal of the chapter 11 case under 11 U.S.C. § 1112. *Id.*

22. Thus, if a bankruptcy estate lacks sufficient funds to pay priority creditors in full, as required by 11 U.S.C. § 1129(a), and the priority creditors do not consent to less favorable

treatment, the debtor's case must be converted or dismissed. Both dispositions respect the relative rights of creditors under federal bankruptcy and state law. The rights of priority creditors are protected in chapter 7 by the requirement that priority creditors be paid first, and in the order specified in section 507. 11 U.S.C. § 726(a). Non-priority general unsecured claims are paid pro rata after all claimholders with higher priorities have been fully paid. 11 U.S.C. § 726(b).

23. In the alternative, a chapter 11 case may be dismissed, leaving creditors free to pursue their claims outside bankruptcy. 11 U.S.C. § 349. As the Supreme Court explained, a dismissal "revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case." *Jevic*, 137 S. Ct. at 979 (citing 11 U.S.C. § 349(b)). It thus "aims to return to the prepetition status quo." *Id*. While the Court acknowledged that a bankruptcy court may, "for cause, orde[r] otherwise" under the statute, this provision is "designed to give courts the flexibility to 'make the appropriate orders to protect rights acquired in reliance on the bankruptcy case.'" *Id.* at 984 (quoting H.R. Rep. No. 95-595 at. 338 (1977)). It does not authorize a court to make "final distributions that do not help to restore the *status quo ante* or protect reliance interests acquired in the bankruptcy, and that would be flatly impermissible in a chapter 7 liquidation or chapter 11 plan because they violate priority without the impaired creditors' consent."[2] *Id.* at 984-985.

24. In *Jevic*, the Supreme Court ruled that a "distribution scheme ordered in connection with the dismissal of a chapter 11 case cannot, without the consent of the affected parties, deviate

---

[2] The Court recognized in *dicta* that there were limited instances where some courts approved of interim, as opposed to final, distributions that violate ordinary priority rules, such as "first day" wage orders, "critical vendor" orders, and "roll-ups," but it noted that "these courts have usually found that the distributions at issue would enable a successful reorganization and make even the disfavored creditors better off." *Jevic*, 137 S. Ct. at 985-986. Such transfers were not at issue in *Jevic*, so the Court did not pass upon them. Interim distributions also are not at issue here.

7

from the basic priority rules that apply under the primary mechanisms the Code establishes for final distributions of estate value in business bankruptcies." *Jevic,* 137 S. Ct. at 978.

25. The Supreme Court also recognized in *Jevic* that nonconsensual deviation from the statutory priority scheme is prohibited under chapter 7 liquidations and the chapter 11 plan process. *Id*. at 979; *see also id*. at 983 (stating that estate assets are "normally" disbursed "through a Chapter 7 liquidation or a Chapter 11 plan," both of which "are governed by priority").

26. As a result, the Supreme Court held in *Jevic* that, under each of the three avenues for leaving chapter 11 – conversion, dismissal, and plan confirmation – bankruptcy courts cannot approve distributions that would violate the priority distribution system established by Congress without the consent of the affected parties. *See id*. at 979 ("It is important to keep in mind that Chapter 11 foresees three possible outcomes."). Nevertheless, the Debtors propose to pay administrative claimants under a pro rata scheme without satisfying those claims in full. At the same time, general unsecured creditors will receive a pro rata share of their respective claims. By the Motion, the Court is being asked to approve a Modified Plan that alters the statutory priorities. This request finds no support whatsoever in the Bankruptcy Code and flies directly in the face of the Supreme Court's reasoning in *Jevic*.

27. The Supreme Court determined in *Jevic* that departure from the priority scheme raises "potentially serious" consequences. *Id.* at 986. These include departing "from protections that Congress granted particular classes of creditors." *Id.* "They include changes in the bargaining power of different classes of creditors," and "risks of collusion, *i.e.*, senior secured creditors and general unsecured creditors teaming up to squeeze out priority unsecured creditors." *Id.* They also include making settlement more difficult to achieve, as there would be greater uncertainty as to what outcome will result in a case. *Id.* For these reasons, courts may not "'alter the balance

struck by the statute.'" *Id*. at 987 (quoting *Law v. Siegel*, 571 U.S. 415, 427, 134 S. Ct. 1188, 1198 (2014)).

28. The Supreme Court's *Jevic* decision was premised upon the bedrock principle that "[t]he Code's priority system constitutes a basic underpinning of business bankruptcy law," which is "fundamental to the Bankruptcy Code's operation." *Jevic*, 137 S. Ct. at 983, 984.

29. The statutory priorities are established by 11 U.S.C. § 507, which is made applicable to chapter 11 cases by 11 U.S.C. § 103(a).

30. Thus, when analyzing a request to make non-plan priority-skipping distributions in a chapter 11 case, this Court must examine the Bankruptcy Code for "some affirmative indication of intent [that] Congress actually meant to make [the proposed disbursement] a backdoor means to" circumvent the statutory priority system established by section 507. *Id*. at 984. "The importance of the priority system leads us to expect more than simple statutory silence if, and when, Congress were to intend a major departure." *Id.*

31. No Bankruptcy Code provides for the priority-skipping distribution proposed in the Modified Plan. As a result, it is not allowed.

32. In reiterating the importance of complying with chapter 11's procedural safeguards, *Jevic* is entirely consistent with the Supreme Court's long history of protecting the substantive and procedural rights of creditors to determine whether to accept a proposal that does not follow the priorities of distribution. *Cf. Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207 (1988) ("the Code provides that it is up to the creditors – and not the courts – to accept or reject a reorganization plan which fails to . . . honor the absolute priority rule"). Even if a "Court . . . believe[s] that petitioners or other unsecured creditors would be better off" with the proposed deal, that "determination is for the creditors to make in the manner specified by the Code." *Id*.

33. The Supreme Court in *Jevic* also rejected the idea that bankruptcy courts can disregard the statutory priority system in "rare cases" in which they find "sufficient reasons." *Jevic*, 137 S. Ct. at 986. The Supreme Court determined that, because "it is difficult to give precise content to the concept 'sufficient reasons,'" the exception would likely swallow the rule, and every case would be presented to the bankruptcy court as the "rare case." *Id*. The Supreme Court further found the consequences of accepting a "rare case" exception to be "potentially serious," including: (i) "departure from the protections Congress granted particular classes of creditors"; (ii) "changes in bargaining power of different classes of creditors even in bankruptcies that do not end in structured dismissals"; and (iii) "risks of collusion, i.e., senior secured creditors and general unsecured creditors teaming up to squeeze out priority unsecured creditors." *Id*.

34. The concerns identified by the Supreme Court are present here. Specifically, administrative claims will not be paid in full before the general unsecured creditors receive a distribution. Under the reasoning of *Jevic*, the Motion should be denied because it seeks to approve a Modified Plan in circumvention of the Bankruptcy Code's priority system and procedural safeguards.

**II.    Section 1191(e) Does Not Permit the "Partial" Payment of Administrative Claims**

35. Section 1129(a)(2) requires that the Modified Plan comply with the applicable provisions of the Bankruptcy Code. Presumably, the Debtors rely upon section 1191(e) to pay the Administrative Claims over the life of the Modified Plan. Section 1191(e) permits the plan to provide for the payment of claims specified in sections 507(a)(2) and (3), notwithstanding the confirmation requirement in section 1129(a)(9) that such claims be paid in full on the plan's effective date. This provision does not, however, permit the Debtors to pay the Administrative Claimants less than the full amount of their claims. This provision does not permit the Debtors to

reduce the amount of any allowed administrative claim or provide for the pro rata payment under an impermissible waterfall. To the contrary, the provision clearly states that the plan must "provide for the payment". In the present cases, the Debtors have failed to "provide for the payment" and have failed to comply with section 1191(e). As a result, the Debtors have failed to meet their burden under section 1129(a)(2).

### III. Post Petition Rent Obligations Do Not Fall Within Section 1191(e)

36. If the court confirms a plan under the cramdown provisions of section 1191(b), section 1191(e) permits the plan to provide for the payment through the plan of claims specified in sections 507(a)(2) and (3), notwithstanding the confirmation requirement in section 1129(a)(9) that such claims be paid in full on the plan's effective date. Section 507(a)(2) includes administrative expense claims allowable under section 503(b), and section 507(a)(3) gives priority to involuntary gap claims allowable under section 502(f). Administrative expenses include claims under section 503(b)(2) for fees and expenses of the trustee and of professionals employed by the debtors and the trustee under section 330(a) and claims under section 503(b)(9) for goods received by the debtor in the ordinary course of business within 20 days before the filing of the petition.

37. Post petition rent obligations, such as those of the landlords, do not fall within the scope of section 1191(e). In *In re Seven Stars on the Hudson Corp.*, 618 B.R. 333, 347 n. 82 (Bankr. S.D. Fla. 2020), the court observed that a subchapter V plan cannot provide for the deferred payment of post-petition rent obligations under a lease of non-residential real property. The Seven Stars court agreed that section 1191(e) permits deferred payment of administrative expense claims allowed under section 503(b). It concluded, however, that section 365(d)(3), not section 503(b), governs post-petition rent obligations. The court ruled, "As such, even though new Section 1191(e) permits certain administrative expense claims to be paid out over the term of a plan, this provision

undoubtedly does not apply to administrative rent." *Id*. Even if the court permitted the debtor to proceed under subchapter V in its case that began prior to section 1191(e)'s enactment, the court ruled, it could not confirm a plan that did not provide for full payment of post-petition rent on the effective date of the plan in accordance with earlier orders of the court.

38. The logic and principles of the *Seven Stars* holding are applicable to the facts and the circumstances in these cases. The landlords' claims are most of the claims which the Debtors have classified as Administrative Claims. Debtors estimate that these claims will exceed $4,200,000. *See*, Modified Plan, Section 2.1 A. These claims are governed by section 365(d)(3), which requires that the claims be paid in full in a timely manner == not in a partial amount over the life of the Modified Plan. *See* 11 U.S.C. § 365(d)(3). Under the proposed terms of the Modified Plan, the landlords will be paid pro rata with other Administrative Claimants over three years. This fails to comply with the provisions of the Bankruptcy Code. As a result, the Debtors cannot meet their burden under section 1129(a)(2).

## IV. The Exculpation Provision is Impermissibly Broad Beyond Circuit Precedent

40. To the extent exculpation is permissible beyond the provisions of section 1125(e) of the Bankruptcy Code, this Circuit has only approved post-petition, pre-effective date exculpations that are limited to estate fiduciaries. The Modified Plan's Exculpation Provision is inconsistent with controlling case law because it includes the Purchaser under the proposed sale. Modified Plan § 1.10.4, Mot. ¶ 50. First, the Purchaser is not an estate fiduciary. Second, the Exculpation Provision is limited to those actions arising prior to the Effective Date. Debtors concede that the Effective Date was November 29, 2024. See Mot., ¶ 12. As a result, the acts of the Purchaser should not be covered by the exculpation, as its involvement in the cases occurred

months after the Effective Date. For these reasons, the Plan should not be confirmed if the provision is not modified.

41. The Third Circuit in *In re PWS Holding Corporation*, 228 F.3d 224 (3d Cir. 2000) articulated the standard of liability to which estate fiduciaries are held in a chapter 11 case in a plan. *See id*. at 246. This Court has consistently interpreted *PWS Holding Corporation* and uniformly held that a party's entitlement to exculpation is based upon its role or status as an estate fiduciary. *See In re Washington Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (holding that an "exculpation clause must be limited to the fiduciaries ***who have served during the chapter 11 proceeding***: estate professionals, the Committees and their members, and the Debtors' directors and officers.") (emphasis added); *accord In re Indianapolis Downs, LLC*., 486 B.R. 286, 306 (Bankr. D. Del. 2013); *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 WL 5509031, at *38 (Bankr. D. Del. Nov. 10, 2011) (Shannon, J.) ("courts have permitted exculpation clauses insofar as they merely state[] the standard to which ... estate fiduciaries [a]re held in a chapter 11 case. That fiduciary standard, however, applies only to estate fiduciaries, no one else.") (internal quotations omitted); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011).

42. Because exculpation is limited to estate fiduciaries who served in the bankruptcy case, they must also be limited to actions and omissions taking place during the bankruptcy case. *See Washington Mut.*, 442 B.R. at 350 (exculpations cover "actions in the bankruptcy case") (citing *PWS*, 228 F.3d at 246).

43. In *In re Mallinckrodt PLC*, 639 B.R. 837 (Bank. D. Del. 2022), this Court recently held that exculpation "only extends to conduct that occurs between the petition date and the effective date" and ordered the debtors to strike contrary language from the exculpation provision.

*Id.* at 883. Here, the inclusion of the Purchaser as an "Exculpated Party" for actions after the Effective Date should not be approved.

## RESERVATION OF RIGHTS

44.     The U.S. Trustee leaves the Debtors to their burden, and reserves any and all rights to, *inter alia*, (i) amend or supplement this objection and (ii) conduct discovery.

**WHEREFORE,** the United States Trustee respectfully requests that this Court deny the Motion and grant such other and further relief as this Court deems just and appropriate.

| | |
|---|---|
| Dated:  May 29, 2025<br>             Wilmington, Delaware | Respectfully submitted,<br><br>**ANDREW R. VARA**<br>**UNITED STATES TRUSTEE**<br>**REGIONS 3 & 9**<br><br>By:  */s/ Jonathan W. Lipshie*<br>Jonathan W. Lipshie<br>Trial Attorney<br>United States Department of Justice<br>Office of the United States Trustee<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207, Lockbox 35<br>Wilmington, Delaware 19801<br>Phone: (202) 567-1124<br>Email: jon.lipshie@usdoj.gov |

**CERTIFICATE OF SERVICE**

   I, Jonathan W. Lipshie, counsel to Andrew R. Vara, the United States Trustee for Regions 3 and 9, do hereby certify that on this ==XX== day of May, 2025, I caused a true and correct copy of this *Objection* to be served on the parties listed below via electronic mail.

*Counsel to the Reorganized Debtors*
PASHMAN STEIN WALDER HAYDEN, P.C.
John W. Weiss
Henry J. Jaffe
Joseph C. Barsalona II
824 North Market Street, Suite 800
Wilmington, DE 19801
jweiss@pashmanstein.com
jbarsalona@pashmanstein.com

*Counsel to the Reorganized Debtors*
PASHMAN STEIN WALDER HAYDEN, P.C.
Amy Oden
Katherine R. Beilin
Court Plaza South, East Wing
21 Main Street, Suite 200
Hackensack, NJ 07601
aoden@pashmanstein.com
kbeilin@pashmanstein.com

*Subchapter V Trustee*
ARCHER & GREINER, P.C.
Natasha M. Songonuga
300 Delaware Avenue, Suite 1100
Wilmington, DE 19801
nsongonuga@archerlaw.com

                By: */s/ Jonathan W. Lipshie*
                Jonathan W. Lipshie
                Trial Attorney