## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Sticky's Holdings LLC, *et al.*, | Case No. 24-10856 (JKS) |
| Reorganized Debtors.[1] | Jointly Administered |
| | **RE: D.I. 595, 609** |

### REPLY OF REORGANIZED DEBTORS IN SUPPORT OF THE REORGANIZED DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE REORGANIZED DEBTORS TO MODIFY, AND APPROVING MODIFICATIONS TO, THE CONFIRMED PLAN OF REORGANIZATION, (II) CONFIRMING THE SUBCHAPTER V REORGANIZED DEBTORS' SECOND MODIFIED FIRST AMENDED PLAN OF REORGANIZATION, AND (III) GRANTING RELATED RELIEF

The above-captioned reorganized debtors (the "Reorganized Debtors") respectfully submit this reply memorandum in support of the *Reorganized Debtors' Motion for Entry of an Order (I) Authorizing the Reorganized Debtors to Modify, and Approving Modifications To, the Confirmed Plan of Reorganization, (II) Confirming the Subchapter V Reorganized Debtors' Second Modified First Amended Plan of Reorganization, and (III) Granting Related Relief* [D.I. 595] (the "Motion"), and in response to the *Objection of the U.S. Trustee to Reorganized Debtors' Motion for Entry of an Order (I) Authorizing the Reorganized Debtors to Modify, and Approving*

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Reorganized Debtor's federal tax identification number are as follows: Sticky's Holdings LLC (3586); Sticky Fingers LLC (3212); Sticky Fingers II LLC (7125); Sticky Fingers III LLC (3914); Sticky Fingers IV LLC (9412); Sticky Fingers V LLC (1465); Sticky Fingers VI LLC (0578); Sticky's BK I LLC (0423); Sticky's NJ 1 LLC (5162); Sticky Fingers VII LLC (1491); Sticky's NJ II LLC (6642); Sticky Fingers IX LLC (5036); Sticky's NJ III LLC (7036); Sticky Fingers VIII LLC (0080); Sticky NJ IV LLC (6341); Sticky's WC 1 LLC (0427); Sticky's Franchise LLC (5232); Sticky's PA GK I LLC (7496); Stickys Corporate LLC (5719); and Sticky's IP LLC (4569). The Reorganized Debtors' mailing address is 21 Maiden Lane, New York, NY 10038.

*Modifications To, the Confirmed Plan of Reorganization, (II) Confirming the Subchapter V*

*Reorganized Debtors' Second Modified First Amended Plan of Reorganization, and (III) Granting*

*Related Relief* [D.I. 609] (the "<u>Objection</u>" of the "<u>US Trustee</u>"). Defined terms used herein have

the same meaning ascribed to them in the Motion and are incorporated herein by reference.

## <u>ARGUMENT</u>

The Modified Plan satisfies all requirements for confirmation under Subchapter V of

chapter 11 of the Bankruptcy Code and represents a significant achievement for all creditor

constituencies who will fare far better under such plan than they would if the Cases were to convert

to chapter 7, where no funds will be available to satisfy creditor claims.

   I.    <u>The Modified Plan Satisfies the Requirements of Section 1191(e) of the Bankruptcy Code</u>

Section 1191(e) of the Bankruptcy Code provides a "Special Rule" that permits a debtor to

confirm a plan under Subchapter V of chapter 11, even where it does not comply with section

1129(a)(9) of the Bankruptcy Code.  This sub-section provides:

(e)    **Special Rule** – Notwithstanding section 1129(a)(9)(A) of this title, a plan that provides for the payment through the plan of a claim of a kind specified in paragraph (2) or (3) of section 507(a) of this title may be confirmed under subsection (b) of this Section.

11 U.S.C. § 1191(e).

The US Trustee takes the position that the Reorganized Debtors' Modified Plan may not

be confirmed because it will not pay Allowed Administrative Claims in full.[2]  The US Trustee is

wrong for at least two reasons.  First, as explained below, section 1191(e) <u>does</u> allow a Subchapter

V plan to be confirmed where it provides payment of administrative claims even if those claims

---

[2]    The US Trustee also argues that section 365(d)(3) is a mandatory payment provision. While the Debtors disagree with the US Trustee's legal argument, the issue is moot as the landlords that hold 365(d)(3) claims have settled those claims and consented to the treatment proposed under the Modified Plan.

are not paid in full.  Second, and equally critical, the Modified Plan should be confirmed because all administrative claimants have either: (a) expressly consented to the treatment and partial payment of their Allowed Administrative Claims; or (b) been placed on notice of the <u>pro rata</u> payment of their Administrative Claims **and that their failure to object to the Modified Plan would be deemed consent to their treatment under the Modified Plan**. Not a single administrative claimant objected to any portion of the Modified Plan, and thus, they should be deemed to have consented to the Modified Plan.  Moreover, those administrative creditors with the most to lose, the landlords whose leases were previously assumed (the "<u>Landlords</u>") and are now being rejected and a settling administrative claimant (U.S. Foods Holding Corp., or "<u>US Foods</u>"), expressly consented to <u>pro rata</u> payment, and agreed to massive reductions to their administrative claims to improve the quantum of distributions being made to other administrative claimants.

> a. Administrative Claimants Have Consented to or Should be Deemed to Have <u>Consented to the Treatment of their Administrative Claims under Section 1191(e)</u>

Although the road they have travelled to seek the confirmation of their Modified Plan has been a difficult one, the Reorganized Debtors submit that, aside from the lone objection of the US Trustee, they come to the Court with a fully consensual Modified Plan which results from the hard work of the Reorganized Debtors, the holders of significant administrative claims, and the Subchapter V Trustee, all of which will benefit a broad range of creditor constituencies.

 After the Court authorized the Reorganized Debtors to seek confirmation of their Modified Plan, the Reorganized Debtors and the Subchapter V Trustee began working to obtain consensus on a Modified Plan.

As part of that process, on May 8, 2025, the Reorganized Debtors filed and served their *Notice of Hearing On (X)(A) Reorganized Debtors' Motion for Entry of an Order (I) Authorizing the Reorganized Debtors to Modify, and Approving Modifications To, the Confirmed Plan of Reorganization, (II) Confirming the Subchapter V Reorganized Debtors' Second Modified First Amended Plan of Reorganization, and (III) Granting Related Relief; and (B) Confirmation Hearing on the Subchapter V Debtors' Second Modified First Amended Plan of Reorganization; and (Y) Notice of: (I) Objection Deadlines with Respect to the Plan Modification Motion and the Confirmation of the Modified Plan and (II) Other Deadlines Related to Confirmation of the Modified Plan* (the "Notice") [D.I. 600].

The Notice specifically informed parties-in-interest "that if you object to the treatment of your Claim as proposed in the Modified Plan, or to any of the provisions of the Modified Plan, you must file a timely objection to the Plan Modification Motion and to Confirmation of the Modified Plan. If you fail to file a timely objection **the Reorganized Debtors will seek an order deeming you to have consented to the Modified Plan**." (emphasis added).

Pursuant to the *Certificate of Service* filed by the Debtors' claims and noticing agent, Kurtzman Carson Consultants, LLC dba Verita Global ("Verita") on May 15, 2025, Verita served the Motion on parties in interest on May 9, 2025. [D.I. 604]. Parties were served with both the Motion and the Notice, and had every opportunity to object to the Modified Plan's proposed treatment of administrative claimants. Tellingly, not a single administrative claimant asserts a timely objection to the Modified Plan even though the Modified Plan very clearly modified the treatment of Administrative Claims contained in the Confirmed Plan, by providing for an up front,

*pro rata* payments as a opposed to an uncertain payments over the course of several years that were dependent on the continued operations and success of the Reorganized Debtors' business.

But the Reorganized Debtors' (and Subchapter V Trustee's) efforts did not stop there. After the Modified Plan was filed and served, the Reorganized Debtors and the Subchapter V Trustee negotiated significant reductions of the administrative rejection claims held by various creditors, including the Landlords whose leases were previously assumed and either have been rejected or will be rejected in connection with the Modified Plan.   These concessions were especially important because, without a voluntary reduction in rejection damage claims, the Landlords would have held administrative claims for up to 2 years of additional rent under section 503(b)(7) of the Bankruptcy Code, thus flooding the administrative claim pool with lease rejection damage administrative claims.   With these concessions, the Landlords' administrative rejection damage claims were limited to no more than *six months* (together with damages existing as of the rejection date).   Yet another administrative claimant, US Foods, has also significantly reduced its administrative claim in excess of $250,000, and has provided comments to the to-be-filed proposed *Findings of Fact, Conclusions of Law, and Order Confirming Subchapter V Debtors' Second Modified First Amended Plan of Reorganization* (the "Proposed Modified Confirmation Order").

The Proposed Modified Confirmation Order details the consensus reached between the Reorganized Debtors and the Landlords and the Reorganized Debtors and US Foods. The Landlords have agreed to the allowed administrative expense claims specified in **Exhibit A** to the to-be-filed Proposed Modified Confirmation Order.   These reductions will, upon confirmation and consummation of the Modified Plan, reduce the Landlords' administrative claims from

approximately $4.4 million to approximately $1.4 million, amounting to about $3 million in reductions.

The concessions that the Reorganized Debtors and Subchapter V Trustee have achieved will yield enormous benefits to garden-variety administrative claimants, who will now receive much larger percentage distributions as a result of the massive, voluntary reductions in the Landlords' administrative claims.  To achieve these benefits, however, **the Modified Plan must be confirmed**.  Otherwise, the Cases will almost certainly convert and the benefits of these resolutions will be lost forever to the detriment of all creditors who will receive nothing if the Modified Plan is not confirmed and the Plan Sponsor's value maximizing transaction is not approved and consummated.

Here, the Court should find that Administrative Claimants have consented to the *pro rata* payment of their administrative claims.  Many courts have found administrative claimant consent to less than full payment on their claims where claimants do not object to such treatment and the facts and circumstances of the case militate in favor of finding implied consent or a waiver to object.  *See, e.g., In re Teligent*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002); *In re Faccipone*, 1992 WL 722289 (Bankr. N.D.N.Y. Oct. 7, 1992); *In re Lindgren*, 85 B.R. 447 (Bankr. N.D.Oh. 1988); *In re Hebert*, 61 B.R. 44 (Bankr. W.D.La. 1986).

"Section 1129(a)(9) says only that holders of administrative or priority claims must 'agree' to different treatment, but it does not say how."  *In re Teligent*, 282 B.R. at 770.  Moreover, "[w]hile section 1129(a)(9) requires agreement, it does not state that the agreement must be express."  *Id.* at 771 (explaining that although section 1126(c) and the Bankruptcy Rules utilize the term "accept" when referring to affirmative votes to "accept" a plan, courts must accord weight

to Congress's presumed intent when it instead used the term "agree" for section 1129(a)(9)). Although "the [United States] Trustee has standing to object to confirmation of the Plan on the basis that it fails to comply with the provisions of the Bankruptcy Code, . . . [h]e does not, have standing to step into the shoes of [an administrative claimant] to agree to or object to the treatment of [its] claim." *In re Facciponte*, 1992 WL 722289, at *1.

*In re Teligent* addressed a case where the Debtors gradually became administratively insolvent and could not fully satisfy even their superpriority claims, thereby leaving nothing for their administrative and priority creditors. As the *Teligent* court aptly explained:

> The Lenders would have to fund it because they were the only party with money. However, in light of the amount of administrative and priority debt, no realistic amount of funding would be enough to pay all of the administrative and priority debt in full. Thus, every administrative and priority creditor would have to agree to accept substantially less. Given the number of creditors, obtaining their consent would be time consuming and expensive, with no guarantee of success.

*In re Teligent*, 282 B.R. at 768.

Similar to the Reorganized Debtors here, the *Teligent* Debtors sent notice to all administrative claimants informing them that they would likely receive nothing at all if a plan could not be confirmed and the case were converted to chapter 7, and urged the claimants to instead accept a plan that would pay between 5-12% of each claim. *Id.* The Debtors also informed the claimants that failure to respond would be "deemed to have agreed to accept the treatment under the Plan." *Id.*

The Court confirmed the plan. The Court noted that nobody explicitly refused or objected to the plan's proposed treatment; the majority of claimants explicitly agreed to accept the proposed different treatment; the creditors holding the majority of the claims agreed to this treatment; the debtors had provided ample notice to the claimants; and that it was certain that "serious and

possibly unintended consequences would follow.  Absent consent to such treatment, the Plan would be rendered unconfirmable. There was no other plan, and the case would have gone into a straight, chapter 7 liquidation." *Id.* at 771-73.  As the Court explained:

> In that event, the debtors could not reorganize around their existing business, the fifty people they intended to employ would not have jobs, the Lenders would get all of the assets, and no other creditor would receive a distribution. In short, it was reasonable and appropriate under the circumstances to require the Administrative Creditors to speak up, failing which they should be deemed to have accepted the debtors' offer of different treatment under the Plan.

> *Id.* at 773.

As in *Teligent*, the Landlords who would otherwise hold the vast majority of administrative claims in these cases, have voluntarily agreed to significant reductions of their administrative claims.  Before their voluntary reductions, the Reorganized Debtors estimated that the Landlords' projected rejection damages might have been in excess of $ 4.4 million dollars (using a two-year rejection damage administrative claim cap under section 503(b)(7)) and, following negotiations, those claims have been limited to approximately $1.4 million.

Other courts have similarly held that where a case faces inevitable conversion to Chapter 7 in the absence of a feasible confirmed plan and attaining explicit agreement from all administrative claimants is financially and practically unworkable, it is reasonable to infer that claimants have agreed to a plan's proposed different treatment when those claimants have been given reason to know that their silence will constitute either agreement to such treatment or waiver of their right to object.  *See, e.g., In re Lindgren*, 85 B.R. at 447; *In re Hebert*, 61 B.R. at 44; *In re Facciponte*, 1992 WL 722289, at *2 (confirming plan over UST's objection, where proposed plan gave administrative claimant "a clear and obvious reason to expect that its silence will constitute agreement to the proposed treatment of its claim and [claimant] thus had a duty to speak if it wished

to be paid in full.  Having remained silent, however, [claimant] has agreed to the treatment of its claim as set forth in Debtor's Plan"); *see also In re Silver Airways LLC*, 2025 WL 1436258, at *7.

Moreover, it is well established that where, as here, a notice and an opportunity to object has been provided to creditors who do not act, such failure is established to constitute consent. *See, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif,* 135 S.Ct. 1932 (S. Ct. 2015).  The Third Circuit has long applied this principle in bankruptcy cases, inferring consent by a creditors' failure to act or object.  *See In re Szostek*, 886 F.2d 1405, 1413 (3d Cir. 1989) (noting that "the acceptance of the plan by a secured creditor can be inferred by the absence of an objection," where a secured creditor inadvertently failed to appear for confirmation hearing despite previously voicing concerns and failing to timely move to vacate upon discovery of confirmation).  Indeed, "to hold otherwise would be to endorse the proposition that a creditor may sit idly by, not participate in any manner in the formulation and adoption of the plan in reorganization and thereafter, subsequent to the adoption of the plan, raise a challenge for the first time. Adoption of [this] approach would effectively place all reorganization plans at risk in terms of reliance and finality."  *Id.* (citing *In re Ruti-Sweetwater*, 836 F.2d 1263 (10th Cir. 1988)); *see also In re Ruti-Sweetwater*, 836 F.2d at 1264, 1266 (upholding bankruptcy court's confirmation of plan where "[t]wenty separate classes of secured claims, including the [appellants], failed to vote" by the final bar date). Such is the case here, as none of the administrative claimants has objected to the Modified Plan and therefore, they should be deemed to consent to their treatment under the Modified Plan.

In sum, the parties have worked tirelessly in these cases to arrive at a Modified Plan with a value maximizing transaction that provides the best and only realistic opportunity for administrative and other claimants to receive any distributions on their claims.  They have also

worked hard since the Modified Plan was filed and served *to significantly improve recovery for garden-variety administrative claimants* by dramatically slashing the administrative claims of Landlords and US Foods (all of whom have consented to their treatment under the Modified Plan). And not surprisingly, not a single administrative claimant has filed a timely objection to the Modified Plan.  As such the Court should not allow the US Trustee to substitute its judgment for the parties with the most to lose (and gain) here who support, consent to, and have not objected to, the Modified Plan.

> b.   The Modified Plan Complies with Section 1191(e) by Providing for Payment of Administrative Claims

Because all relevant parties have consented to (or should be deemed to consent to) their treatment in connection with the Modified Plan and have failed to object to the Plan, the Court need not reach the merits of whether a Subchapter V plan can be confirmed absent the payment in full of all administrative claims.  Even, however, if the Court reaches this issue, the US Trustee is simply wrong that a Subchapter V plan that does not pay administrative claims in full cannot be confirmed.

The US Trustee argues that section 1191(e) of the Bankruptcy Code requires payment, in full, of administrative claims, solely on the proposition that the statutory language, "provides for payment," means that payment must be made in full. However, the US Trustee does not provide support for such proposition.  But, the natural meaning of "provides for" does not mean "pays in full."    Rather   it   simply   means   to   make   available. *See*   https://www.merriam-webster.com/disctionary/provide  ("to  supply  or  make  available  (something  wanted  or needed).")  If Congress intended for "provide" as used in section 1191(e) to mean payment in a particular quantum, it knew how to say so.  There are numerous provisions in the Bankruptcy Code

where Congress set forth the quantum of recovery that is required for payment of a claim.  *See, e.g.*, Sections 1129(a)(7)(A)(ii), 1129(a)(7)(B), 11129(a)(9)(A), (B)(i) and (ii), 1129(a)(9)(C)(i), 1129(a)(9)(D), 1129(b)(2)(A)(i)(II), and 1129(b)(2)(B)(i).    Section 1191(e) employes no descriptive language dictating the quantum of payment to be provided.  Instead, the section 1191(e) requirement of "provides" expressly states the standard for approval of the proposed treatment of administrative claims – "may be confirmed under subsection (b) of this section."  Section (b) of 1191 sets forth the standard for confirmation of a plan that provides for administrative claims: "if the plan does not discriminate unfairly, and is fair and equitable."  Section 1191(b).

As previously noted, Subchapter V contains a "special rule" outlined in section 1191(e), which provides that "[n]otwithstanding section 1129(a)(9)(A) of this title, a plan that provides for the payment through the plan of a claim of a kind specified in paragraphs (2) or (3) of section 507(a) of this title may be confirmed under subsection (b) of this section." 11 U.S.C. § 1191(e). Thus, section 1191(e) establishes that a plan of reorganization may be confirmed under Section 1191(b) without regard to section 1129(a)(9)(A).  In interpreting equivalent "notwithstanding" lead-in language to Section 1129(b)(1), the Bankruptcy Court in *In re Tribune*, 972 F.3d 228 (3rd Cir. 2019) held an otherwise enforceable subordination agreement was not applicable to prevent confirmation, under the cram down provisions of the Bankruptcy Code, of a plan of reorganization that did not enforce the subordination agreement. The Third Circuit reasoned that:

> "We have previously defined the phrase "notwithstanding" in the bankruptcy context to mean "'in spite of' or 'without prevention or obstruction from or by.'" *Goody's*, 610 F.3d at 817 (quoting Webster's Third Int'l Dictionary 1545 (1971)); see also *In re Federal Mogul Global Inc.*, 684 F.3d 355, 369 (3d Cir. 2012) (reading the lead-in to Bankruptcy Code § 1123(a)—"notwithstanding any otherwise applicable non-bankruptcy law"—to mean that what follows in subsection (a) displaces conflicting state nonbankruptcy law). Although these cases interpret different sections of the Code, their analysis applies equally to § 1129(b)(1)

because, "[p]resumptively, identical words used in different parts of the same act are intended to have the same meaning." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 460, 113 S. Ct. 2173, 124 L. Ed. 2d 402 (1993) (internal quotation marks and citation omitted). Further, as we explained in *Federal-Mogul*, "[w]hen a federal law contains an express preemption clause, we focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." 684 F.3d at 369 (internal quotation marks omitted). Applying the lessons of *Goody's* and *Federal-Mogul* here, § 1129(b)(1) overrides § 510(a) because that is the plain meaning of "[n]otwithstanding." Thus our holding becomes simple: Despite the rights conferred by § 510(a), "if all of the applicable requirements of subsection (a) of this section [1129] . . . are met with respect to a plan, the court . . . shall confirm the plan . . . if [it] does not discriminate unfairly, and is fair and equitable," for each impaired class that does not accept the plan."

Like in contractual subordination agreements otherwise enforceable under Section 510(b) but rendered inapplicable pursuant to Section 1129(b)(1) by reason of the lead-in "notwithstanding" clause, the general rule in a chapter 11 cases that administrative claims have to be paid in full unless the holder consents does not apply to a plan of reorganization under Subchapter V that is confirmed under Section 1191(b), by reason of the "notwithstanding" lead-in clause in Section 1191(e). Thus, the consent of a holder of an administrative claim should govern its treatment under a Subchapter V plan of reorganization. The test under Section 1191(b) requires no unfair discrimination, and that the treatment must be fair and equitable. The test requires distribution of projected disposable income over a period of three to five years.

The test for "unfair discrimination" is not modified under Subchapter V.  The Bankruptcy Court in *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022) summarized the standard as follows:

"Generally, the standard "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Armstrong World Indus., Inc.* 348 B.R. 111, 121 (D. Del. 2006) (quoting *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)). As the District Court for the District of Delaware observed, "[v]arious tests have emerged in the caselaw, with the hallmarks being whether there is a reasonable basis for the discrimination, and

whether the debtor can confirm and consummate a plan without the proposed discrimination." *In re Nuverra Envtl. Sols. Inc.*, 590 B.R. 75, 90 (D. Del. 2018)."

*Id.* at 897.

The Bankruptcy Court in *Mallinckrodt* also discussed the Third Circuit decision in *Tribune*. *Id.* In *Tribune*, the Third Circuit noted that unfair discrimination is "subject to interpretation," *Tribune,* 972 F.3d at 242, and "is rough justice." *Id.* at 245.

Here, as set forth in the Motion and declarations filed in support of it, the proposed treatment of administrative claims, secured claims and unsecured claims follows the Confirmed Plan both in structure and in value to be distributed. While the Modified Plan modifies certain aspects of the Confirmed Plan, and neither administrative claims nor unsecured claims will receive total payments aggregating the projected amounts of the allowed claims, the Confirmed Plan did not guaranty full payment. The Confirmed Plan was dependent upon future performance of the Reorganized Debtors. In addition, as noted above, the aggregate dollars allocated to administrative claims and unsecured claims follows the Confirmed Plan. While it is true that the aggregate amount of administrative claims and unsecured claims are now larger because the Confirmed Plan cannot be implemented, and thus recoveries may be lower than what was projected (but not guaranteed) under the Confirmed Plan, this outcome is the result of uncontrollable circumstances and not any discrimination that falls within the meaning of "unfair discrimination."

The facts and circumstances supporting that the Modified Plan imposes no unfair discrimination and is fair and equitable are amply demonstrated in the record, as set forth in the Motion and the declarations filed in support thereof. That record is uncontroverted.

The US Trustee further argues that post-petition rent obligations do not fall within the purview of section 1191(e) of the Bankruptcy Code, arguing that 1191(e) does not allow for

payment of landlords over time on section 365(d)(3) post-petition claims. Section 365(d)(3) merely establishes a post-petition obligation for pre-rejection claims. Courts have regularly noted that while section 365(d)(3) mandates timely performance, it fails to set out a landlord's remedies in the event of a default. *See, e.g., In re Mr. Gatti's, Inc.*, 164 B.R. 929, 933 (Bankr. W.D. Tex. 1994) ("As straightforward as newly added Section 365(d)(3) was regarding the obligation of the debtor-tenant to fully and timely perform, it was wholly lacking with regard to any expression of the remedies available to the lessor in the event of a default."). Furthermore, each of the Landlords has consented to the proposed treatment set forth under the Modified Plan and Proposed Modified Confirmation Order, as more fully set forth in **Exhibit A** to the to-be-filed Proposed Modified Confirmation Order. Because each of the Landlords has already consented to the treatment, the Court need not address this argument by the US Trustee.

II.   *Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973 (2017) Does Not Preclude the Modified Plan from Being Confirmed Without Paying Administrative Claims in Full*

In support of its Objection, the US Trustee relies heavily on *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) ("*Jevic*"), a chapter 11 case that sought approval of a structured dismissal outside of the protections of plan confirmation. *Jevic* was not a Subchapter V case. Subchapter V expressly abrogates the requirements of section 1129(a)(2) which were the basis of the holding in *Jevic*. Moreover, *Jevic* did not involve confirmation of a plan of reorganization to which no creditor has objected, as is the case here, and instead was focused on the propriety of a structured dismissal which is not applicable to the instant case. In sum, *Jevic* has no general bearing on the confirmation requirements of a Subchapter V plan of reorganization under the Bankruptcy Code nor does it have any bearing on the confirmation of the Modified Plan.

III.    There is No Third Circuit Rule Stating That a Plan Exculpation Provision Only Applies to Estate Fiduciaries and the Exculpation Provision of the Purchaser is Limited

In its Objection, the US Trustee argues that the exculpation provision in the Modified Plan is impermissibly broad. As discussed in the Reorganized Debtors' Plan Modification Motion, Harker Palmer Investors, LLC ("Harker Palmer" or the "Purchaser") has provided ample support to the Reorganized Debtors, holds Equity Interests in the Reorganized Debtors, is providing the funding through the Purchase Price to fund the Modified Plan and avoid a conversion to chapter 7, and its controlling owner is a member of the Board but recused himself from the Board decisions regarding the Harker Palmer LOI and the Modified Plan. *See In re Laboratory Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan Sponsor was appropriate under section 1123(b)). The exculpation provision is integral to the Reorganized Debtors' reorganization and is a reasonable, appropriate, and tailored provision that is in the best interest of these estates.

The US Trustee contends that the third circuit in *In re PWS Holding Corporation*, 228 F.3d 224 (3d Cir. 2000) determined that exculpation is limited to estate fiduciaries who served in the bankruptcy cases, and thus, Harker Palmer's inclusion as an exculpated party for its actions after the effective date should not be approved. In *PWS*, the Court held that ""[w]e did not treat § 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of **third parties**. Because of the differences between the releases in the two cases, Continental II does not compel the conclusion that this release is impermissible. Indeed, because this release does not affect the liability of **third parties**, but rather sets forth the appropriate standard of liability, we

believe that this release is outside the scope of § 524(e)." *Id.* (emphasis added). The Third Circuit's exculpation discussion was not limited to estate fiduciaries, but referred to "third parties" more generally. Furthermore, the exculpation provision in *PWS* covered parties including those who were not expressly estate fiduciaries. The *PWS* case acknowledges the common occurrence of plan exculpation provisions, endorses their inclusion in a plan, and confirms that an exculpation provision does not alter liability, but sets forth the governing standard of liability: "However, we believe that Paragraph 58, which is apparently a commonplace provision in Chapter 11 plans, does not affect the liability of these parties, but rather states the standard of liability under the Code, and thus does not come within the meaning of § 524(e)." *Id.* at 245.

Here, the in an attempt to alleviate the US Trustee's concerns and in response to the US Trustee's Objection, Harker Palmer has agreed to a modification to the exculpation provision in section 7.11 of the Modified Plan as reflected in the bolded added language below. This modification would only cover Harker Palmer under the exculpation provision if claims are being brought against it as a fiduciary. If a fiduciary-related claim is asserted, it would be covered by the revised Modified Plan exculpation provision, and Harker Palmer would be exculpated without incurring the expense and delay of such litigation. If fiduciary related claim is not asserted, but other claims are, those other claims would not be covered by the revised exculpation provision. The revised exculpation provision would be applied to Harker Palmer consistent with the position of the US Trustee:

> None of the Debtors, their Professionals, Greer, the Debtors' officers and directors that served any time on or after the Petition Date, the Subchapter V Trustee, or the Purchaser, in its capacity as purchaser of the Purchased Assets **solely to the extent the Purchaser is alleged to be a fiduciary and/or held to be a fiduciary**, (collectively, the "Exculpated Parties") shall have or incur any liability to any Holder of a Claim or Equity Interest, or other party in interest, with respect

to any Exculpated Claim, including, without limitation, any act or omission in
connection with, related to, or arising out of, in whole or in part, the Debtors'
Chapter 11 Cases from the Petition Date to the Modified Plan Effective Date,
except for willful misconduct, gross negligence, fraud or criminal misconduct as
determined by a Final Order of a court of competent jurisdiction, and, in all
respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel
with respect to their duties and responsibilities under the Modified Plan.

The Debtors submit that the above exculpation clause as revised is appropriate. Just as *PWS*
notes that a commonplace exculpation clause does not alter liability, but merely sets forth the
governing standard of liability under the Code, the revised exculpation provision in section 7.11
of the Modified Plan similarly conforms to the standard of liability for the Exculpated Parties.

The US Trustee's Objection also relies upon the decisions in *In re Washington Mut., Inc.*,
442 B.R. 314, 350-51 (Bankr. D. Del. 2011), *In re Indianapolis Downs, LLC.*, 486 B.R. 286, 306
(Bankr. D. Del. 2013), *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011), and *In re PTL
Holdings LLC*, 2011 WL 5509031, at *11-*12 (Bankr. D. Del. Nov. 10, 2011). These cases do
not establish a controlling *per se* rule as to the scope of a plan exculpation that is binding on this
Court.[3]

In *Washington Mutual*, the court stated, without analysis or explanation: "That fiduciary
standard, however, applies only to estate fiduciaries." *In re Washington Mut., Inc.*, 442 B.R. at
350. The *Washington Mutual* Court's statement that that estate fiduciaries could be exculpated is
correct. The Court's proposition can equally be interpreted to mean that an exculpation provision

---

[3]    *See "Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991) ("[I]t is clear that
there is no such thing as the law of the district. Even where the facts of a prior district court case are, for all
practical purposes, the same as those presented to a different district court in the same district, the prior
resolution of those claims does not bar reconsideration by this Court of similar contentions. The doctrine of
stare decisis does not compel one district court judge to follow the decision of another.") (internal citations
omitted); *see also Marcus Montgomery Wolfson & Burten, P.C. v. AM Int'l (In re AM Int'l)*, 203 B.R. 898,
905 (applying the *Threadgill* rule to bankruptcy court decisions).

that applies to non-estate fiduciaries may be appropriate but would require a different standard, or that only estate fiduciaries are entitled to the benefit of an exculpation provision. The *Washington Mutual* decision provides no guidance as to the rationale, analysis or support for reading the *PWS* decision as establishing a *per se* rule that a plan exculpation can only apply to estate fiduciaries.

In *PTL Holdings*, the Court attempted to explain the basis for the Court's decision in *Washington Mutual*, but the Court did not engage in a fulsome analysis of the reason for limiting plan exculpation to estate fiduciaries, but rather stated that the limitation is an "implication" of the holding in *PWS*:

The Ninth Circuit took a broader approach in *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020), where it approved exculpation of non-estate fiduciaries, including the debtors' largest creditor, and explaining the exculpation clause allowed parties to "engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation." Likewise, other courts have similarly approved plan exculpation provisions for persons that were not fiduciaries, including secured creditors, plan administrators, lenders, equity holders, and other parties involved in the formulation of the debtor's plan. *See, e.g.*, *In re Astria Health*, 623 B.R. 793, 799-800 (Bankr. E.D. Wash. 2021) (holding that an exculpation may properly be applied to non-estate fiduciaries, including the debtors' main secured creditor); *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 502-03 (Bankr. S.D. Ohio 2021) (holding that it was appropriate to apply the exculpation to non-estate fiduciaries to ensure that skilled parties participated in the formulation of a debtor's chapter 11 plan); *In re Ditech Holding Corp.*, 606 B.R. 544, 631–32 (Bankr. S.D.N.Y. 2019) (holding exculpation provision that included the plan administrator was reasonable and could be approved); *In re Cumulus Media Inc., et al.*, Case No. 17-13381 (SCC)

[D.I. 769] (Bankr. S.D.N.Y. May 10, 2018) (approving exculpation for term loan lenders and equity holders); *In re Garlock Sealing Technologies LLC*, Case No 10-31607 (JCW) [D.I. 5972] (Bankr. W.D.N.C. May 24, 2017) (approving exculpation for ad hoc asbestos claimants committee and other non-estate fiduciaries).

The US Trustee also objects to the Modified Plan exculpation provision to the extent that it applies to actions after the "Effective Date." That objection is misguided. While the Confirmed Plan Effective Date has occurred, the Reorganized Debtors remained under the Court's supervision following the Confirmed Plan Effective Date, and the Modified Plan, if confirmed, will set a new, controlling effective date. *See Astria Health*, 623 B.R. at 798-799 (holding the exculpation provision was appropriate, noted the provision covered the period "during which the debtors and their affairs were subject to this court's supervision"). The Exculpation Provision would cover all actions prior to the Modified Plan Effective Date.

Here, Harker Palmer has gone through extraordinary lengths to provide funding and an orderly process for modification of the confirmed Plan, and has worked cooperatively with the Reorganized Debtors, the Subchapter V Trustee, and administrative claimants to provide a consensual Modified Plan providing a recovery for stakeholders that would not happen should these cases convert. In light of this, Harker Palmer should be afforded the limited exculpation provided for in section 7.11 of the Modified Plan.

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in its Opening Brief, the Reorganized Debtors respectfully request that this Court: (1) grant the Reorganized Debtors' Motion; and (2) grant such other and further relief as the Court deems just and proper.

Dated: June 3, 2025          **PASHMAN STEIN WALDER HAYDEN, P.C.**
      Wilmington, Delaware

*/s/ Henry J. Jaffe*
Henry J. Jaffe (No. 2987)
John W. Weiss (No. 4160)
824 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 592-6496
Email: jweiss@pashmanstein.com
      hjaffe@pashmanstein.com

-and-

Amy Oden (admitted *pro hac vice*)
Katherine R. Beilin (admitted *pro hac vice*)
Court Plaza South, East Wing
21 Main Street, Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200
Email: aoden@pashmanstein.com
      kbeilin@pashmanstein.com

*Counsel to the Reorganized Debtors*