**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Sticky's Holdings LLC, *et al.*, | Case No. 24-10856 (JKS) |
| Reorganized Debtors.[1] | Jointly Administered |
| | **Re: D.I. 595** |

**DECLARATION OF JAMIE GREER IN SUPPORT OF
REORGANIZED DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING THE REORGANIZED DEBTORS TO MODIFY,
AND APPROVING MODIFICATIONS TO, THE CONFIRMED PLAN
OF REORGANIZATION, (II) CONFIRMING THE SUBCHAPTER V
REORGANIZED DEBTORS' SECOND MODIFIED FIRST AMENDED
PLAN OF REORGANIZATION, AND (III) GRANTING RELATED RELIEF**

I, Jamie Greer, declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I submit this Declaration (this "Declaration") in support of confirmation of the *Reorganized Debtors' Motion for Entry of an Order (I) Authorizing the Reorganized Debtors to Modify, and Approving Modifications to, the Confirmed Plan of Reorganization, (II) Confirming the Subchapter V Reorganized Debtors' Second Modified First Amended Plan of Reorganization, and (III) Granting Related Relief* [D.I. 595] (the "Motion") seeking (i) authority to modify, and approve the modifications to, the *Subchapter V Reorganized Debtors' Second Modified First Amended Plan of Reorganization* [D.I.368] (the "Confirmed Plan") and (ii) confirmation of the

---

[1]     The Reorganized Debtors in these cases, along with the last four digits of each Reorganized Debtor's federal tax identification number are as follows: Sticky's Holdings LLC (3586); Sticky Fingers LLC (3212); Sticky Fingers II LLC (7125); Sticky Fingers III LLC (3914); Sticky Fingers IV LLC (9412); Sticky Fingers V LLC (1465); Sticky Fingers VI LLC (0578); Sticky's BK I LLC (0423); Sticky's NJ 1 LLC (5162); Sticky Fingers VII LLC (1491); Sticky's NJ II LLC (6642); Sticky Fingers IX LLC (5036); Sticky's NJ III LLC (7036); Sticky Fingers VIII LLC (0080); Sticky NJ IV LLC (6341); Sticky's WC 1 LLC (0427); Sticky's Franchise LLC (5232); Sticky's PA GK I LLC (7496); Stickys Corporate LLC (5719); and Sticky's IP LLC (4569). The Reorganized Debtors' mailing address is 21 Maiden Lane, New York, NY 10038.

*Subchapter V Reorganized Debtors' Second Modified First Amended Plan of Reorganization* [D.I. 595, Ex. A] (as amended, modified, or supplemented from time to time, the "Modified Plan").[2]

2.        I am the chief executive officer ("CEO") of the above-captioned reorganized debtors and debtors in possession (collectively, the "Debtors," and following the Confirmed Plan Effective Date, the "Reorganized Debtors").

3.        I am over the age of 18 and am authorized to submit this Declaration on the Debtors' behalf.

4.        I graduated from Syracuse University in 2014 with a B.A. in Hospitality Management.

5.        After graduation, I managed a Magnolia Bakery location from August 2014 to July 2015.

6.        I joined Sticky's in July 2015 as Director of Customer Experience. In that role, my responsibilities included catering logistics, social media (including answering customer reviews), as well as other administrative work. In January 2017, I was promoted to District Manager. I was responsible for managing four locations and became familiar with the payables, receivables, and management process. In January 2019, I was promoted to Director of Operations. My responsibilities were mostly the same as District Manager, but I also managed the opening and staffing of four new locations. In December 2019, I was promoted to Vice President of Operations. My responsibilities were mostly the same as Director of Operations, but I also established training teams, catering teams, and marketing teams.

---

[2]        Capitalized terms used but not defined herein shall have the meaning given to such terms in the Motion or the Modified Plan, as applicable.

7.      In August 2023, I was promoted to Interim CEO, and in April 2024, I officially became the permanent CEO.  In this role, I became familiar with the balance sheet, operating costs, and payables, and I monitored financial records and managed books and records.  I also reported to, and made recommendations to, the board of directors of the Debtors (the "<u>Board</u>").

8.      As the Reorganized Debtors' CEO, I am generally familiar with the Reorganized Debtors' business, day-to-day operations, financial affairs, and books and records.  Except as otherwise indicated, the statements set forth in this Declaration are based upon my personal knowledge of the Reorganized Debtors' operations, information learned from my review of relevant documents, information supplied to me from the Reorganized Debtors' advisors, or my own opinion based on my knowledge, experience, and information concerning the Reorganized Debtors' operations and financial condition.  I am authorized to submit this Declaration on behalf of the Reorganized Debtors.  If called to testify, I could and would testify competently to the matters set forth in this Declaration.

9.      I am familiar with, and took part in, the good faith, arm's-length negotiations that took place between the Reorganized Debtors and Harker Palmer that resulted in the Modified Plan.

10.     As this Declaration is provided in support of confirmation of the Modified Plan, I have reviewed and am generally familiar with the terms and provisions of the Modified Plan and applicable requirements set forth under Bankruptcy Code sections 1190, 1191, and 1129.

## **BACKGROUND**

11.     On April 25, 2024 (the "<u>Petition Date</u>"), the Debtors commenced voluntary cases (these "<u>Cases</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") as debtors defined in Bankruptcy Code section 1182(1) and the Debtors elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code pursuant to the Small Business Debtor Reorganization Act, as amended.

12.     On April 26, 2024, the United States Trustee appointed Natasha Songonuga of Archer & Greiner, P.C. to serve as the Subchapter V trustee (the "Subchapter V Trustee") in these cases pursuant to Bankruptcy Code section 1183(a).  No official committee was appointed in this case.

13.     Additional detail regarding the Reorganized Debtors, their businesses, the events leading to commencement of these Cases, and the facts and circumstances supporting the relief requested herein are set forth in the following filings, each incorporated herein by reference: (a) *Declaration of Jamie Greer in Support of First Day Relief*, sworn to on April 25, 2024 [D.I. 13] (the "First Day Declaration"); the *Brief in Support of Subchapter V Debtors' Modified First Amended Plan of Reorganization* [D.I. 380] (the "Confirmation Brief"); (b) the *Findings of Fact, Conclusions of Law, and Order Confirming Subchapter V Debtors' Modified First Amended Plan of Reorganization* [D.I. 431] (the "Confirmed Plan Confirmation Order"); and (c) the *Declaration of Jamie Greer in Support of Reorganized Debtors' Motion for Entry of an Order (I) Authorizing Reorganized Debtors' Entry Into Proposed Letter of Intent with Harker Palmer Investors LLC; (II) Authorizing Reorganized Debtors and their Professionals to Perform Obligations Thereunder; and (III) Granting Related Relief* [D.I. 571] (the "LOI Declaration").  A true and correct copy of the LOI Declaration is attached hereto as **Exhibit A**.

14.     Each condition precedent to the effectiveness of the Confirmed Plan occurred in accordance with the provisions of the Confirmed Plan, and the Confirmed Plan went effective November 29, 2024 (the "Effective Date").

15.     As described in the *Motion of Reorganized Debtors to Convert the Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [D.I. 481] (the "Motion to Convert"),

filed February 10, 2025, and the LOI Declaration, the Reorganized Debtors were unable to generate sufficient cash to administer these Cases and continue as a going concern.

16.     Following multiple status conferences on the Motion to Convert, the Bankruptcy Court requested that, should any proposed letter of intent be entered into between the Reorganized Debtors and another party in interest, the Reorganized Debtors file such letter of intent with the Court.  Moreover, several parties in interest expressed concern that absent a possible deal being presented by March 31, 2025, they were likely in favor of conversion.

17.     On March 30, 2025, the Reorganized Debtors received the proposed Harker Palmer LOI, which the Reorganized Debtors selected as the highest and best offer available.

18.     On April 3, 2025, the Reorganized Debtors filed the *Reorganized Debtors' Motion for Entry of an Order (I) Authorizing Entry Into Proposed Letter of Intent with Harker Palmer Investors LLC; (II) Authorizing Reorganized Debtors and Their Professionals to Perform Obligations Thereunder; and (III) Granting Related Relief* [D.I. 545] (the "LOI Motion").

19.     On April 30, 2025, the Court entered the *Order (I) Authorizing Entry Into Proposed Letter of Intent with Harker Palmer Investors LLC; (II) Authorizing Reorganized Debtors and Their Professionals to Perform Obligations Thereunder; and (III) Granting Related Relief* [D.I. 585] (the "LOI Order").

20.     Pursuant to the LOI Order, the Reorganized Debtors filed the Motion for authority to modify their Confirmed Plan, approval of the modifications to the Confirmed Plan, and Confirmation of the Modified Plan.

21.     After the Court authorized the Reorganized Debtors to seek confirmation of their Modified Plan, the Reorganized Debtors and the Subchapter V Trustee began working to obtain consensus on a Modified Plan.  While I did not participate in those negotiations, I was kept abreast

of relevant developments by the Subchapter V Trustee and understood that the negotiations, if successful, would significantly benefit the Reorganized Debtors' bankruptcy estates and improve the percentage distributions to be made to other Holders of Administrative Expense Claims.

22.     After the proposed Modified Plan was filed, the Reorganized Debtors and the Subchapter V Trustee negotiated significant reductions of the administrative rejection damage claims held by various creditors, including (a) the landlords whose leases were previously assumed and either have been rejected or will be rejected in connection with the Modified Plan (the "Landlords") and (b) U.S. Foods Holding Corp. ("US Foods"), whose pre-Effective Date Administrative Expense Claims had previously been settled pursuant to the Confirmed Plan.

## **PROPOSED MODIFICATIONS TO CONFIRMED PLAN**

23.     The Modified Plan includes the following material modifications to the Confirmed Plan, without limitation:

a.     The Purchased Assets will be sold to the Purchaser Free and Clear.

b.     The Purchase Price will be used to fund the Modified Plan, including to establish an Administrative Expense Claims Reserve and an Allowed General Unsecured Claims Reserve.

c.     The Administrative Expense Claims Reserve shall fund the costs and expenses of administering the Administrative Expense Claims Reserve and Pro Rata payments to Allowed Administrative Expenses Claims, including those on account of Unpaid Ordinary Course Expenses, Post-Confirmation Unpaid and Allowed Professional Fees and Expenses, Professional Fees as of the Confirmed Plan Effective Date, Administrative Tax Claims, the U.S. Foods Settlement, Cure Claims, and Lease Rejection Administrative Claims, to the extent such Claims are Allowed.

d.     The General Unsecured Claims Reserve shall fund the costs and expenses of administering the General Unsecured Claims Reserve and Pro Rata payments to each holder of an Allowed General Unsecured Claim.

e.     With respect to Allowed Secured Claims: (1) the SBA's Secured Claim will be assumed by the Purchaser and paid in accordance with the terms of the EIDL Loans; (2) each holder of Other Secured Claims shall receive in satisfaction of such Claim the collateral securing such Claim, and any remaining Allowed Claim shall be paid Pro Rata from the General Unsecured Claims Reserve.

f.    The Reorganized Debtors will surrender all furniture, fixtures, and equipment subject to a lien in favor of the lessor of a furniture, fixtures, and equipment lease to such lessor (to the extent not earlier surrendered) and in the absence thereof, to the applicable landlord.

g.    The Reorganized Debtors other than Reorganized Sticky's will be dissolved, and Reorganized Sticky's will continue to exist for the purpose of implementing the Modified Plan.

## **MODIFICATION OF THE CONFIRMED PLAN IS APPROPRIATE**

24.    I believe that the Reorganized Debtors have met the standard to modify a confirmed plan because: (a) exigent financial circumstances warrant permitting the modifications in light of what I understand is a key policy goal of Subchapter V—providing a small business debtor an expedited reorganization process; (b) recoveries under the Confirmed Plan were not guaranteed, but were uncertain and dependent upon the Reorganized Debtors' operating performance; (c) the modifications benefit all creditors and either do not adversely affect their treatment or provide a better recovery than they would receive if these cases were converted to chapter 7—the only other option under the circumstances; (d) the Modified Plan is not required to comply with section 1129(a)(9) of the Bankruptcy Code, but even if it is required to comply with this section, all Holders of Administrative Expense Claims have either: (1) expressly consented to the treatment and partial payment of their Administrative Expense Claims; or (2) are deemed to consent to such treatment by failing to object to the Modified Plan; and (e) the proposed sale of the Purchased Assets to the Purchaser with the funding provided pursuant thereto requiring the modifications to the Confirmed Plan is the only value-maximizing transaction available to the Reorganized Debtors under the circumstances.

25.    My understanding is that following or in connection with the filing of the Motion, the Reorganized Debtors filed and served their *Notice of Hearing on (X)(A) Reorganized Debtors' Motion for Entry of an Order (I) Authorizing the Reorganized Debtors to Modify, and*

*Approving Modifications to, the Confirmed Plan of Reorganization, (II) Confirming the Subchapter V Reorganized Debtors' Second Modified First Amended Plan of Reorganization, and (III) Granting Related Relief; and (B) Confirmation Hearing on the Subchapter V Debtors' Second Modified First Amended Plan of Reorganization; and (Y) Notice of: (I) Objection Deadlines with Respect to the Plan Modification Motion and the Confirmation of the Modified Plan and (II) Other Deadlines Related to Confirmation of the Modified Plan* (the "Notice") [D.I. 600], which notified creditors and other parties' in interest, including Holders of Administrative Expense Claims, of the relief sought in the Motion.  Based on discussions with our counsel, I understand that no objection was filed by any Holders of Administrative Expense Claims regarding the relief sought in the Motion and the Modified Plan and I have not received any informal objections from the Holders of Administrative Expense Claims of the proposed *pro rata* treatment of their claims or any other relief sought in the Motion and the Modified Plan, and understand from professionals, such as our counsel and the Subchapter V Trustee, that they support and agree with the treatment proposed in the Plan.

26.    The resolutions reached by the Subchapter V Trustee not only result in the consent to the Modified Plan by the Holders of Administrative Expense Claims holding both millions of dollars and the vast majority of the Holders of Administrative Expense Claims, they greatly improve the percentage distributions to be made under the Modified Plan to other Holders of Administrative Expense Claims (*i.e.*, administrative claimants other than the Landlords and US Foods).

27.    Specifically, as shown in the reserves funding chart attached hereto as **Exhibit B** (the "Reserves Funding Chart"), of the $2,000,000 purchase price to be paid by Harker Palmer, $1,189,160 will be used to create an Administrative Expense Claims reserve (the "Administrative

Claims Reserve") and after deducting an estimated $80,000 of projected claims processing costs[3], approximately, $1,109,160 will be available to be used for distributions to Holders of Administrative Expense Claims.

28.    Absent the resolutions reached by the Subchapter V Trustee and the Landlords, I estimate that between pre-Effective Date Administrative Expense Claims, post-Effective Date Administrative Expense Claims and Landlord rejection damage claims, the amount of Administrative Expense Claims asserted against the Reorganized Debtors would be approximately $6,845,358.96 as set forth in **Exhibit C** hereto. Critically, this amount includes approximately $4,424,975 in Administrative Expense Claims of the Landlords who would hold pre-rejection Administrative Expense Claims and also post-rejection Administrative Expense Claims calculated under two-year rejection damage cap set forth in section 503(b)(7) of the Bankruptcy Code, as more fully set forth in **Exhibit D** hereto. In addition, this amount includes $860,294.88 that would otherwise be owed to US Foods, of which $363,056 was owed to US Foods pursuant to its settlement under the Confirmed Plan along with another $497,238.88 which was owed as a result of post-Effective Date goods and services provided to the Reorganized Debtors by US Foods. Excluding the (pre and post-Effective Date) claims of Landlords and US Foods, this amount also includes approximately $72,828 of pre-Effective Date cure and non-professional Administrative Expense Claims as well approximately $230,405.88 of post-Effective Date Administrative Expense Claims.

29.    The resolutions achieved greatly reduce the Administrative Expense Claims being asserted by Landlords and US Foods. As more fully set forth in **Exhibit E,** the revised Landlord

---

[3]    These processing costs have been estimated in an abundance of caution. The Reorganized Debtors hope and expect the amount necessary to resolve these claims is substantially lower than this amount, which will further enhance recoveries for Holders of Administrative Expense Claims.

Administrative Expense Claims pursuant to these consensual concessions have now been reduced to $1,404,727.77, **an estimated reduction of approximately $3,020,247.23**, or stated differently, **it is estimated that the Landlords have reduced their claims to less than 32 percent of their original claims amount**. With these concessions, the Landlords' administrative rejection damage claims, which could have added up to *two years* of administration Administrative Expense Claims, were limited to no more than *six months* (together with damages existing as of the rejection date).

30.    Likewise, US Foods has reduced its Administrative Expense Claims from approximately $ 860,294.88, to $600,000, **a reduction of approximately $260,294.88 a reduction to approximately 70 percent of its original claim amount**.

31.    On the whole, the consensual resolutions reached would result in a reduction of Administrative Expense Claims by a total of approximately $3,280,542.11.

32.    As a result, absent the concessions agreed to by the Landlords, I estimate a distribution of approximately 16.2 percent to administrative claimants ($1,109,060 divided by $6,845,358.96), whereas, with the projected concessions, I estimate a distribution of approximately 31.1 percent to administrative claimants ($1,109,060 divided by $3,564,816.85 (*i.e.*, $6,845,358.96 minus $3,280,542.11)).

33.    These concessions were especially important because, without a voluntary reduction in rejection damage claims, I understand that the Landlords' lease rejection damage Administrative Expense Claims would have flooded the Administrative Expense Claims pool.

34.    Here, I believe permitting modifications of the Confirmed Plan will provide the Reorganized Debtors an accelerated path to finalizing their reorganization and emergence from bankruptcy, consistent with what I understand are the key objectives of Subchapter V.  In contrast

to having to wait three (3) years for payments under the Confirmed Plan (which now is not even possible), the funding to be provided through the sale of the Purchased Assets to the Purchaser will allow the Reorganized Debtors to complete their reorganization process, minimize further administrative costs, and allow creditors to receive payments earlier than anticipated in the Confirmed Plan. I believe that none of this would likely be achieved if these Cases are converted to chapter 7. Indeed, I believe conversion of these Cases to chapter 7 would likely result in a materially worse outcome for stakeholders. Given that: (a) the primary Subchapter V goals are expediency, benefit to the estates and creditors, and reorganization; (b) entering into the LOI was a sound exercise in the Reorganized Debtors' business judgment as found by the Bankruptcy Court in entering the LOI Order; and (c) the exigent facts and circumstances warrant modifying the Confirmed Plan, the Reorganized Debtors should be authorized to modify the Confirmed Plan as set forth in the Modified Plan, and such modifications should be approved.

## THE MODIFIED PLAN SHOULD BE CONFIRMED

35.    I understand that the Confirmed Plan satisfied the disclosure requirements of section 1190. Confirmation Brief ¶¶ 30–31; Confirmed Plan Confirmation Order ¶ S. These disclosures have been supplemented in the Modified Plan, *see* Modified Plan Art. 1.10, *see also* LOI Declaration ¶¶ 9–33. These supplemental disclosures describe the events that have transpired since the confirmation of the Confirmed Plan, the adverse financial circumstances the Reorganized Debtors have suffered, the Reorganized Debtors' efforts to identify an alternative transaction, and the circumstances surrounding the Reorganized Debtors' entry into the Harker Palmer LOI, and the Court approving the Reorganized Debtors' entry into the Harker Palmer LOI. Accordingly, the I believe that the Modified Plan satisfies the disclosure requirements of section 1190.

## THE MODIFIED PLAN SATISFIES
## THE APPLICABLE BANKRUPTCY CODE REQUIREMENTS

**A.     Sections 1129(a)(1) and (2).**

36.   Sections 1129(a)(1) and (2) require that the Reorganized Debtors and the Modified Plan comply with the applicable requirements of the Bankruptcy Code, including sections 1122 and 1123.  I understand that the Confirmed Plan complied with such requirements. Confirmation Brief ¶¶ 36–37, Confirmed Plan Findings ¶¶ K & I.  As the Modified Plan follows the structure of the Confirmed Plan, I believe that it, too, complies with sections 1129(a)(1) and (2) as detailed below.

**B.     Section 1122.**

37.   The Modified Plan, like the Confirmed Plan, in accordance with section 1122, specifies four (4) separate classes of claims and interests, with each class containing substantially similar claims or interests as required by section 1122 – Small Business Administration's Secured Claim (Class 1), Other Secured Claims (Class 2), General Unsecured Claims (Class 3), and Equity Interests (Class 4).  Modified Plan Art. 3.2.  Each of the four classes are dissimilar and, therefore, are properly classified separately under the Modified Plan.  *Id.*; Confirmation Brief ¶¶ 38–39; Confirmed Plan Confirmation Order ¶ K.  Based upon the foregoing, I believe that the Modified Plan complies with the provisions of section 1122.

**C.     Section 1123**

38.   **Section 1123(a)(1).**  As with the Confirmed Plan, the Modified Plan, as I understand is required by section 1123(a)(1), expressly classifies all claims and interests against the Reorganized Debtors, other than Administrative Expense Claims and Priority Tax Claims, which are unclassified under the Modified Plan.  Modified Plan Art. 2.1; Confirmation Brief ¶

41; Confirmed Plan Confirmation Order ¶ K. Based upon the foregoing, I believe that the Modified Plan complies with section 1123(a)(1).

39. **Section 1123(a)(2).** As with the Confirmed Plan, the Modified Plan in Article 2, as I understand is required by section 1123(a)(2), identifies Small Business Administration's Secured Claim (Class 1), Other Secured Claims (Class 2), and Equity Interests (Class 4) as unimpaired. Modified Plan Art. 2.1; Confirmation Brief ¶ 42; Confirmed Plan Confirmation Order ¶ K. Based upon the foregoing, I believe that Modified Plan complies with section 1123(a)(2).

40. **Section 1123(a)(3).** As with the Confirmed Plan, the Modified Plan in Article 2, as I understand is required by section 1123(a)(3), specifies the treatment of General Unsecured Claims (Class 3), the impaired class under the Modified Plan. Modified Plan Art. 2.2; Confirmation Brief ¶ 43; Confirmed Plan Confirmation Order ¶ K. Based upon the foregoing, I believe that the Modified Plan complies with section 1123(a)(3).

41. **Section 1123(a)(4).** As with the Confirmed Plan, Article 2 of the Modified Plan provides that each claim or interest that is classified in a particular Class under the Modified Plan will receive the same treatment as other claims and interest included in such Class, as I understand is required by section 1123(a)(4). Modified Plan Art. 2.1;Confirmation Brief ¶ 44; Confirmed Plan Confirmation Order ¶ K. Based upon the foregoing, I believe that Modified Plan complies with section 1123(a)(4).

42. **Section 1123(a)(5).** As with the Confirmed Plan, Article 2 of the Modified Plan in Article 2 provides for adequate means of implementation of the Modified Plan, including: (i) the sale of the Purchased Assets to the Purchaser Free and Clear, (ii) the funding of the Reserves; (iii) the rejection of Executory Contracts; (iv) deadlines for filing proofs of claim;

(v) the dissolution of the Reorganized Debtors other than Reorganized Sticky's; and (vi) the management of Reorganized Sticky's, as I understand is required by section 1123(a)(5). Modified Plan Art. 2.5; Confirmation Brief ¶ 45; Confirmed Plan Confirmation Order ¶ M. Based upon the foregoing, I believe that Modified Plan complies with section 1123(a)(5).

43. **Section 1123(a)(6).** Section 1123(a)(6) prohibits the issuance of non-voting equity securities and requires the reorganized debtors' charters to so provide. The Modified Plan, like the Confirmed Plan, does not provide for issuance of non-voting equity securities and, as such, I believe that Modified Plan complies with section 1123(a)(6).

44. **Section 1123(a)(7).** As with the Confirmed Plan, Holders of Equity Interests will maintain their existing Equity Interests as they existed on the Petition Date and applicable non-bankruptcy law and the Modified Plan, like the Confirmed Plan, specifies the Reorganized Debtors' post-confirmation management. Modified Plan Art. 2.2 & 2.5.5; Confirmation Brief ¶ 47; Confirmed Plan Confirmation Order ¶ T. Based upon the foregoing, I believe that Modified Plan complies with section 1123(a)(6).

45. **Section 1123(a)(8).** I understand that this section is inapplicable as it only applies to individuals and the Reorganized Debtors are not individuals. Confirmation Brief ¶ 48.

46. **Section 1123(b).** I understand that section 1123(b) permits the Modified Plan to include various enumerated provisions, and "any other appropriate provision not inconsistent with the applicable provisions of this title." Section 1123(b). I believe that the Modified Plan, like the Confirmed Plan, complies with section 1123(b). Confirmation Brief ¶ 56–77; Confirmed Plan Confirmation Order ¶¶ O–P, 6, 7, & 12.

**D.      Section 1123(b)(1) - Discretion to Impair or Leave Unimpaired Claims and Equity Interests**

47.    The Modified Plan specifies Classes of Claims and Equity Interests that are either impaired or unimpaired in satisfaction of section 1123(b)(1).

**E.      Section 1123(b)(2) – Executory Contracts**

48.    Article 2.4 of the Modified Plan provides for the assumption and rejection of Executory Contracts in satisfaction of section 1123(b)(2).

49.    The Modified Plan generally provides for rejection of previously assumed executory contracts.    However, the Reorganized Debtors are not rejecting the separation agreement between the Debtors and Paul Abrahamian (the "Separation Agreement").    For the avoidance of doubt, the treatment of the Separation Agreement as an Assumed Contract under the Modified Plan is the same as under the Confirmed Plan.    Assumption of the Separation Agreement was approved pursuant to the Confirmed Plan Confirmation Order, which was not appealed and has become a Final Order.

**F.      Section 1123(b)(3) – Settlement and Retention of Estate Claims**

50.    Article 3 of the Modified Plan incorporates the settlement with U.S. Foods previously approved, Confirmed Plan Art. 3; Confirmation Brief  ¶¶ 125–34; Confirmed Plan Confirmation Order ¶ 21, and preserves the Estates' claims, Causes of Action, and Avoidance Actions.

**G.      Section 1123(b)(4) – Sale of Assets**

51.    Article 2.5 of the Modified Plan implements the Harker Palmer LOI and provides for the sale, Free and Clear, of the Purchased Assets to the Purchaser for the Purchase Price.  As described and established by the HP LOI Approval Motion, the LOI Order, and the LOI Declaration:

- As of the end of January 2025, the Reorganized Debtors could no longer operate and implement the Confirmed Plan.

- As a result of the financial circumstances plaguing the Reorganized Debtors, they were forced to cease operations and file the Motion to Convert.

- Despite the adverse circumstances that befell the Reorganized Debtors, the Reorganized Debtors engaged in substantial efforts to identify and develop an alternative value-maximizing transaction.

- During the months of February, March and April 2025, the Reorganized Debtors engaged in negotiations with various parties.

- As a result of the Reorganized Debtors' efforts, in the exercise of their fiduciary duties, and in the reasoned and deliberated application of their business judgment, the Reorganized Debtors entered into, and obtained Court approval to enter into, the Harker Palmer LOI.  LOI Order.

- The negotiations with Harker Palmer regarding the Harker Palmer LOI and the Modified Plan were at arm's length, fair and reasonable, not collusive, and in good faith.  LOI Order.  Harker Palmer has supported the Reorganized Debtors' restructuring, holds Equity Interests in the Reorganized Debtors, and its controlling owner (who is a member of the Board) recused himself from the Board deliberations regarding the Harker Palmer LOI.  LOI Declaration ¶ 26; LOI Order.

- The Purchase Price for the Purchased Assets is fair consideration, is the only transaction available to the Reorganized Debtors following efforts to identify an alternative transaction, is value maximizing, and is in the best interest of the estates.

- The sale of the Purchased Assets to Harker Palmer, Free and Clear, the inclusion of Harker Palmer as an Exculpated Party, and the other terms and conditions of the Harker Palmer LOI as incorporated into the Modified Plan were negotiated in good faith, at arms' length, and are reasonable, fair and necessary provisions to induce Harker Palmer to consummate the sale of the Purchased Assets.  Without the consummation of the sale of the Purchased Assets, the Cases would convert to chapter 7 cases.  *Id.*

## H.    Section 1123(b)(5) – Other Provisions

### i.    Reorganized Debtors' Releases and Consensual Third-Party Releases

52.    The Confirmed Plan included releases by the Debtors and consensual third-party releases, which were approved. Confirmed Plan Art. 7.9 & 7.10; Confirmation Brief ¶¶ 49–67;

Confirmed Plan Confirmation Order ¶¶ O & 6.   The Modified Plan incorporates these same releases.  Modified Plan Art. 7.9 & 7.10.  As the Confirmed Plan contemplated deferred payments over time, the releases in the Confirmed Plan were contingent upon the distributions being completed.  *Id.*  In contrast, under the Modified Plan, the funding of the Modified Plan will be completed on the Modified Plan Effective Date, with Distributions to be made on, or as soon as practicable after, the Modified Plan Effective Date.  On the Modified Plan Effective Date, the funding of the Reserves will be made into a trust account to be used for the intended purposes. Accordingly, I understand that the releases in the Modified Plan are effective upon the Modified Plan Effective Date.  Based upon the foregoing, I believe that release provisions continue to be integral to the Debtors' reorganization, are a condition of the Harker Palmer LOI, and are reasonable, appropriate, tailored provisions in the best interests of these estates.  Accordingly, I believe that the release provisions comply with section 1123(b).

> ii.   Exculpation

53.   The Confirmed Plan included an exculpation provision that was approved. Confirmed Plan Art. 7.11; Confirmation Brief ¶¶ 68–77; Confirmed Plan Confirmation Order ¶¶ O & 6 .  The Modified Plan incorporates the same provision, with the addition of the Purchaser as an Exculpated Party.  Modified Plan at Definitions – Exculpated Party.  The Purchaser's inclusion as an Exculpated Party is a condition of the Harker Palmer LOI.  I believe the inclusion of the Purchaser as an Exculpated Party is also fair, reasonable and in the best interest of the estates, as described in the Modified Plan.  Modified Plan Art. 1.10.4.  The Purchaser has provided substantial support to the Reorganized Debtors, holds Equity Interests in the Reorganized Debtors, is providing the funding through the Purchase Price to fund the Modified Plan and avoid a conversion to chapter 7, and its controlling owner is a member of the Board but recused himself from the Board decisions regarding the Harker Palmer LOI and the Modified

Plan. For these reasons, and as I understand is customary with sponsors of a plan of reorganization, it is fair and appropriate, and consistent with section 1125(e), to include the Purchaser as an Exculpated Party. Based upon the foregoing, I believe that the exculpation provision continues to be integral to the Debtors' reorganization, is a condition of the Harker Palmer LOI, and is a reasonable, appropriate, tailored provision in the best interests of these estates. Accordingly, I believe that the exculpation provision complies with section 1123(b).

iii.    Post-Modified Plan Effective Date Operations and Management

54.    As provided for in Article 2.5.3 of the Modified Plan, from and after the Modified Plan Effective Date, Reorganized Sticky's will create the Reserves and implement the Modified Plan. The Reorganized Debtors, other than Reorganized Sticky's, will be dissolved upon occurrence of the Modified Plan Effective Date.

55.    As of the Modified Plan Effective Date, the Board will be comprised of myself, James Hart, and Bradley Scher, and management will be comprised of myself as CEO and Meredith Saucci as Vice President of Finance & Administration. Mr. Scher, who will be employed through Ocean Ridge Capital Advisors LLC, will act as Winddown-Officer to implement the Modified Plan. All other Directors shall be deemed to have resigned immediately prior to the Modified Plan Effective Date.

56.    **Section 1129(a)(3)**. As with the Confirmed Plan, the Modified Plan is proposed in good faith. Confirmation Brief ¶¶ 78–79; Confirmed Plan Confirmation Order ¶ T. Specifically, as with the Confirmed Plan, the Modified Plan is the product of arms-length negotiation with Holders of Claims and Equity Interests, the Subchapter V Trustee, and the U.S. Trustee. In addition, the Board engaged in a months-long process to avoid conversion to chapter 7 by identifying and pursuing a value-maximizing transaction. The Harker Palmer LOI, which forms the basis of the Modified Plan, was negotiated at arms-length, in good faith, and provides

18

a value-maximizing transaction for the Reorganized Debtors and the estates.  Thus, I believe that

there is substantial support for a finding that the Modified Plan has been proposed in good faith

and not by any means forbidden by law.  Based upon the foregoing, I believe that the Modified

Plan complies with section 1129(a)(3).

57.   **Section 1129(a)(4)**.  In compliance with section 1129(a)(4), the Confirmed Plan

required that each estate professional to serve and file a properly noticed fee application.  Each

Professional did so and the Bankruptcy Court entered orders approving such Professional Fee

Claims.  Under the Confirmed Plan, the Reorganized Debtors' Professional Fee Claims are not

subject to further approval of the Bankruptcy Court, but they are subject to the approval of the

Reorganized Debtors.  Under the Modified Plan, Reorganized Debtors' Professional Fee Claims

will continue to be subject to the approval of the Reorganized Debtors to the extent that they are

incurred during the period since the Effective Date of the Confirmed Plan and are in excess of

the amounts allocated therefor as part of the Deposits paid by Harker Palmer pursuant to the

Harker Palmer LOI.   To the extent that the Reorganized Debtors Professional Fee Claims

accruing after the Confirmed Plan Effective Date exceed the Deposits, and are approved by the

Reorganized Debtors, the Modified Plan provides that they will be Allowed Administrative

Expense Claims that will share Pro Rata from the Allowed Administrative Expense Reserve.

Modified Plan Art. 2.1(a).  Accordingly, I believe that the Modified Plan complies with section

1129(a)(4).

58.   **Section 1129(a)(5).**  Article 2 of the Modified Plan, as with the Confirmed Plan,

describes the Reorganized Debtors' post-confirmation management.  Confirmed Plan Art. 2.7;

Modified Plan ¶ 2.5.5.   Accordingly, I believe that the Modified Plan complies with section

1129(a)(5).

59. **Section 1129(a)(6).** I understand that this section is inapplicable as the Reorganized Debtors are not subject to rate regulations.

60. **Section 1129(a)(7).** The "best interest of creditors test" was satisfied with respect to the Confirmed Plan. Confirmation Brief ¶¶ 87–88; Confirmed Plan Confirmation Order ¶ T. The Reorganized Debtors cannot implement the Confirmed Plan, have ceased operations, and have determined that the sale of the Purchased Assets to the Purchaser, and the corresponding modifications to the Confirmed Plan, presents the best (and only) available value-maximizing transaction. In the absence of confirmation of the Modified Plan, I believe that these Chapter 11 Cases would convert to chapter 7. Under these circumstances, and with the Reserves being funded in amounts that are the same as the aggregate total consideration that the Confirmed Plan proposed to pay to Holders of Allowed Administrative Expense Claims and Allowed General Unsecured Claims, the Modified Plan similarly satisfies the "best interest of creditors test". Accordingly, I believe that the Modified Plan complies with section 1129(a)(7).

61. **Section 1129(a)(8).** The Confirmed Plan was not confirmed pursuant to Bankruptcy Code section 1129(b), which I understand is inapplicable under Bankruptcy Code section 1181(a). I understand that pursuant to section 1191(b) of the Bankruptcy Code, the Modified Plan need not comply with section 1129(a)(8). Confirmation Brief ¶¶ 89–90; Confirmed Plan Confirmation Order ¶ T. I understand that confirmation of the Modified Plan is being sought pursuant to section 1129(b), rendering section 1129(a)(8) inapplicable.

62. **Section 1129(a)(9).** The Reorganized Debtors are not subject to claims under sections 507(a)(1), (4), (5), (6) or (7). The allowed priority tax claims under the Confirmed Plan were paid and there are no current priority tax claims. *Id.* There are, however, outstanding section 50(7)(a)(2) Administrative Expense Claims.

63.    Based on the facts and circumstances set forth above, even if the standard set forth in section 1129(a)(9)(A) applies to claims under section 507(a)(2), as explained above, I believe that the Holders of Administrative Expense Claims should be deemed to have consented to their *pro rata* treatment under the Modified Plan as claimants holding many of the largest Administrative Expense Claims – the Landlords and US Foods, have expressly consented to the reduction and *pro rata* payment on their claims, other professionals (including our counsel) have consented to this treatment and none of the other Holders of Administrative Expense Claims have objected to the Modified Plan.

64.    Furthermore, it is my understanding that consent of the holder of a Holder of an Administrative Expense Claim to a payment of less than the allowed amount of its claim is nonetheless permitted in connection with a Subchapter V plan to ensure that it complies with the tests set forth in sections 1191(b) (no unfair discrimination and fair and equitable) and 1191(e) of the Bankruptcy Code.

65.    Accordingly, I believe that the Modified Plan satisfies the requirements of section 1129(a)(9).    Therefore, I believe that the Modified Plan complies with the "no unfair discrimination" and "fair and equitable" tests.

66.    **Section 1129(a)(10).**  I understand that the Confirmed Plan was not confirmed pursuant to section 1129(b), which is inapplicable under section 1181(a).  I understand that pursuant to section 1191(b) of the Bankruptcy Code, the Modified Plan need not comply with section 1129(a)(10).    Confirmation Brief ¶ 97.; Confirmed Plan Confirmation Order ¶ T. Similarly, confirmation of the Modified Plan is not being sought pursuant to section 1129(b), rendering section 1129(a)(10) inapplicable.

67.    **Section 1129(a)(11).**  The Confirmed Plan contemplated the Reorganized Debtors continuing to operate, and the Court found that the Confirmed Plan met the requirements of section 1129(a)(11).   Confirmation Brief ¶¶ 98–105; Confirmed Plan Confirmation Order ¶ T. Under the Modified Plan, the Reorganized Debtors (other than Reorganized Sticky's) will be dissolved upon occurrence of the Modified Plan Effective Date.   Modified Plan Art. 2.5.4; 11 U.S.C. § 1129(a)(11) ("unless such liquidation or reorganization is proposed in the plan").   In contrast, Reorganized Sticky's will continue in existence for the purpose of implementing the Modified Plan.  Accordingly, I believe that the Modified Plan satisfies the requirements of section 1129(a)(11).

68.    **Section 1129(a)(12).**  I understand that because these Chapter 11 Cases are proceeding under Subchapter V of the Bankruptcy Code, section 1129(a)(12) is inapplicable. Confirmation Brief ¶ 106; Confirmed Plan Confirmation Order ¶ T.

69.    **Section 1129(a)(13).**  The Reorganized Debtors do not have any present obligations to pay retiree benefits within the meaning of section 1129(a)(13).   Accordingly, I understand that this section of the Bankruptcy Code is inapplicable.

70.    **Section 1129(a)(14).**  The Reorganized Debtors are not individuals and do not have domestic support obligations to pay retiree benefits within the meaning of section 1129(a)(14).  Accordingly, I understand that this section of the Bankruptcy Code is inapplicable.

71.    **Section 1129(a)(15).**  I understand that pursuant to section 1181(a), section 1129(a)(15) is inapplicable in these Cases.  Further, I understand that section 1191(a) provides that a plan that is confirmed under section 1191(b), need not comply with section 1129(a)(15). Accordingly, I understand that this section of the Bankruptcy Code is inapplicable.

72.   **No Unfair Discrimination and Fair and Equitable – 1191(c)–(e).**  I understand

that to confirm the Modified Plan pursuant to section 1191(b), that section requires no unfair

discrimination and fair and equitable treatment under the Modified Plan.  I understand that the

Bankruptcy Code incorporates this same test in connection with the "Special Rule" set forth in

section 1191(e) with respect to Administrative Expense Claims.

73.   Under the Modified Plan, the proposed treatment of Administrative Expense

Claims, Secured Claims, and General Unsecured Claims follows the Confirmed Plan both as to

the amount to be distributed.  While the Modified Plan modifies certain aspects of the Confirmed

Plan in order to reflect changed circumstances and implement the Harker Palmer LOI, these

changes do not alter the fundamental structure of the treatment of Holders of Claims and Interests,

albeit Administrative Expense Claims will be paid *pro rata* from available funding and not in

full over an extended and uncertain future period (which has turned out to be impossible).  Under

the Modified Plan, Holders of Administrative Expense Claims and Holders of General Unsecured

Claims each will have the benefit of a dedicated Reserve that is similarly structured, and both are

allocated value to their respective Reserves that for each aggregates the projected amounts that

were to be paid (over time) under the Confirmed Plan.  Importantly, the Confirmed Plan did not

guaranty full payment; it was dependent upon future performance of the Reorganized Debtors.

At this point, the Confirmed Plan cannot be implemented.  In contrast, the Modified Plan provides

for immediate funding into the Reserves on the Modified Plan Effective Date from the Purchase

Price being paid by the Purchaser for the Purchased Assets.  While it is true that the aggregate

amount of Administrative Expense Claims and General Unsecured Claims are now larger

because the Confirmed Plan cannot be implemented, and thus percentage recoveries will be lower

than what was projected (but not guaranteed) under the Confirmed Plan, this outcome is the result

of uncontrollable circumstances and not any discrimination that falls within the meaning of "unfair discrimination."  The Modified Plan's certainty of funding and identified proceeds to fund distributions to holders of Allowed Claims is a marked improvement over the uncertainty of payment in a chapter 7 conversion.

74.    In addition, the SBA continues to receive the benefit of its bargain as the EIDL Loans will be assumed by the Purchaser.  Further, the Modified Plan provides for the Landlords to regain possession of their properties on an expedited basis, and allows equipment lessors to recover their collateral (in each case, to the extent, if at all, that has been done sooner).

75.    Since the Motion was filed, the Subchapter V Trustee and the Reorganized Debtors have diligently worked to settle the Landlords' lease rejection Administrative Expense Claims.  As described above, all of the Reorganized Debtors' Landlords, whose leases are being rejected after they were previously assumed under the Confirmed Plan, have agreed to settlements of their Administrative Expense Claims.

76.    Based upon the foregoing, I believe that the Modified Plan satisfies the "no unfair discrimination" requirement.

77.    **Fair and Equitable.**  I understand that the fair and equitable rule in a Subchapter V case is not the absolute priority rule that applies in a chapter 11 case.

78.    With the Free and Clear sale of the Purchased Assets to the Purchaser, the projected value of the estates is maximized and realized immediately, without deferral and uncertainty—and in lieu of conversion to cases under chapter 7.  Under the Modified Plan, all of the value from the Purchase Price is available to the Reorganized Debtors for the benefit of creditors.  And, while I believe that "consent" from the Holders of Administrative Expense Claims for less that the full amount of their Administrative Expense Claims has been obtained

here consistent with section 1129(a)(9), I further believe that value is fairly and equitably allocated under the Modified Plan in a manner that is consistent with the non-guaranteed expectations as to the value available under the Confirmed Plan.  Accordingly, I believe that the Modified Plan is fair and equitable.

79.   Therefore, just as was the case with the Confirmed Plan, I believe that the Modified Plan meets all applicable requirements for confirmation under section 1191(b) and should therefore be confirmed.

*[Remainder of page left blank intentionally]*

## **<u>CONCLUSION</u>**

80.    Based on the foregoing, I believe that the Modified Plan satisfies the requirements of the Bankruptcy Code and the Bankruptcy Rules and should be confirmed.

Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 5, 2025

*/s/ Jamie Greer*
   Name:  Jamie Greer